**DECLARATION**

## DECLARATION OF STEVEN HIRSCH

I, Steven Hirsch, declare and state as follows:

1.      I am the co-founder and co-Chairman of Vivid Entertainment Group ("Vivid"), a Plaintiff in this action.  I offer this Declaration in support of the Plaintiffs' Motion for Preliminary Injunction against the enforcement of The County of Los Angeles Safer Sex in the Adult Film Industry Act ("Measure B").  I have personal knowledge of the facts stated herein.

2.      I have been employed in the adult entertainment industry for my entire career.  My entry to the adult film industry was working in the warehouse of a distribution firm that my father owned.  I later became national sales manager for Cal Vista, one of the largest distributors of adult videos in the industry.  In 1984 I founded and now co-own Vivid with David James and Bill Asher.  Since that time, I have guided Vivid as a leading provider of adult entertainment and as a pioneer in high-quality entertainment, astute marketing, and technological currency.

3.      At Vivid, I developed a system in which top adult actresses are signed to exclusive contracts, much like stars during the Hollywood film studio era.  I also oversaw the creation of glamorous, upscale packaging of the adult videos that allowed them to be sold in mainstream stores for the first time.  The faces of "Vivid Girls" have appeared on billboards in high traffic venues such as Sunset Boulevard and Times Square.

4.      As part of my stewardship of Vivid, I led the company in devising a strategy to move beyond production of videos and DVDs into marketing in virtually all distribution channels, from mainstream retail stores, to Internet and broadband video-on-demand (VOD), to building Vivid TV, to name but a few.  I helped make Vivid a household name through licensing ranging from publishing and condoms, to Vivid Vodka, and now licensing the Vivid name to gentlemen's clubs starting with venues in Charlotte, North Carolina, Los Angeles, and New York City.  These, along with many other products, are cross-promoted with Vivid's DVDs, VOD offerings, and Internet sites.

5.      Vivid also brought adult film into the mainstream through image-building programs such as multiple series on Showtime, frequent appearances on popular television and online news reports such as The Huffington Post and TMZ, as well as being featured in articles in

1

The New York Times, The Economist, Forbes and other leading outlets. Vivid also made a deal with Harper Collins to publish the best-selling book *How to Have a XXX Sex Life: The Ultimate Vivid Guide*, co-authored by the Vivid Girls.

6.     Vivid has always placed heavy emphasis on high quality erotic film entertainment. Early on, Vivid sought to differentiate itself by developing movies that could be enjoyed by couples, and by emphasizing high production values and well-written scripts and plotlines, all wrapped in unequaled sensuality. Today, Vivid has more AVN Awards – the "Oscars" of the adult film industry – than any other studio, as well as the industry's largest archive of movies made by a single studio.

7.     During its nearly 30 year history, Vivid has shot approximately 95 percent of its adult films in Los Angeles County. Over that time, Vivid has engaged the services of hundreds of adult film performers and thousands of other employees in Los Angeles County in the production, advertising, distribution and sale of its adult films, apparel, books, and other products. Vivid has shot adult films in hundreds of locations in Los Angeles County.

8.     Vivid, and the adult film industry in general, is keenly aware of potential health risks to performers from exposure to blood borne pathogens, HIV, and other sexually transmitted diseases ("STDs"), and has a long history of taking steps to address these risks.

9.     While the public was first becoming aware of diseases like HIV/AIDS and hepatitis, the adult film industry made information available to those working in the industry by describing the diseases, how they were transmitted, and ways to prevent exposure.

10.     Since the mid- to late-1990s, Vivid, along with all leading producers of adult films, implemented strict requirements for each production to protect models and performers, and to prevent the spread of HIV and other STDs. Vivid joined with other members of the adult film industry to help fund the Adult Industry Medical Health Care Foundation ("AIM"), as a testing and screening facility, and Vivid contributed financially to AIM's ongoing efforts. AIM provided HIV and STD testing and treatment, as well as counseling services and support group programs, to individuals who work in the adult film industry, as well as to the general public.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST. SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800

11.     More recently, Free Speech Coalition, the trade association of the adult entertainment industry to which Vivid belongs, helped establish Adult Production Health & Safety Services ("APHSS").  APHSS assists adult film producers like Vivid and the performers that Vivid employs to ensure a safe and healthy work environment.

12.     APHSS's database of approved labs provides performers in Vivid's adult films information about places that follow basic testing and notification protocols for HIV and STD safety in adult films.  These protocols require that APHSS-approved clinics screen patients for HIV using the PCR/DNA test, and screen for chlamydia, syphilis, and gonorrhea as well.  The adult film industry maintains a subsidy fund for APHSS testing to make testing affordable and accessible to all performers who appear or intend to appear in adult films.

13.     APHSS-approved clinics provide continually updated information to APHSS on adult film performers who have a current negative-test status, based on testing every 14-28 days, and who are thus available for work in adult films.  Vivid relies on a database that APHSS keeps in turn, which identifies performers who have current negative-test results from APHSS-approved labs, and who are thus available for work in adult films.

14.     Vivid requires performers in films that Vivid produces, and/or that Vivid contracts out for production, to be tested at an APHSS-approved lab at least once every 28 days.  When Vivid produces an adult film, prior to any filming or production, all performers and models must present a driver's license or other form of government identification.  Vivid accesses APHSS's database of available performers to confirm the negative-test status of each performer as of the date of production (which "availability" reflected in the database is based on the performer having tested negative for HIV and other STDs within no more than the last 28 days).  Without a current, negative test (or proper identification), Vivid does not and will not allow any performer to appear in an adult film in a way that would potentially expose anyone to HIV or any other sexually transmitted disease.

15.     I have observed that compliance with this testing regime is universal across the adult film industry.  No law-abiding adult film producer allows performers to appear without a

3

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800

1  current APHSS or equivalent negative-test confirmation, and no performer would agree to film

2  without confirming his or her co-performers' negative-test status.

3       16.    The AIM and APHSS regimes, and the other steps Vivid and the adult industry

4  have taken to prevent the transmission of HIV and other STDs, and to ensure safe and healthy

5  work environments, have proved successful. Since 2004, over 300,000 sexually explicit scenes

6  have been filmed by major producers of adult films in Los Angeles County, with zero cases of

7  HIV transmission.

8       17.    With regard to Vivid, this is due in part to our long-standing blood borne pathogen

9  exposure protocol. Under that protocol, Vivid uses containers that comply with guidelines estab-

10  lished by the California Division of Occupational Safety and Health ("Cal/OSHA") for materials

11  that have been in contact with bodily fluids, and we make condoms available to performers on the

12  sets of all Vivid adult film productions. Vivid also produced an instructional video, with the help

13  of a former Cal/OSHA staff member, that informs performers and other employees about HIV and

14  STD safety and awareness. The production manager on the sets of Vivid's productions confirms

15  that performers watch or have seen the video, and will not let performers shoot scenes in adult

16  films until they do so. In addition, notwithstanding their compliance with the AIM and APHSS

17  regimes described above, the production manager visually inspects each performer, including his

18  or her genitalia, to ensure that there are no visible indicia of STDs.

19       18.    It is my understanding that Measure B requires producers of adult films to obtain

20  a permit from the Los Angeles County Department of Public Health ("Department") before any

21  production can take place. In order to secure a permit, we must pay a fee and complete an

22  application form demonstrating successful completion of a blood borne pathogen training course

23  approved by the Department. As a business entity subject to this permitting regime, *all* of our

24  "principals and management-level employees" – including any and all film directors – must have

25  completed the required course.

26       19.    Though Vivid has a blood borne pathogen exposure control plan as described

27  above, no principal of Vivid has completed a blood borne pathogen training course, nor have

28  any of the film directors Vivid employs.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800

20.     Shortly after Measure B took effect, Vivid requested that the City of Los Angeles cancel an adult film shooting permit the City had previously issued, and that it refund the permit fee Vivid had paid. The City refused to do so. It claimed that producing adult films in the City of Los Angeles remained permissible notwithstanding the enactment of Measure B by Los Angeles County and the County's announcement that Measure B had taken effect. However, when Vivid consulted the City of Los Angeles Police Department, which has enforcement authority for film permits, the Police Department would not confirm that producing adult films in the City of Los Angeles is permissible without complying with Measure B. The Police Department indicated that Vivid's previously issued City permit should be canceled.

21.     Since Los Angeles County has announced that Measure B has taken effect, and given Vivid's experience with City of Los Angeles permitting and its police force, Vivid has stopped shooting adult films in Los Angeles County where Measure B applies. Measure B has thus served to chill Vivid's speech in which, prior to Measure B's enactment, Vivid was able to engage freely.

22.     It is also my understanding that Measure B requires the use of condoms by performers for all acts of anal or vaginal sex during the production of adult films. In Vivid's experience, performers in adult films do not want to use condoms during shooting, for a variety of reasons. Among these is the fact that shooting sexually explicit scenes takes much longer than the depicted sexual activity would take in the "real world." As a result, female performers find condom use over such an extended period to be painful – so much so, that they often cannot work two consecutive days if condoms are used. Similarly, condoms reduce physical sensation for male performers, which makes it more difficult to maintain sexual readiness over the extended period necessary to shoot adult films. In addition, condoms can break, especially during such prolonged use. When that happens, re-shooting and even longer periods of production/sexual activity are required.

23.     The respective effects that condoms have on female and male performers in adult films affect the creative process and thus the expressive work of adult film performers and the producers who depend on them. Thus, notwithstanding that Vivid makes condoms available on

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800

all adult film shoots as stated above, performers rarely use them, opting instead to rely on highly reliable and fastidiously followed HIV and STD testing.

24.      Condoms also interfere with the expressive work of adult film producers and performers because they are inconsistent with the aura of fantasy that adult films create. Condom use in adult films call to mind "real world" sex, where condoms are associated with birth control and avoiding STDs, which is inconsistent with the suspension of disbelief adult film-makers depend upon and strive to sustain for their works.

25.      Adult films audiences react negatively to the use of condoms by performers. In Vivid's experience, adult films that use condoms experience 35 percent lower sales than those that forgo condoms in reliance on APHSS testing and related measures. Vivid's experience is also that its audiences expect to explicitly see that the performers in our films actually engage in the sex acts depicted; consequently, editing or otherwise manipulating the works to avoid showing genital-to-genital or genital-to-anal contact because a condom was used, to disguise the use of condoms, or to otherwise manipulate the image would not be accepted by adult film audiences.

26.      For all of the reasons above, with Measure B's enforcement, Vivid has had no choice but to modify its approach to the production of adult films. Filming in places other than where Measure B is effective in Los Angeles County is not alone a solution. In the first instance, no surrounding county offers Vivid all the services and infrastructure that are available for shooting and otherwise producing films as is available in Los Angeles. That is because Los Angeles County is the seat of non-adult film movie-making as well. Consequently, nowhere else offers the necessary access to services and facilities that exist for non-adult films on which we rely – and which face no impediments under Measure B – including production crews, editors, sound-tracking, equipment suppliers, set directors, location finders, and other needs.

27.      Los Angeles County is also home to the many soundstages that all filmmakers require – including non-adult producers, as well as Vivid – because soundstages provide elements necessary for production like lighting, sets and props (and a place to store them), and special effects (including green-screens). These soundstages also provide the controlled environments

6

1   that are needed for movie sets by any film producer, including Vivid.  Such soundstages simply

2   are not available outside Los Angeles County.

3         28.      Even to the extent other facilities and services may exist outside Los Angeles

4   County – in vastly diminished quantity and quality – the effect on Vivid's production, and thus its

5   expression, remains considerable.  Due to limitations imposed by Measure B, the many adult film

6   producers accustomed to shooting in Los Angeles County find themselves, like Vivid, greatly

7   constrained.  This has resulted in a much tighter concentration of adult film producers being

8   shunted into an increasingly limited number of locations in which to film.  The limited availability

9   of these locations means that Vivid cannot produce films as quickly or, therefore, release them as

10  frequently, as it would otherwise, due to the need to wait for locations to become available.  Use

11  of the same, limited number of locations also interferes with Vivid's ability to differentiate its

12  expression from that of its competitors, because adult film companies are reduced to using – and

13  re-using – the same settings for their movies.  Even the fact that Vivid itself must reuse these

14  locations makes it more difficult to distinguish its various productions from each other.

15        29.      Dispersing locations outside Los Angeles County also means they are much further

16  apart than if they are all centrally located in Los Angeles County as was possible before Measure

17  B.  This means performers and others working in adult film must travel much further from pro-

18  duction to production, limiting their ability to work on multiple productions on, *e.g.*, the same

19  day.  The added travel time also extends Vivid's already-long production schedules, so much so

20  that, unlike in the past, shooting on consecutive days becomes infeasible.  All of this adversely

21  affects the content and frequency of Vivid's releases, while also limiting Vivid's creativity and

22  artistic options for its film settings, which also directly affects the substance of its expression.

23        30.      The impediments to production, and thus expression, imposed by Measure B also

24  interferes with Vivid's ability to claim the cachet of shooting in Los Angeles County, and being a

25  "Hollywood" adult film company.  This affects how Vivid's films are perceived by its audience.

26  Even though Vivid may not film performers engaged in actual sex in iconic (outdoor) locations in

27  Los Angeles County, Vivid may still wish to include the locations in its films.  It therefore must

28  film performers engaged in actual sex outside Los Angeles County, then bring them back to Los

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800

1    Angeles County to shoot exterior scenes that are part of the narratives that tie Vivid to Los

2    Angeles. This inability to have interior and exterior shoots proximate to each other practically

3    doubles our production schedules, and necessarily also affects how frequently Vivid can

4    disseminate works of expression.

5         31.    In addition, there are some locations and settings that are simply not available

6    outside Los Angeles County. There are, for instance, places in Los Angeles County that can

7    stand-in for Paris, France. There are also places, like old 1920s- and 1930s-era warehouses,

8    which evoke their own, specific mood, that are available only in Los Angeles County, and Vivid

9    is thus precluded from using them as settings for its films. Recently, the script for a film Vivid

10   was producing called for a parking garage opposite a high-rise, downtown loft – a combination

11   that is found only in Los Angeles County, and is not available in surrounding locales. Again,

12   even if actual sex does not take place at these locations when Vivid would include the locations in

13   its films, traveling between these unique locations in Los Angeles County, to places outside the

14   County where Vivid can film expression involving actual sex, directly effects Vivid's end-

15   product.

16        32.    All these limitations – from the availability of performers and other talent, to less-

17   accessible support services, to significant limits on potential locations to film – necessarily affect

18   the artistic options Vivid enjoys, and translates directly into how Vivid expresses itself through

19   adult film. Vivid is now, as a result of Measure B, forced to write scripts around the locations that

20   are available for it to shoot its adult films, rather than being able to bring its full creativity to bear

21   in conceiving the unique, high-quality adult films that are its hallmark.

22   Moreover, even if the above impediments did not affect Vivid's speech as drastically as they do,

23   simply looking to locations other than Los Angeles County cannot solve the incursion onto

24   Vivid's expressive endeavors that Measure B poses. Surrounding localities have adopted similar

25   laws, and there is nothing stopping other nearby (or even far-flung) localities from doing so. This

26   is especially a concern to the extent that Measure B was placed on the ballot as a result of

27   advocacy groups collecting signatures, and that the law was adopted by popular vote. This

28   extinguishes alternative avenues for communications even outside Los Angeles County. If

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800

Measure B is not enjoined, its enforcement will serve as a serious impediment to Vivid's production of works protected by the First Amendment.

I declare, under penalty of perjury under the laws of the State of California and the laws of the United States of America, that the foregoing is true and correct and that this declaration was executed on May 28 at _____.

Steven Hirsch, Co-Chairman

Vivid Entertainment Group

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800

**DECLARATION**

## DECLARATION OF JANE DOE a/k/a KAYDEN KROSS

I, Kayden Kross, declare and state as follows:

1.     I am a Plaintiff in this action.  I offer this Declaration in support of the Plaintiffs' Motion for Preliminary Injunction against the enforcement of The County of Los Angeles Safer Sex in the Adult Film Industry Act ("Measure B").  I have personal knowledge of the facts stated herein.

2.     I am a performer who appears in "adult films" within the meaning of Measure B.  In addition, I regularly write columns appearing in such publications as *Complex* and *Xbiz* magazines, I have contributed to *Timothy McSweeny's Internet Tendency*, and my short story "Plank" appeared in the 2012 e-book collection *Forty Stories:  New Writing from Harper Perennial*.  I have also won several awards for roles in adult films, from AVN, XBIZ, and other adult film organizations.

3.     I have worked in adult film for over six years.  During that time I have appeared as a contract performer in adult films for Vivid Entertainment Group, Adam & Eve, and Digital Playground, as well as an independent actress.  During that time, I have performed in approximately 75 adult films.

4.     Many of the adult films in which I have appeared were filmed in the County of Los Angeles, California, in both its incorporated cities and unincorporated areas, including in the City of Los Angeles.  The adult films in which I intend to appear in the future can likewise be expected to be filmed in Los Angeles County, in both its incorporated and unincorporated areas, including the City of Los Angeles.

5.     As a performer in adult films, I am tested once every 15 days (until recently, it was every 30 days) for HIV and other sexually transmitted diseases ("STDs"), including chlamydia, gonorrhea and syphilis.  All of my testing is done at clinics approved by Adult Production Health & Safety Services ("APHSS") for my testing.

6.     Prior to my participating in any filming or production of any adult film, I present my driver's license and test results confirming my current negative status for HIV and STDs.  I do not and will not perform in any adult film unless and until all performers with whom I am to work



similarly produce IDs and confirmation of their current status as having tested negative for HIV and other STDs. I also am able to consult, on-set if necessary, APHSS's database of available performers to confirm the negative-test status of my prospective co-performers.

7.      To my knowledge, for the entire time I have worked in adult film, not a single case of HIV has been transmitted on a film set where I have participated as a performer.

8.      Conversely, to the extent I am aware that adult film performers have contracted HIV off set, it has been flagged by the standard testing procedures that the industry uses. Such "flagged" individuals were removed from the pool of performers available to work in adult film, and were thus prevented from transmitting any disease on any adult film set to other performers.

9.      I used condoms in the scenes I shot for the first adult film in which I appeared. The added friction from the condoms caused a great deal of discomfort while I was performing, and in retrospect affected my performance. The condoms were not a birth control measure, but rather were – theoretically – protection against STDs, though all the performers with whom I worked in the film produced current negative HIV/STD test results before filming started.

10.      In the next adult film in which I performed, and in all adult films I have appeared in since, I opted to forgo the use of condoms, and to rely instead on the APHSS testing regime (and prior to that, AIM's) to ensure a safe and healthy working environment. I have continued to do so for the ensuing six years, with a perfect testing record.

11.      Apart from the discomfort, one of the key reasons I opt to forgo condoms when performing in adult films is that the adult film industry is in the business of selling fantasy. The films in which I perform are fantastical, with fantastical situations in which incredibly unlikely female specimens enthusiastically engage in sexual relations with men who have their own in-credibly unlikely anatomy. In my view as an expressive artist performing in adult films, using condoms in adult films, as Measure B requires, represents a real-world intrusion into the illusion of fantasy that adult films strive to create.

12.      Condoms are a reminder of real-world concerns that our audience seeks to escape when watching the films we create, and condoms in particular are reminders of the specters of pregnancy and disease that can attend sexual relations in the real world. Adult films seek to sus-

pend such concerns and allow audience members to suspend their disbelief while watching our work. Mandatory use of condoms in adult films also deprives us, as performers, of the choice to forgo condoms, while requiring us to convey the government's view of "safe sex" as part of our expressive works. I cannot conceive of any viable way to position actors' bodies, or to otherwise manipulate the end-product of performance through editing or digital trickery, to conceal that condoms were used in filming, while still maintaining what I am seeking to communicate by engaging in actual sex acts in my films.

13.     The enactment of Measure B, Los Angeles County's statements that Measure B is currently in effect, and the specter of enforcement directly inhibit my ability to express myself through adult film in the manner I have in the past, as all production of adult films in which I might appear in Los Angeles County has been cancelled or postponed.

14.     I typically shoot at least two scenes a month as part of my contract work – however, due to Measure B, I was able to perform under my contract only once in April 2013, and have not shot any scenes under my contract at all in May 2013. Because Measure B has resulted in indefinite postponements of shooting adult films in Los Angeles County, I anticipate being pre-cluded from appearing in as many as 16 productions over the balance of calendar year 2013 due to Measure B.

15.     Measure B also has prevented me from expressing myself through the other primary adult film outlet in which I perform, specifically, my website Club Kayden. I use my own home to produce performances for Club Kayden, but because my home is in Los Angeles County, Measure B has prevented me from shooting. And, because I do not have budget for Cub Kayden productions to shoot outside my home by traveling beyond Los Angeles County and/or renting locations owned by others, my production of adult films for Club Kayden has been brought to a halt by Measure B.

16.     In addition, Measure B would require the use of condoms for my performances, including those with my boyfriend, even though I know his sexual history and negative test status. So in addition to running contrary to my preference not to use condoms while performing as

stated above, Measure B requires condom use even for performances in my own home with partners who I know do not expose me to risk of STD exposure.

I declare, under penalty of perjury under the laws of the State of California and the laws of the United States of America, that the foregoing is true and correct and that this declaration was executed on May 23, 2013, at ___9 am_____.

Kayden Kross

**DECLARATION**

## DECLARATION OF JOHN DOE a/k/a LOGAN PIERCE

I, Logan Pierce, declare and state as follows:

1.      I am a Plaintiff in this action.  I offer this Declaration in support of the Plaintiffs' Motion for Preliminary Injunction against the enforcement of The County of Los Angeles Safer Sex in the Adult Film Industry Act ("Measure B").  I have personal knowledge of the facts stated herein.

2.      I have worked in adult film for approximately a year, appearing as a performer in adult films for Penthouse, Brazzers, Twistys, and Reality Kings, among others.  During that time, I have performed in over 200 adult films.

3.      Many of the adult films in which I have appeared were filmed in the County of Los Angeles, California, in both its incorporated cities and unincorporated areas, including in the City of Los Angeles.  The adult films in which I intend to appear in the future can likewise be expected to be filmed in Los Angeles County, in both its incorporated and unincorporated areas, including the City of Los Angeles.

4.      As a performer in adult films, I am tested once every 14 days for HIV and other sexually transmitted diseases ("STDs"), including chlamydia, gonorrhea and syphilis.  I go to clinics approved by Adult Production Health & Safety Services ("APHSS") for my testing.

5.      Prior to participating in any filming or production of any adult film, I present identification and a copy of test results (usually received from APHSS via email) to confirm my current negative status for HIV and STDs.  The adult film producers then typically have me sign and date a copy of the reviewed test results, which is kept for their records.  I do not and will not perform in any adult film unless and until all other performers with whom I am to work similarly produce IDs and a confirmation of their current status as having tested negative for HIV and other STDs.  I can also confirm on-set if necessary my co-performers' negative-test status, by checking the APHSS database of available performers.

6.      I have, on occasion, used condoms when performing in adult films, including for educational films.  However, condom use is not a birth control measure, but rather ostensibly

1   intends to protect against STDs, even though all performers with whom I work must have

2   provably tested negative for HIV and STDs before any filming.

3       7.      In my experience, instances when I have used condoms in adult films have

4   involved much longer shooting schedules and delays in production.  Scenes take much longer to

5   film because we must often swap out condoms mid-scene – sometimes repeatedly – and/or rely

6   on much more frequent use of assistive measures like lubrication.  Sometimes we find we must

7   switch out condoms mid-scene because a performer involved has a latex allergy requiring use of

8   condoms consisting of alternative material.  Condoms also decrease my sensitivity and thus affect

9   how easy it is to maintain sexual readiness throughout shooting, and for my partners, increased

10  friction from condoms can cause discomfort.  All of this necessarily affects performance, and

11  thus, what producers capture and express on film.

12      8.      Apart from the above mechanical consequences, which have their own impact on

13  the content of our expression, I choose to forgo condoms when performing in adult films because

14  they are inconsistent with portraying sex and sexuality with the air of escapism that we seek to

15  convey.  The films in which I perform involve explicit sexual conduct in over-the-top and/or

16  romantic scenarios involving characters with physical and sexual personas that are idealized and

17  seek to personify sexual fantasy.  Condoms are reminder of the avoidance of STDs and pregnancy

18  that "real world" sex must take into consideration.

19      9.      From my perspective as a performer and creative participant in the process of

20  producing adult films, Measure B's requirement that I use condoms is inconsistent with the sense

21  of romance and fantasy that adult films seek to maintain.  Similarly, clever editing or camera

22  tricks to disguise condom use (up to and including not showing what makes a sex act "explicit"

23  or "actual") can be inconsistent with what I seek to convey when performing.  Measure B thus

24  deprives me of the creative choice to not be depicted using condoms.  It also forces me to endorse

25  a government-sponsored message regarding proper "safe sex" practices.  All told, condoms can

26  result in the final product being lackluster compared to productions where condoms are not used.

27      10.     The facts of Measure B's enactment and that it is in effect and can be enforced

28  at any time has had a marked impact on my participation in adult films, and thus my ability to

express myself through them.  The frequency and amount of production have decreased significantly due to the fear of enforcement of Measure B against shooting in the parts of Los Angeles County where it is in effect.  Fear of enforcement has definitely chilled production by adult film companies.  As a result, I have worked less and adult film companies have shot less frequently, all of which limits my opportunities to express myself as I would otherwise choose on film.

11. In addition, substantially more filming – if it is done in Southern California at all – is exported outside Los Angeles County.  I therefore have to travel much more, and across greater distances, to find opportunities to perform in adult films.  Even when this has meant filming near but outside Los Angeles County, film shoots are happening further and further apart, and as a result of travel time between locations, production occurs less frequently.  To the extent travel spaces apart production days geographically, travel means I must schedule productions in which I perform further apart, limiting the number of productions in which I can appear in any given time-frame.  As a result of Measure B, I have had to travel not just outside Los Angeles County, but outside California, to both a nearby state, and to one all the way across the country, and even as far as Spain.  Obviously, being unable to participate in productions that are geo-graphically near each other, as when productions more typically were in Los Angeles County before Measure B's enactment, greatly limits my opportunities to engage in free expression by performing in adult films.

I declare, under penalty of perjury under the laws of the State of California and the laws of the United States of America, that the foregoing is true and correct and that this declaration was executed on 5/29/13 at Los Angeles, CA.

_Logan Pierce_
Logan Pierce

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**DECLARATION**

# DECLARATION OF RONALD G. LONDON

I, Ronald G. London, declare and state as follows:

1.      I am an attorney licensed to practice law before all the courts of the District of Columbia, Maryland, and before this Court.  I am an attorney in the law firm of Davis Wright Tremaine LLP, and one of the attorneys for Plaintiffs VIVID ENTERTAINMENT, LLC; CALIFA PRODUCTIONS, INC.; JANE DOE A/K/A KAYDEN KROSS; AND JOHN DOE A/K/A LOGAN PIERCE (collectively "Plaintiffs"), in this action.  The matters stated below are true of my own personal knowledge, except those matters stated on information and belief, which I believe to be true.

2.      On April 5, 2013, Plaintiffs filed a Motion for Preliminary Injunction (Docket No. 39), with an accompanying Memorandum of Points and Authorities, and Request for Judicial Notice (Docket No. 38), and a Motion for Judgment on the Pleadings (Docket No. 37), all noticed for hearing May 6, 2013.  The Motion for Preliminary Injunction referred to and incorporated by reference large portions of the Motion for Judgment on the Pleadings.  *See* Docket No. 39.

3.      On April 16, 2013 Intervenors were granted party status in this matter. Docket No. 44.  At the hearing on the Motion to Intervene on April 15, 2013, the Court suggested the parties, including Intervenors, agree to a briefing schedule for Plaintiffs' Motion for Preliminary Injunction and Motion for Judgment on the Pleadings already on file.

4.      On April 30, 2013, the parties submitted a stipulation to the Court that proposed a revised schedule for the pending motions (Docket No. 45.), by agreeing to remove the hearing on Plaintiffs' Motion for Judgment on the Pleadings from the calendar, to continue the Preliminary Injunction hearing, and to enable the Intervenors' to submit a Motion to Dismiss.

5.     On May 1, 2013, the Court issued an order which approved the Stipulation while also vacating Plaintiffs' Motion for Judgment on the Pleadings (though that was not specified in the Stipulation), and indicated that the Motion for Judgment on the Pleadings must be completely re-filed if necessary.  (Docket No. 46.)  In the same order, the Court continued the Motion for Preliminary Injunction to June 24, 2013, and directed Intervenors to file any response by May 13, 2013.

6.     On May 9, 2013, pursuant to a Stipulation filed by the parties (Docket No. 47), the Court continued the hearing on the Motion for Preliminary Injunction to July 1, 2013.  (Docket No. 48.)

7.     Because the Motion for Judgment on the Pleadings was vacated, significant parts of the argument in support of the Motion for Preliminary Injunction were no longer in an operative pleading.  This issue created uncertainty as to how the Motion for Preliminary Injunction should proceed.  Accordingly, on Thursday, May 9, 2013, I sent an email to counsel for Intervenors, Samantha Azulay, and counsel for Defendants, John Ly, raising this issue and asking to discuss how best to proceed.  A true and correct copy of my email is attached hereto as Exhibit A.

8.     On May 10, 2013, Ms. Azulay indicated she was unavailable to discuss and would do so at an undetermined time in the future.  A true and correct copy of this email is attached hereto as Exhibit B.

9.     Toward the end of the day on May 13, 2013, the day Intervenors were to file their opposition to the Motion for Preliminary Injunction, Ms. Azulay sent a brief email offering to discuss, and inquiring about the nature of the concern, even though it had been set out in my May 9 email.  A true and correct copy of this email is attached hereto as Exhibit C.  Given that this offer to confer came the same day that Intervenors' opposition was due, it was apparent that our inquiry would be answered by the opposition itself.

10.     On May 13, 2013, Intervenors filed their opposition to the Motion for Preliminary Injunction.  Docket No. 51.  Therein, Intervenors argued that because

DECLARATION OF RONALD G. LONDON

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST. SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1  the Motion for Judgment on the Pleadings was vacated, the Motion for Preliminary

2  Injunction fails for lack of support. *See id.* at 5:22-6:2.  This argument is the exact

3  type of procedural argument that Plaintiffs hoped to avoid, and was the impetus of

4  my May 9 email.

5        11.    Due to the unanticipated procedural events listed above, Plaintiffs

6  determined it was necessary to withdraw the pending Motion for Preliminary

7  Injunction and file another motion that includes the merits discussion from the now-

8  vacated Motion for Judgment on the Pleadings, so that all the facts and arguments

9  in support of the Motion could be properly before the Court.

10        12.    Plaintiffs' new Motion for Preliminary Injunction has been filed with

11  sufficient time so that it may be heard on the same date as Intervenors' Motion to

12  Dismiss (Docket No. 49) on July 1, 2013.

13        13.    No party will be prejudiced by the filing of the new Motion for

14  Preliminary Injunction.  All parties will have the time afforded under the Federal

15  Rules of Civil Procedure and Local Rules to respond to the new motion, and file a

16  reply in support thereof.

17        14.    Attached hereto as Exhibit D is a true and correct copy of an article,

18  cited in the Motion for Preliminary Injunction, by Jacob Weis published on May 9,

19  2013, entitled *No Condoms in Porn Country*, and available at:

20  http://projectwordsworth.com/no-condoms-in-porn-country.

21        15.    Attached hereto as Exhibit E is a true and correct copy of an article,

22  cited in the Motion for Preliminary Injunction, by Mark Kernes, published on May

23  7, 2013, entitled *The Latest Porn Unfriendly Place: Ventura County*, and available

24  at http://business.avn.com/articles/legal/The-Latest-Porn-Unfriendly-Place-

25  Unincorporated-Ventura-County-516286.html.

26

27

28

DECLARATION OF RONALD G. LONDON

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST. SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1      I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct and that this declaration was executed

3  at Washington, District of Columbia on May 29, 2013.

4

5                                   /s/ Ronald G. London

6                                    Ronald G. London

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF RONALD G. LONDON

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**EXHIBIT  A**

**From:**       London, Ronald
**Sent:**       Thursday, May 09, 2013 9:11 AM
**To:**         Samantha Azulay
**Cc:**         Louie Sirkin; Paul Cambria; Corn-Revere, Bob; Grumer, Janet; Peterson, Matthew; jly@glaserweil.com
**Subject:**    RE: Vivid Entertainment, LLC, et al v. Jonathan Fielding, et al, Case No.: 13-cv-00190, Meet and Confer Letter

Samantha –

With the stip now on file reflecting the parties' agreement on PI and MTD filing deadlines and hearing, we wanted to flag one procedural issue to ensure we're all on the same page there, as well.

As you're probably well aware given the impending deadline for AHF's PI response, that motion's success-on-the-merits showing incorporates by reference substantive arguments in our MJOP, the two motions having been filed concurrently and linked.  We assume that, notwithstanding the Court's "vacation" of the MJOP, you plan to acknowledge the incorporation by reference and address the merits arguments as part of your PI opposition.  Those issues all have to be put before the Court in any event, not only for the PI motion, but for your MTD as well, so simply proceeding to address them as part of the PI response would be the procedurally cleanest way for the parties to proceed.

If our assumption on how you intend to respond to the PI motion in this regard is incorrect, though, please let us know.  As we see it, the only alternative would be for us to re-file and re-notice the MJOP per the Court's May 1 order, to more formally re-establish its incorporation by reference the PI.  But given your prior position on the MJOP, that would not seem to be your preference.

Accordingly, please let us know how you intended to proceed, and/or if necessary, when would be a good time to discuss this point.  Thanks.

**Ronald London** | Davis Wright Tremaine LLP
1919 Pennsylvania Avenue NW, Suite 800 | Washington, DC 20006
Tel: (202) 973-4235 | Fax: (202) 973-4435
Email: ronnielondon@dwt.com | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

**From:** Samantha Azulay [mailto:Samantha.Azulay@aidshealth.org]
**Sent:** Tuesday, May 07, 2013 3:48 PM
**To:** Peterson, Matthew; jly@glaserweil.com
**Cc:** London, Ronald
**Subject:** Re: Vivid Entertainment, LLC, et al v. Jonathan Fielding, et al, Case No.: 13-cv-00190, Meet and Confer Letter

We agree. You can e-sign for me and file.  Thank you.

Samantha R. Azulay
Assistant General Counsel
AIDS Healthcare Foundation
6255 W. Sunset Boulevard, 21st Floor
Los Angeles, California 90028
Tel:  (323) 860-5223

1

**EXHIBIT B**

| | |
|---|---|
| **From:** | Samantha Azulay <Samantha.Azulay@aidshealth.org> |
| **Sent:** | Friday, May 10, 2013 4:49 PM |
| **To:** | London, Ronald |
| **Cc:** | Louie Sirkin; Paul Cambria; Corn-Revere, Bob; Grumer, Janet; Peterson, Matthew; jly@glaserweil.com |
| **Subject:** | Re: Vivid Entertainment, LLC, et al v. Jonathan Fielding, et al, Case No.: 13-cv-00190, Meet and Confer Letter |

Counsel:

I apologize for not getting back sooner.  I am underwater with the filings due today and Monday.  When I come up for air, we can talk.  Thanks and have a nice weekend.

Samantha
Samantha R. Azulay
Assistant General Counsel
AIDS Healthcare Foundation
6255 W. Sunset Boulevard, 21st Floor
Los Angeles, California 90028
Tel:  (323) 860-5223
Fax:  (323) 467-8450
samantha.azulay@aidshealth.org
www.aidshealth.org

**From:** <London>, Ronald <ronnielondon@dwt.com>
**Date:** Thursday, May 9, 2013 9:11 AM
**To:** Samantha Azulay <samantha.azulay@aidshealth.org>
**Cc:** Louie Sirkin <hls@santen-hughes.com>, Paul Cambria <pcambria@lglaw.com>, "Corn-Revere, Bob" <bobcornrevere@dwt.com>, "Grumer, Janet" <janetgrumer@dwt.com>, "Peterson, Matthew" <MatthewPeterson@dwt.com>, "jly@glaserweil.com" <jly@glaserweil.com>
**Subject:** RE: Vivid Entertainment, LLC, et al v. Jonathan Fielding, et al, Case No.: 13-cv-00190, Meet and Confer Letter

Samantha —

With the stip now on file reflecting the parties' agreement on PI and MTD filing deadlines and hearing, we wanted to flag one procedural issue to ensure we're all on the same page there, as well.

As you're probably well aware given the impending deadline for AHF's PI response, that motion's success-on-the-merits showing incorporates by reference substantive arguments in our MJOP, the two motions having been filed concurrently and linked.  We assume that, notwithstanding the Court's "vacation" of the MJOP, you plan to acknowledge the incorporation by reference and address the merits arguments as part of your PI opposition.  Those issues all have to be put before the Court in any event, not only for the PI motion, but for your MTD as well, so simply proceeding to address them as part of the PI response would be the procedurally cleanest way for the parties to proceed.

If our assumption on how you intend to respond to the PI motion in this regard is incorrect, though, please let us know.  As we see it, the only alternative would be for us to re-file and re-notice the MJOP per the Court's May 1 order, to more formally re-establish its incorporation by reference in the PI.  But given your prior position on the MJOP, that would not seem to be your preference.

**EXHIBIT  C**

| | |
|---|---|
| **From:** | Samantha Azulay <Samantha.Azulay@aidshealth.org> |
| **Sent:** | Monday, May 13, 2013 11:59 AM |
| **To:** | London, Ronald |
| **Subject:** | Measure B |

Ronald,

I have some time to talk today if you would like.  What exactly is your concern?

Samantha R. Azulay
Assistant General Counsel
AIDS Healthcare Foundation
6255 W. Sunset Boulevard, 21st Floor
Los Angeles, California 90028
Tel:  (323) 860-5223
Fax:  (323) 467-8450
samantha.azulay@aidshealth.org
www.aidshealth.org

**EXHIBIT  D**

*If you enjoy this story, we ask that you consider paying for it. Please see the payment section below.*



# NO CONDOMS IN PORN COUNTRY

### By Jacob Weis

MAY 9, 2013

Logan Pierce is hard at work. There's a girl draped across the bed behind him, lying patiently among red rose petals and spotless white sheets. She pushes one of the flower bits off her thigh with a fingertip. Pierce sighs, swigs some bottled water, wipes his brow, turns back to the bed for the next take. Facing her again, Pierce smiles despite himself. He looks past the silent black-rimmed cameras trained on the prone brunette, the handful of slow-breathing crew members gathered around, watching but not watching, the dangling booms and white-hot lights, and faithfully finds his co-star's gaze.

"And just like that," he says, "I fall in love."

Pierce, who is 22, finished the scene—aptly titled Rose Petals—about an hour later, its conclusion coming when he did. He's a porn star, one of a handful of men in the adult industry to earn a reputation as something other than a prop for female performers to rub up against. Porn noticed: just eight months after he

filmed his first scene, Pierce won the coveted Best Male Newcomer award at the 2012 Adult Video News ceremony in Vegas. Not bad for a Philly kid in L.A. for a post-grad internship. The accolade propelled Pierce's rep, leading the boyish—slim build, wide-eyes, floppy brown hair—porn-fan to over 200 jobs in the past year.

Pierce says he's successful for two reasons.

1. He loves his job. (All chime in now: Like that's hard.) Pierce's take on his occupation: "I shot a scene on a yacht off the coast of Ibiza last month. I didn't just go there; I got paid to go there. And I didn't just get paid; I got paid to fuck beautiful women."

2. He's romantic. "If I'm going to make love to a girl," he tells me after wrapping Rose Petals, "I'm going to make that girl think that I'm in love with her. I'm going to worship her body." Such on-set dedication is rare in porn, where detachment despite sex is key to maintaining any semblance of what Pierce calls a "normal emotional life" off set. Case in point: days before we met, Pierce broke up with a girlfriend of three months, who, despite being a porn performer herself, couldn't reconcile with her boyfriend's daily emotional investment on the job.

Pierce's romantic nature makes him considerate, too: "I'm the only male performer who actually wipes his come off the girl at the end." Pierce says his co-stars are shocked every time: no other guys ever bother. This makes girls clamor to work with him. Hence, popular. Hence, successful.

But things may be changing for Pierce. Lately his romanticism—or "porn-idealism," as he puts it—has led him far from sets populated by horn-rimmed

teachers and horny housewives. The stud is now plaintiff in a lawsuit to repeal Measure B, a new law that makes condoms mandatory everywhere in Los Angeles County that a male performer plans to penetrate a co-star on film. Specifically anally or vaginally, so you know. Excluding oral and other, more fetishy stuff, so you know more.

Pierce protested Measure B because if he didn't, he worried "no one else would." He still isn't sure whether most porn performers don't voice their opinions more because "they are afraid of the ridicule" of the public's daylight-eye, "or because they have nothing to say." Either way, unafraid and with plenty to say, Pierce decided to play the leader. To "fight for a cause I believe in." Through December, he spoke with Kayden Kross, a female star consistently ranked in the top five of any 100 Hottest Porn Stars! list published since her first D.V.D. cover in 2006, and adult production giant Vivid Entertainment. In January, on behalf of Pierce, Kross and itself, Vivid lawyered up, retaining porn's most celebrated judicial champ, First Amendment and criminal defense attorney Paul Cambria of Buffalo, New York.

From there things moved fast. On January 11th, Cambria—who politely prefers the industry he represents referred to as "adult," rather than "porn"—sought an injunction against L.A. County's Director of Public Health Jonathan Fielding, District Attorney Jackie Lacey and L.A. County itself to repeal Measure B.

His suit's grounds? Expansive.

Foremost and "extremely important," Cambria argues that Measure B infringes his clients' First Amendment rights of free expression.

"On the bases of prior restraint"—government censorship on expression before

the expression is even expressed— and content-based regulation —expression blocked based on its substance—Cambria tells me from his Buffalo office, condoms compromise porn's rights. By requiring actors to don rubbers while they perform on camera, the county is dictating how content creators make their films. That's unacceptable constitutionally, according to the attorney.

And Cambria knows his Constitution—especially when it comes to after-dark entertainment. The broad-jawed, slick-locked attorney has represented nudie heavyweights since the 1970s, when pornographers like Hustler founder Larry Flynt were routinely brought up on obscenity charges. Cambria represented Flynt back in the day, saw the skin-mag icon shot in the spine outside a Lawrenceville, Georgia courthouse during an obscenity trial in 1978. Cambria has defended rapper DMX, rocker Marilyn Manson, "everyone from judges to priests" since, filling a slot on porn's speed dial all the way.

He tells me condoms corrupt pornographers' creativity by breaking the illusion their films thrive on.

"Let's say this was the Pirates of the Caribbean movies, which take place in the 1730s," he says. "And all of a sudden Captain Jack whips out a condom. It kind of destroys the movie. The whole creative process."

Condoms could be similarly ridiculous in porn.

"What if we had a movie where a couple was trying to have a child, and they couldn't?" Cambria asks. Desperate to get knocked up, the wife—let's call her Darla—decides to have sex with the four other members of her husband's bowling team. Everyone's willing enough, Cambria explains, but every time Darla approaches a bowler, he reaches for a condom. There goes the premise.

"That's actually not far fetched as a subject for one of these movies," Cambria offers the silence on the other end of the line.

For Kayden Kross, rights are means to profits. The California native is likely what you picture when someone says "porn star:" tousled yellow hair, a form simultaneously toned and curved, a red upper lip as swollen as its lower sister, bright eyes that in photos play only coy or yes or surprise!

She's also smart, and works to sound it. She navigates her sentences carefully but edged, like a woman crossing a minefield the rest of the world refuses to acknowledge.

"Legislators will never come out and explicitly say they're going to amend your free speech rights," she tells me, pinioning her cell between her chin and shoulder as she herds a yippy puppy into her L.A. apartment. "Instead they'll do something like enforce condoms, knowing we have a consumer base that won't buy condom porn, eating away at our sales and stunting our business."

Besides, Kross continues, performers are healthy without condoms. Long before Measure B, the industry instituted a "green test" policy, she says. Every two weeks, each performer underwent a urine-based test for a host of S.T.D.s. No green result, no roles.

Kross has relied on porn's testing procedures since her first scene six years ago. She still does, traveling out of L.A. County almost daily to film scenes bareback.

"The testing is tried and true," she asserts. "I've been shooting a movie a month since I started, and I've never had a dirty test."

Porn's in-place testing has been "mandated through 100 percent of the industry" since 1998, adds Pierce. But mandatory condoms make that testing redundant, and producers won't waste money on two safeguards. With condoms the new standard, Pierce cautions, producers will "take anyone off the street and throw a condom on him." More random dudes in the porn pool makes for more danger of disease brought in from outside the community. Which makes mandatory condoms potentially more dangerous than porn's testing.

"There are no protections," says Cambria, "that are as good as the testing that had been working in the adult industry for all these years."

If you have an afternoon to kill, ask an adult performer if they enjoy filming with condoms. Spoiler: They do not. Latex is Kryptonite to porn stars.

"We're shooting for 45, 60 minutes at a time, in positions that are not ideal for condoms at all," Kross explains. The "high energy, high impact" positions, invented "to open up for the camera so you can get a clear shot," coupled with constant "switching and stretching in different ways," says Kross, makes putting a "latex barrier in between those very sensitive organs" extremely irritating, extremely quickly.

The male perspective?

"I can't tell you how much I despise wearing condoms," Pierce tells me. "They are restricting and abrasive. They dry the girl out and dry themselves out so you have to keep reapplying them." The hassle slows shoots down, which "amounts to male talent losing wood, everyone losing energy, needing more lube." The naked comedy of errors continues: "Then the card's full on the D.S.L.R. and by the time you get a new one, no one's even horny anymore."

Other concerns?

"Believe it or not," says Pierce, "there are a lot of girls in this industry who have latex allergies."

Stocked with porn's anti-condom rationale, I contacted reps of L.A. County's health community. I wondered if sharing porn's reasons would affect how the Measure B camp weighs its do-good law.

Not so much.

Paula Tavrow has been involved with Measure B since before it had a name. One mild California evening in 2005, Tavrow, the Director of the Bixby Program in Population and Reproductive Health at U.C.L.A.'s School of Public Health, heard some of her graduate advisees talking about porn. What does sexual health in the adult industry look like? the students wondered. Tavrow organized a series of speakers to fill the students in: visiting porn performers told one side, health officials another. But the two stories were irreconcilable. To porn, their industry was as healthy a livelihood as dentistry; health workers saw the barometer closer to volcano spelunking.

Piqued, Tavrow oversaw a one-day "think tank" that "brought all the players together...to see if there was a way we could bridge our differences," she says, "and agree on a healthier way for porn to proceed in L.A."—if necessary. Attendees included public health officials, porn stars and producers, even Paul Cambria. But porn was "very antagonistic" to the idea of safer, condomed sex being mandatory, Tavrow says, something the public health camp maintained was a reasonable suggestion. No consensus was reached by day's end.

"That's when the AIDS Healthcare Foundation got interested," says Tavrow. The A.H.F., the largest community-based HIV/AIDS medical provider in the U.S., had attended Tavrow's strategy session. They sensed a worthy cause in porn's condoms; a publicized estimate that 22 L.A. HIV infections since 2004 could be traced to the industry soon followed. The A.H.F. drafted a proposition for the law that would become Measure B—and started fundraising immediately. Over the next six years, the nonprofit collected nearly $1.7 million. The coffer dwarfed the $118,000 raised by the adult industry to campaign against the fledgling Measure; with little trouble, the A.H.F. swayed the L.A. city council to approve their condom proposition, dubbing it the County of Los Angeles Safer Sex in the Adult Film Industry Act. (Less of a mouthful, 'Measure B' is the law's street name.)

But problem, not solved. Most porn was shot in the San Fernando Valley, well out of L.A. city limits. So the A.H.F. went county-wide, placing Measure B on the presidential ballot in November, where the act would appear before the most voters possible. By Election Day 2012, the foundation's treasure chest had put in

work: "Vote Yes on B" billboards, t-shirts, and sign-twirlers dotted the county. The electorate responded; 89 percent of L.A. County presidential voters casted ballots on Measure B, and the proposition became law.

W hile condoms-on-set is everyone's favorite Measure B point to yell about, it isn't the whole law. Measure B makes porn real, a lawful business with serious safety procedures and penalties for screwing around. To

wit: Before they film, producers must obtain what the Measure calls "adult film production public health permits" from the County; pay permit fees to cover salaries of "condom inspectors" (that's a Kross-ism) who will inspect porn's collective penis periodically; prove everyone on-set took a course in bloodborne pathogen safety.

Any violations are punishable by $1,000 fines or six months in county jail. Or both. Multiple violations are punishable as separate offenses, so multiply the fines and jail time by however many condoms or permits producers don't provide their sets.

Then there's an obscure bit towards the Measure's end: "Any person or entity issued a permit for the filming of an adult film…are [sic] required to maintain engineering and work practice controls sufficient to protect employees from exposure to blood and/or any other potentially infectious materials controls, in a matter consistent with California Code of Regulation, Title 8, Section 5193."

But the details of Title 8, Section 5193 are nowhere on Measure B.

I found them on the California Division of Occupational Safety and Health site. For something not on the Measure, Section 5193 has a lot of strings. Outlining "barrier protections" from infectious materials, it's what guarantees safe conditions for workers in medically dangerous places, like hospitals. Porn workers are exposed to the same possibly infectious materials hospital workers are, the Measure reasons, so they should be entitled to the same protections. Whether they like it or not.

That means Measure B doesn't just affect performers. Any employee who will be exposed to infectious materials on-set—which could be anyone present, as fluids

fly around porn sets at unpredictable times and angles, like lasers in Star Trek—must take the same precautions as the performers themselves, says 5193.

And the precautions are steep. Working on a porn set or in a hospital means never knowing exactly what's in the fluid flying at your head or spattered on the floor waiting for your clean up. Better super-safe than very dead: In such an environment, all bodily fluids—all blood, semen, vaginal excretions, etc.—are "treated as if known to be infectious for HIV…and other bloodborne pathogens," per Section 5193.

Quick question: If you were getting ready to go to work orifice-deep in HIV-laced goo, how would you dress?

I'd pack a mask. Maybe two. I'd double-up on gloves. I'd suit up hazmat-style.

Section 5193 feels about the same. It orders "personal protective" parameters undertaken when exposure to possible pathogens is likely, including safety goggles, masks, gloves; prohibiting eating, drinking, smoking, applying cosmetics or contact lenses on exposed surfaces; decontaminating exposed equipment with bleach before traveling.

Endless safety measures meant to protect workers from lazy or cheap employers who provide dangerous working conditions that might infect and kill. With Measure B, L.A.'s health department slapped a biohazard sticker on the entire L.A. County adult entertainment industry.

Ask a porn performer if they feel condoms, gloves, goggles and the rest of Measure B makes their jobs safer. They'll say yes. I asked a bunch, and that's what happened. But they're quick to add that they aren't going to gear up like

Fukushima radiation screeners before work every day. No matter what health officials advise. They'd rather leave L.A. County. And take thousands of jobs with them, according to the Valley Industry and Commerce Association, the San Fernando Valley's largest business advocacy group.

Is that what the A.H.F. wanted all along?

T o the A.H.F.'s Mark McGrath, Measure B is common sense.

"I'm actually astonished at the resistance we've had," McGrath tells me. He was one of Tavrow's bored grad students in 2005, brainstorming for something interesting to research. After receiving his master's in public health from U.C.L.A., McGrath joined a L.A. County Health Department investigative team studying an outbreak of gonorrhea and HIV in the adult industry. Then the A.H.F. came knocking. McGrath now consults for the nonprofit: he drafted Measure B's language and its website's talking points, and organized its campaign.

McGrath considers the adult industry "quasi-human trafficking."

"The industry feels it has no limits," he says, "like they could at any time conceive a scenario and put a young man or young woman in that scenario, with no liability—at least for the producer."

So he and his provided liability: "In Hollywood, we have stunt people. They do a lot of crazy shit. But they take precautions—they have to. The person on fire isn't actually on fire."

"Porn does double anal penetration," Tavrow adds. "That's so dangerous for the woman"—only slightly less dangerous than pyrotechnics. "So we made it safer."

But it's not all workers' safety. It's financial, too. When run-of-the-mill unregulated workers suffer injuries on the job, "the county agencies, as the main healthcare resources, end up paying those costs," says McGrath. No difference in porn: as long as adult performers have fallen ill, California medical clinics have been "subsidizing this industry's reckless disregard for human safety," he says.

The adult industry has higher rates of S.T.D.s like chlamydia and gonorrhea than those of the general population, says McGrath. Technically, that's an epidemic. Measure B is the answer, he continues, "the most cost effective way to prevent exposure." And ensure California clinics don't burn cash treating more outbreaks than it should be.

Here's where I cleared my throat and related porn's reasons for rejecting the rubbery cure. But McGrath and Tavrow had heard them before.

"The free speech argument is a symptom of the adult industry's impotence," McGrath answers. "It's the only trick they have in their bag. And it won't work."

Tavrow explains why: She'd always expected Cambria to lob a First Amendment argument. "That's why we made it very clear in Measure B that they don't have to show condoms in the final product," she says. Health officials couldn't care less if Pierce's condom is visible as he beds Kross on film, only that it's there. Transparent condoms, digital tweaking of tape in postproduction to remove

rubbers and "tricks of the trade," Tavrow says, like creative camera angles and contorted limb-positioning would leave the industry's final product unaffected by Measure B.

Producers can even fake the "so-called money shot—you know, when they spray a women's face with semen," Tavrow continues in a voice that suddenly sounds too much like my bubbie's to be detailing such things. "There are substances that look like semen that you can spray all over her and the public would…think it was coming out of some guy's penis or several guys' penises," she tells me.

And if porn claims the fudging would cost too much—which they did, to me— Tavrow calls them savvy exaggerators. The Ph.D. has spoken to porn producers who confided in her privately that they already spend substantial time and money on digital postproduction, "weeks," she says, "removing zits and scar lines from bad breast jobs on actresses." Removing condoms wouldn't be an extra burden.

But can postproduction remove hazmat suits? I ask.

What hazmat suits? McGrath replies.

According to the drafter of Measure B, porn is "fear mongering" when they say Section 5193 will make for sex scenes between cosmonauts. Gloves? Required only when fisting, McGrath says. Goggles? Only in money shot scenes, worn by the performer being shot with money—and only if his or her co-star is aiming for the eyes. No condoms in oral sex scenes either, unless there's an open sore on either party's pertinent part.

"Anywhere that broken skin or a mucus membrane like the eyes' come in contact with blood" or other potentially infectious fluids, McGrath says, constitutes exposure and necessitates a protective barrier. But fluid "contacting unbroken skin is not considered an exposure," and doesn't require dressing up.

So Title 5193 is less severe than porn complains. No hazmat suits, gloves, goggles or masks on anyone not about to touch a questionable substance with their eye, anus, abraded anus, or wound. That means no plastic on the cameraman at all. Unless he plans on getting frisky with a sound-guy's mucus membrane.

I f it's unwise to ask a porn star about having sex on latex, it's downright dumb to ask a California health expert whether porn's preemptive testing is ship-shape.

"That's what the producers tell the performers," McGrath says with a huff. "That they're using the most up-to-date scientific protocols to keep them safe." Really, as far as McGrath's medical circle assesses, "the testing they're doing is inadequate," falls woefully short of "recommendations from health departments."

Porn "should be swabbing anatomical sites, i.e. rectums and throats," McGrath explains, "but instead they're using urine-based tests," which are outdated and "miss as much as two-thirds of the infections."

As far as the S.T.D.s that performers and producers are aware of, floating down their bloodstreams or clinging to their soft pink organs, McGrath sighs, "We—they—are looking at a tip of the iceberg."

An estimate of the submerged part of that iceberg: "Sexually Transmitted Infection Testing of Adult Film Performers: Is Disease Being Missed?" a study by Christina Rodriguez Hart, another of Tavrow's former students, analyzed S.T.D.s treated by L.A. County clinics in 2010 and found that an adult performer is 8.5 and 34 times more likely than any other sexually active adult to contract chlamydia and gonorrhea, respectively.

"Worse yet," McGrath said, "the reinfection rate within a year is very high— between 25 percent and 26 percent." Even if porn's old-school test hits on a performer's disease and he or she is cured, they're likely to get sick again. Quick.

"And yet," MsGrath adds, "producers have convinced their performers that this testing is a cleansing ritual," a biological members-only pass to a party of protected intimates. "Something that matters."

T "hey're full of shit."
    -Kayden Kross

Porn remains dubious. Despite the data, Kross still flatly refuses to perform with condoms. She seems as worried about S.T.D.s on set as she is about poison dart frogs.

But the longer we speak, the more her script slips. Turns out Kross isn't fully reassured by porn's testing procedures or some biophysical trust built between performers. She's secure most of all because she's popular.

Kross, who is 27, has killed it in porn since she first unzipped for the camera. Hot enough to land video and magazine covers, Kross says she "has a lot of pull with the fans." Which translates into pull on set. If she "asked for the moon," she laughs, producers would "hand it to her with a fucking bow on it."

Kross's pull leverages her healthy choices: she picks whom she performs with and when. Less popular performers risk their jobs if they refuse to work bareback with a co-star who hasn't been tested in nearly month; top stars like Kross don't. She says no thanks, producers find her another warm body.

Kross offers an analogy to connect her popularity to her Measure B aversion: "Let's say Major League Baseball was thinking about introducing a new rule to require protective vests for pitchers" so they aren't killed by line drives to the chest. "And the high end, valuable players said they didn't want the rule. But the little people in the minor league who sit on the bench all day said they did want it. Are you going to pass this law because the little people who are barely in the sport at all want it?"

Unfortunately for Kross, the answer to her rhetorical question is, apparently, yes. The law passed. Seems the "little people" had some pull, too.

Logan Pierce's case for Measure B also slips lower the longer he makes it. The more we chat, the more he talks about the tougher days in porn, like the November afternoon he partook in a six-man-one-girl gangbang.

"That was a fucking weird experience," Pierce exhales. He was a porn rookie, and had never done anything remotely orgy-tastic before. But ready or not, the cameras started rolling. "At least the girl was into it," he says.

Pre-scene:

"I love it," Sarah Shevon ogles into the camera lens a foot from her face. She's perched on the edge of a teacher's desk, the chalkboard behind her blank. Her dark hair, thick-framed glasses, red mouth and white blouse, top two buttons open, convey some conflation of teacher and asking for it. It's been a year and a half since her last gangbang, she confides in the camera, all lashes and dimples, "and I've really been itching for more."

"What do you want to accomplish here?" the cameraman persists.

"I just want to be busy," Shevon shrugs, miming stroke-motions in the air around her head. "Get as many cocks in me as I can."

Cut to that happening.

Shevon loses her shirt and skirt, masturbates at the head of the class, then hops down and crawls between the students' desks, fishing under them for those male parts she mentioned. It must be a night class for adults, because some of her students are at least 45. No worries. Shevon seems, as Pierce says, "into it."

Shevon's game-day attitude got Pierce through. Barely. To turn himself on, he still had to tap into "those dark fantasies everyone has," he says, "throw all romance aside" and give in to the "subconscious, visceral, primal." Not a place Pierce often likes to go.

But it worked. The day was successful because he connected with his co-star.

That's what Pierce hoped his lawsuit would do, he explains, segueing so fast my eyes cross. Pierce wanted the suit to connect the porn community, give it a cause to rally behind.

I first spoke to Pierce three weeks after Cambria filed his suit. Three months later, Pierce's enthusiasm is faded. "I haven't heard dick from those people," Pierce says. "Not one word from those lawyers since my name was written on that bill."

After all the frantic fundraising, press calls, wide-eyed commercials series, "Vote No On B" bannered buses, solemn Ron Jeremy YouTube spots, swarms of platinum-blonde and goateed picketers in front of Hustler Hollywood chanting "Keep my wienie free/ No on Measure B," countless interviews and tweets and retweets by everyone from M.I.L.F.-niche-staple Lisa Ann to perpetually eye-brow-cocked porn boy toy James Deen; and after hiring Paul Cambria—who don't come cheap—porn has done nothing?

Seems not.

Unless it was a play, I offer.

A ruse. A firestorm of feigned outrage because outrage is interesting and what's interesting grabs eyes. What if porn's lawsuit against Measure B was never a fight the industry planned on winning—or even seriously waging? Was just another role up for hungry takers, another set with more thoroughly clothed actors and even droller writing, where the only real difference was what the performers meant when they said briefs?

"I honestly wouldn't put it past them," Pierce says with a sigh. Over the last fourteen weeks, once the phone stopped ringing with Cambria or Vivid C.E.O. Steven Hirsch on the line, vetting Pierce to make sure he "wasn't a moron, didn't represent them poorly," he says, Pierce's righteous chest deflated. He wondered why a kid who'd just entered the industry was entrusted such a representative role. "What about the guys that have been in porn for 20 years? Shouldn't they have a voice?" he asked himself.

Unless those industry vets were seasoned enough to know what this was from the start: A noisemaker for its own sake. Maybe Pierce took the role—"which was casted for, by the way; Vivid wanted one female and one male," Pierce tells me—not because he was brave, but naïve.

Pierce now suspects his bosses "just wanted something on paper that they could spit out and make into a public statement."

Kross is less concerned. From the beginning, putting her name on the suit was a no-lose scenario, however it turned out in court. "Being a plaintiff let me do N.P.R., B.B.C., big mainstream interviews," she says. Thanks to the highly publicized protest, "my name got exposure, which furthers my brand, which makes me more valuable to Digital Playground," Kross's main employer. "It's a self-helping loop."

The more work a porn performer does outside of adult content, the more currency she banks within the agency, Kross explains, extending the popularity lesson she gave me before. Landing mainstream roles (like playing a porn star in an episode of The League, as Kross did in 2011) means making new fans who

will trail the star back to porn. The Crossover Star of the Year award, one of the A.V.N.'s "most coveted," says Kross, recognizes the performer with the most mainstream currency. Kross has been nominated, but never won. She has high hopes for 2014.

Unlike Kross, Pierce was still new by Measure B's birth. He didn't understand as she did that the game is Exposure: porn star with the most by day's end wins. Or that lawsuits are in-bounds. To him, porn wasn't a job or a business, but a fun way to pass time that he incidentally was paid for—how lucky. So he stayed buoyant, romantic. Fell in love every day. Signed onto suits he believed in, causes he felt were worth fighting for.

But while his name lines the top of porn's suit, producers are probing escape routes. Kross travels out of L.A. County by car, Pierce himself is flown to Ibiza. Even Cambria, who maintains that things are progressing as planned—"We have filed challenging constitutionality and our motion for a preliminary injunction is pending," he recently wrote me—says "company after company is stopping production, moving somewhere else."

Why should they stay? The opposition is surging: in mid-April, a Central District of California judge granted the A.H.F.'s Measure B wing, Yes on B, "Leave to Intervene" in Cambria's suit, putting the foundation—and its "huge lobbying money," per Cambria—officially in the fight. Two weeks later, California Assembly Bill 332, a statewide version of B, cleared the state's Committee on Labor and Employment in a unanimous, bipartisan vote. Any further and the barebacked porn dude is an endangered species.

Even Kross, jaded, doesn't think porn's suit stands a chance. And she's its female lead.

"I don't think we'll win. That's how it is," she tells me. "That's the world."

The A.H.F. sure doesn't mind porn's fatalism. To the foundation, thousands of porn jobs fleeing the County is a healthy sacrifice.

"I don't give a shit about their jobs," McGrath tells me. "Are these the types of jobs we need in California?"

P ierce is flagging at work. Porn is familial—its intimacy fast and deep—but not communal, the average performer departing forever after three months. It's fun, but only until abuse rears or profits wilt. He loves the play, and for him the going is still good, so he'll linger for now. But he's learned from Measure B, from its loud, limp suit. And he'll reposition.

"Imagine every day you fuck a girl and fall in love," Pierce tells me as he turns onto a dusky L.A. highway and I fail miserably for the hundredth time to fathom what he asks.

"But it's just a fantasy world, and they throw it away when they're done."

Like   48        Tweet   97

*Great stories are worth something. Help us figure out how much.*

*How much is this story worth to you? Please enter an amount:*

$ [____]  [ Pay now ]

*All proceeds go to the authors.*

Read More Stories (/)

© Project Wordsworth (/) 2013 | Illustrations by Eléonore (Léo) Hamelin
(http://www.eleonorehamelin.com)
Authors (/authors/) | **f** Facebook (https://www.facebook.com/ProjectWordsworth) **t** Twitter
(https://twitter.com/ProjWordsworth)

**EXHIBIT E**



Welcome! Sign in or become a member!

PLEASURE    BUSINESS    VOD    AVN AWARDS 2014



NEWS    MOVIES    MAGAZINES    EVENTS    AVN LIVE    AVN ID    CHARTS    MARKETPLACE    FORUM    GLBT

Home > Business > Legal News > The Latest Porn-Unfriendly Place: Unincorporated Ventura County

# The Latest Porn-Unfriendly Place: Unincorporated Ventura County

Please select a category



Posted May 07th, 2013 04:00 PM by Mark Kernes

     3

**VENTURA, Calif.**—It stretches from roughly Topanga Canyon Boulevard on the southeast to where Route 150 meets the Pacific Coast Highway on the northwest, and now this 1845 square mile patch of land has become the latest California community to officially become unfriendly to the adult entertainment industry. In other words, the Ventura County Board of Supervisors has today unanimously passed the "mandatory condom" ordinance introduced in late April by County Supervisor Linda Parks (R-District 2). The ordinance will take effect immediately.

ADVERTISEMENT



Parks allegedly sponsored the ordinance, whose text was unavailable at press time, after she had been contacted by residents of Newbury Park who complained that they could "hear and see the sex scenes" being shot at a home in the unincorporated neighborhood of Ventu Park.

The County Board of Supervisors is not the first Ventura County body to have passed a "mandatory condom" ordinance (though how much more than condoms are required will depend on the text of the ordinance). The city of Simi Valley recently passed an ordinance similar to the one adopted by the City of Los Angeles late last year, but with the added requirements that an on-site health care professional monitor the condom use, and that the producer submit a copy of the finished production to the Simi Valley Police Department to confirm compliance. Thousand Oaks, while lacking a specific ordinance related to adult filming, nonetheless has a requirement that any production company planning to shoot in the city obtain an agreement to the shoot from 90 percent of neighbors within 200 feet of the filming site. And finally, the city of Camarillo in late March enacted a 45-day moratorium on any adult filming in the city—a moratorium that is up for extension within the next few days.

Of course, it's not surprising that there's been so much anti-adult sentiment in the county. Of Ventura County's roughly 800,000 residents, 49.3 percent of its registered voters were Republicans according to the 2010 census, though the county did marginally favor Barack Obama in the 2008 and 2012 elections.

Unknown is whether AIDS Healthcare Foundation, which successfully petitioned both the city and county of Los Angeles to enact "barrier protection" ordinances, had had any contact either with Parks to write the just-enacted ordinance and/or with other supervisors to lobby in favor of its passage.

Like   5      Tweet   33      3

E-mail    Comments

Previous article                                    Next article
This Week in Censorship News: Japan and the UK    Sanctioned Copyright Lawyer Says He Will Appeal Judge's Order

Related Content:

Article Authors

Mark Kernes

Comments



YOU DESERVE BETTER BILLING

AMERICAN AND EUROPEAN IPSP AND DMA SOLUTIONS THAT PUT YOU FIRST.

Commerce Gate  GLOBAL BILLING

- Open for Business! -

US: (866) 877 1964    INTL: +34 931 149 991
sales@commercegate.com

Please log in to comment.
Don't have a free account? Become a member!

*By participating you agree to our Privacy Policy & the AVN "Be Kind Policy" and represent that you are not under the age of 18.*

## Related Topics

Ventura County   condoms   barrier protection   hazmat suits   ordinance   Linda Parks   Republican





Advertise with AVN  |  Contact Us  |  Privacy Policy  |  Sitemap
All models were at least 18 years old at the time of their performance.
18 U.S.C. 2257 Record-Keeping Requirements Compliance Statement.

© 2013 AVN Media Network