PAUL J. CAMBRIA, JR. (State Bar No. 177957)
    pcambria@lglaw.com
LIPSITZ GREEN SCIME CAMBRIA LLP
1631 West Beverly Blvd., Second Floor
Los Angeles, CA 90026
Telephone: (323) 883-1807

*See attached for additional counsel for Plaintiffs*

Attorneys for Plaintiffs
VIVID ENTERTAINMENT, LLC; CALIFA
PRODUCTIONS, INC.; JANE DOE A/K/A
KAYDEN KROSS; AND JOHN DOE A/K/A
LOGAN PIERCE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIVID ENTERTAINMENT, LLC; CALIFA PRODUCTIONS, INC.; JANE DOE a/k/a Kayden Kross; and JOHN DOE a/k/a Logan Pierce,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>JONATHAN FIELDING, Director of Los Angeles County Department of Public Health, JACKIE LACEY, Los Angeles County District Attorney, and COUNTY OF LOS ANGELES<br><br>                    Defendants. | Case No. **CV 13-00190 DDP (AGRx)**<br>Assigned to the Hon. Dean D. Pregerson<br><br>**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY AND NOTICE OF INTENT TO FILE MOTION FOR RECONSIDERATION OF RULING ON MOTION TO INTERVENE (DOCKET NO. 44)**<br><br>Action Filed:  January 10, 2013 |

*Additional counsel for Plaintiffs:*

JANET L. GRUMER (State Bar No. 232723)
    janetgrumer@dwt.com
MATTHEW D. PETERSON (State Bar No. 251490)
    matthewpeterson@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, Suite 2400
Los Angeles, CA  90017-2566
Telephone: (213) 633-6800

H. LOUIS SIRKIN (*Admitted Pro Hac Vice*)
    HLS@santen-hughes.com
Santen & Hughes LPA
600 Vine Street, Suite 2700
Cincinnati, OH 45202
Telephone: (513) 721-4450

ROBERT CORN-REVERE (*Admitted Pro Hac Vice*)
    bobcornrevere@dwt.com
RONALD G. LONDON (*Admitted Pro Hac Vice*)
    ronnielondon@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006
Telephone: (202) 973-4200

NOTICE OF SUPPLEMENTAL AUTHORITY

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that attached hereto as Exhibit A is supplemental authority that bears on Intervenors' standing to proceed as a party in this action, to wit, the Supreme Court's decision in *Hollingsworth v. Perry*, No. 12-144 (U.S. June 26, 2013).  ).  In *Hollingsworth*, the Court holds that the proponents of ballot initiatives, like Intervenors here with Measure B, "have no 'personal stake' in defending its enforcement … distinguishable from the general interest of every citizen of California" and thus lack Article III standing.  Slip op. 8.  *See also id.* at 9-10, 16-17 ("We have never before upheld the standing of a private party to defend the constitutionality of a state statute when state officials have chosen not to.").

The decision in *Hollingsworth* bears not only on the Court's grant of Intervenors' Motion to Intervene (Docket No. 44), but also on the pending Intervenors' Motion to Dismiss (Docket No. 49) and Plaintiffs' Motion for Preliminary Injunction (Docket No. 55), which Intervenors opposed but Defendants did not.  All courts have an obligation to ensure standing and jurisdiction at all stages of a case.  *See Hollingsworth*, Slip Op. 6 ("Article III demands that an 'actual controversy' persist throughout all stages of litigation."); *see also*, *e.g.*, *Bashkin v. Hickman*, 2008 WL 183696, at *7 (S.D. Cal. Jan. 17, 2008) ("Court has a continuing duty to examine its own jurisdiction to grant relief").

PLEASE TAKE FURTHER NOTICE that Plaintiffs Vivid Entertainment, LLC, Califa Productions, Inc., Jane Doe a/k/a Kayden Kross and John Doe a/k/a Logan Pierce (collectively "Plaintiffs") intend to file a motion for reconsideration of the Court's ruling on Intervenors' Motion to Intervene (Docket No. 44), in light of

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

the Supreme Court's ruling in *Hollingsworth*, after attempting to meet and confer with Intervenors on the proposed motion.

DATED: June 26, 2013          LIPSITZ GREEN SCIME CAMBRIA LLP
                              PAUL J. CAMBRIA, JR.

                              SANTEN & HUGHES LPA
                              H. LOUIS SIRKIN

                              DAVIS WRIGHT TREMAINE LLP
                              ROBERT CORN-REVERE
                              RONALD G. LONDON
                              JANET L. GRUMER
                              MATTHEW D. PETERSON


                              By:_____/s/ Matthew D. Peterson_____
                                        Matthew D. Peterson

                              Attorneys for Plaintiffs
                              VIVID ENTERTAINMENT, LLC;
                              CALIFA PRODUCTIONS, INC.;
                              JANE DOE a/k/a Kayden Kross; and
                              JOHN DOE a/k/a Logan Pierce

NOTICE OF SUPPLEMENTAL AUTHORITY
DWT 22206488v2 0097322-000001

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HOLLINGSWORTH ET AL. *v.* PERRY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 12–144.  Argued March 26, 2013—Decided June 26, 2013

After the California Supreme Court held that limiting marriage to op-posite-sex couples violated the California Constitution, state voters passed a ballot initiative known as Proposition 8, amending the State Constitution to define marriage as a union between a man and a woman**.**  Respondents, same-sex couples who wish to marry, filed suit in federal court, challenging Proposition 8 under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and naming as defendants California's Governor and other state and local officials responsible for enforcing California's marriage laws.  The officials re-fused to defend the law, so the District Court allowed petitioners—the initiative's official proponents—to intervene to defend it.  After a bench trial, the court declared Proposition 8 unconstitutional and en-joined the public officials named as defendants from enforcing the law.  Those officials elected not to appeal, but petitioners did.  The Ninth Circuit certified a question to the California Supreme Court: whether official proponents of a ballot initiative have authority to as-sert the State's interest in defending the constitutionality of the ini-tiative when public officials refuse to do so.  After the California Su-preme Court answered in the affirmative, the Ninth Circuit concluded that petitioners had standing under federal law to defend Proposition 8's constitutionality.  On the merits, the court affirmed the District Court's order.

*Held*: Petitioners did not have standing to appeal the District Court's order.  Pp. 5–17.

   (a) Article III of the Constitution confines the judicial power of fed-eral courts to deciding actual "Cases" or "Controversies."  §2.  One es-sential aspect of this requirement is that any person invoking the power of a federal court must demonstrate standing to do so.  In oth-

Syllabus

er words, the litigant must seek a remedy for a personal and tangible harm. Although most standing cases consider whether a plaintiff has satisfied the requirement when filing suit, Article III demands that an "actual controversy" persist throughout all stages of litigation. *Already, LLC* v. *Nike, Inc.*, 568 U. S. ___, ___. Standing "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 64. The parties do not contest that respondents had standing to initiate this case against the California officials responsible for enforcing Proposition 8. But once the District Court issued its order, respondents no longer had any injury to redress, and the state officials chose not to appeal. The only individuals who sought to appeal were petitioners, who had intervened in the District Court, but they had not been ordered to do or refrain from doing anything. Their only interest was to vindicate the constitutional validity of a generally applicable California law. As this Court has repeatedly held, such a "generalized grievance"—no matter how sincere—is insufficient to confer standing. See *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 573–574. Petitioners claim that the California Constitution and election laws give them a "'unique,' 'special,' and 'distinct' role in the initiative process," Reply Brief 5, but that is only true during the process of enacting the law. Once Proposition 8 was approved, it became a duly enacted constitutional amendment. Petitioners have no role—special or otherwise—in its enforcement. They therefore have no "personal stake" in defending its enforcement that is distinguishable from the general interest of every California citizen. No matter how deeply committed petitioners may be to upholding Proposition 8, that is not a particularized interest sufficient to create a case or controversy under Article III. Pp. 5–9.

(b) Petitioners' arguments to the contrary are unpersuasive. Pp. 9–16.

(1) They claim that they may assert the State's interest on the State's behalf, but it is a "fundamental restriction on our authority" that "[i]n the ordinary course, a litigant . . . cannot rest a claim to relief on the legal rights or interests of third parties." *Powers* v. *Ohio*, 499 U. S. 400, 410. In *Diamond* v. *Charles*, 476 U. S. 54, for example, a pediatrician engaged in private practice was not permitted to defend the constitutionality of Illinois' abortion law after the State chose not to appeal an adverse ruling. The state attorney general's "letter of interest," explaining that the State's interest in the proceeding was "'essentially co-terminous with'" Diamond's position, *id.,* at 61, was insufficient, since Diamond was unable to assert an injury of his own, *id,* at 65. Pp. 9–10.

(2) Petitioners contend the California Supreme Court's determi-

Syllabus

nation that they were authorized under California law to assert the State's interest in the validity of Proposition 8 means that they "need no more show a personal injury, separate from the State's indispensable interest in the validity of its law, than would California's Attorney General or did the legislative leaders held to have standing in *Karcher v. May,* 484 U. S. 72 (1987)." Reply Brief 6. But far from supporting petitioners' standing, *Karcher* is compelling precedent against it. In that case, after the New Jersey attorney general refused to defend the constitutionality of a state law, leaders of New Jersey's Legislature were permitted to appear, in their official capacities, in the District Court and Court of Appeals to defend the law. What is significant about *Karcher,* however, is what happened after the Court of Appeals decision. The legislators lost their leadership positions, but nevertheless sought to appeal to this Court. The Court held that they could not do so. Although they could participate in the lawsuit in their official capacities as presiding officers of the legislature, as soon as they lost that capacity, they lost standing. *Id.,* at 81. Petitioners here hold no office and have always participated in this litigation solely as private parties. Pp. 10–13.

(3) Nor is support found in dicta in *Arizonans for Official English* v. *Arizona, supra.* There, in expressing "grave doubts" about the standing of ballot initiative sponsors to defend the constitutionality of an Arizona initiative, the Court noted that it was "aware of no Arizona law appointing initiative sponsors as agents of the people of Arizona to defend, in lieu of public officials, the constitutionality of initiatives made law of the State." *Id.,* at 65. Petitioners argue that, by virtue of the California Supreme Court's decision, they *are* authorized to act as "agents of the people of California." Brief for Petitioners 15. But that Court never described petitioners as "agents of the people." All the California Supreme Court's decision stands for is that, so far as California is concerned, petitioners may "assert legal arguments in defense of the state's interest in the validity of the initiative measure" in federal court. 628 F. 3d 1191, 1193. That interest is by definition a generalized one, and it is precisely because proponents assert such an interest that they lack standing under this Court's precedents. Petitioners are also plainly not agents of the State. As an initial matter, petitioners' newfound claim of agency is inconsistent with their representations to the District Court, where they claimed to represent their *own* interests as official proponents. More to the point, the basic features of an agency relationship are missing here: Petitioners are not subject to the control of any principal, and they owe no fiduciary obligation to anyone. As one *amicus* puts it, "the proponents apparently have an unelected appointment for an unspecified period of time as defenders of the initiative, however and to

4                          HOLLINGSWORTH *v.* PERRY

                                   Syllabus

whatever extent they choose to defend it." Brief for Walter Dellinger
23. Pp. 13–16.

   (c) The Court does not question California's sovereign right to
maintain an initiative process, or the right of initiative proponents to
defend their initiatives in California courts. But standing in federal
court is a question of federal law, not state law. No matter its rea-
sons, the fact that a State thinks a private party should have stand-
ing to seek relief for a generalized grievance cannot override this
Court's settled law to the contrary. Article III's requirement that a
party invoking the jurisdiction of a federal court seek relief for a per-
sonal, particularized injury serves vital interests going to the role of
the Judiciary in the federal system of separated powers. States can-
not alter that role simply by issuing to private parties who otherwise
lack standing a ticket to the federal courthouse. Pp. 16–17.

671 F. 3d 1052, vacated and remanded.

   ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA,
GINSBURG, BREYER, and KAGAN, JJ., joined. KENNEDY, J., filed a dis-
senting opinion, in which THOMAS, ALITO, and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

—————

No. 12–144

—————

## DENNIS HOLLINGSWORTH, ET AL., PETITIONERS *v.* KRISTIN M. PERRY ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 26, 2013]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The public is currently engaged in an active political debate over whether same-sex couples should be allowed to marry. That question has also given rise to litigation. In this case, petitioners, who oppose same-sex marriage, ask us to decide whether the Equal Protection Clause "prohibits the State of California from defining marriage as the union of a man and a woman." Pet. for Cert. i. Respondents, same-sex couples who wish to marry, view the issue in somewhat different terms: For them, it is whether California—having previously recognized the right of same-sex couples to marry—may reverse that decision through a referendum.

Federal courts have authority under the Constitution to answer such questions only if necessary to do so in the course of deciding an actual "case" or "controversy." As used in the Constitution, those words do not include every sort of dispute, but only those "historically viewed as capable of resolution through the judicial process." *Flast* v. *Cohen*, 392 U. S. 83, 95 (1968). This is an essential

limit on our power: It ensures that we act *as judges*, and do not engage in policymaking properly left to elected representatives.

For there to be such a case or controversy, it is not enough that the party invoking the power of the court have a keen interest in the issue. That party must also have "standing," which requires, among other things, that it have suffered a concrete and particularized injury. Because we find that petitioners do not have standing, we have no authority to decide this case on the merits, and neither did the Ninth Circuit.

## I

In 2008, the California Supreme Court held that limiting the official designation of marriage to opposite-sex couples violated the equal protection clause of the California Constitution. *In re Marriage Cases*, 43 Cal. 4th 757, 183 P. 3d 384. Later that year, California voters passed the ballot initiative at the center of this dispute, known as Proposition 8. That proposition amended the California Constitution to provide that "[o]nly marriage between a man and a woman is valid or recognized in California." Cal. Const., Art. I, §7.5. Shortly thereafter, the California Supreme Court rejected a procedural challenge to the amendment, and held that the Proposition was properly enacted under California law. *Strauss* v. *Horton*, 46 Cal. 4th 364, 474–475, 207 P. 3d 48, 122 (2009).

According to the California Supreme Court, Proposition 8 created a "narrow and limited exception" to the state constitutional rights otherwise guaranteed to same-sex couples. *Id.,* at 388, 207 P. 3d, at 61. Under California law, same-sex couples have a right to enter into relationships recognized by the State as "domestic partnerships," which carry "the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law . . . as are granted to and

Opinion of the Court

imposed upon spouses." Cal. Fam. Code Ann. §297.5(a) (West 2004). In *In re Marriage Cases*, the California Supreme Court concluded that the California Constitution further guarantees same-sex couples "all of the constitutionally based incidents of marriage," including the right to have that marriage "officially recognized" as such by the State. 43 Cal. 4th, at 829, 183 P. 3d, at 433–434. Proposition 8, the court explained in *Strauss*, left those rights largely undisturbed, reserving only "the official *designation* of the term 'marriage' for the union of opposite-sex couples as a matter of state constitutional law." 46 Cal. 4th, at 388, 207 P. 3d, at 61.

Respondents, two same-sex couples who wish to marry, filed suit in federal court, challenging Proposition 8 under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Federal Constitution. The complaint named as defendants California's Governor, attorney general, and various other state and local officials responsible for enforcing California's marriage laws. Those officials refused to defend the law, although they have continued to enforce it throughout this litigation. The District Court allowed petitioners—the official proponents of the initiative, see Cal. Elec. Code Ann. §342 (West 2003)—to intervene to defend it. After a 12-day bench trial, the District Court declared Proposition 8 unconstitutional, permanently enjoining the California officials named as defendants from enforcing the law, and "directing the official defendants that all persons under their control or supervision" shall not enforce it. *Perry* v. *Schwarzenegger*, 704 F. Supp. 2d 921, 1004 (ND Cal. 2010).

Those officials elected not to appeal the District Court order. When petitioners did, the Ninth Circuit asked them to address "why this appeal should not be dismissed for lack of Article III standing." *Perry* v. *Schwarzenegger*, Civ. No. 10–16696 (CA9, Aug. 16, 2010), p. 2. After brief-

ing and argument, the Ninth Circuit certified a question to
the California Supreme Court:

> "Whether under Article II, Section 8 of the California
> Constitution, or otherwise under California law, the
> official proponents of an initiative measure possess
> either a particularized interest in the initiative's valid-
> ity or the authority to assert the State's interest in the
> initiative's validity, which would enable them to de-
> fend the constitutionality of the initiative upon its
> adoption or appeal a judgment invalidating the initia-
> tive, when the public officials charged with that duty
> refuse to do so." *Perry* v. *Schwarzenegger*, 628 F. 3d
> 1191, 1193 (2011).

The California Supreme Court agreed to decide the
certified question, and answered in the affirmative. With-
out addressing whether the proponents have a particular-
ized interest of their own in an initiative's validity, the
court concluded that "[i]n a postelection challenge to a
voter-approved initiative measure, the official proponents
of the initiative are authorized under California law to
appear and assert the state's interest in the initiative's
validity and to appeal a judgment invalidating the meas-
ure when the public officials who ordinarily defend the
measure or appeal such a judgment decline to do so."
*Perry* v. *Brown*, 52 Cal. 4th 1116, 1127, 265 P. 3d 1002,
1007 (2011).

Relying on that answer, the Ninth Circuit concluded
that petitioners had standing under federal law to defend
the constitutionality of Proposition 8. California, it rea-
soned, "'has standing to defend the constitutionality of its
[laws],'" and States have the "prerogative, as independent
sovereigns, to decide for themselves who may assert their
interests." *Perry* v. *Brown*, 671 F. 3d 1052, 1070, 1071
(2012) (quoting *Diamond* v. *Charles*, 476 U. S. 54, 62
(1986)). "All a federal court need determine is that the

Opinion of the Court

state has suffered a harm sufficient to confer standing and that the party seeking to invoke the jurisdiction of the court is authorized by the state to represent its interest in remedying that harm." 671 F. 3d, at 1072.

On the merits, the Ninth Circuit affirmed the District Court. The court held the Proposition unconstitutional under the rationale of our decision in *Romer* v. *Evans*, 517 U. S. 620 (1996). 671 F. 3d, at 1076, 1095. In the Ninth Circuit's view, *Romer* stands for the proposition that "the Equal Protection Clause requires the state to have a legitimate reason for withdrawing a right or benefit *from one group but not others*, whether or not it was required to confer that right or benefit in the first place." 671 F. 3d, at 1083–1084. The Ninth Circuit concluded that "taking away the official designation" of "marriage" from same-sex couples, while continuing to afford those couples all the rights and obligations of marriage, did not further any legitimate interest of the State. *Id.,* at 1095. Proposition 8, in the court's view, violated the Equal Protection Clause because it served no purpose "but to impose on gays and lesbians, through the public law, a majority's private disapproval of them and their relationships." *Ibid.*

We granted certiorari to review that determination, and directed that the parties also brief and argue "Whether petitioners have standing under Article III, §2, of the Constitution in this case." 568 U. S. ___ (2012).

## II

Article III of the Constitution confines the judicial power of federal courts to deciding actual "Cases" or "Controversies." §2. One essential aspect of this requirement is that any person invoking the power of a federal court must demonstrate standing to do so. This requires the litigant to prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial deci-

Opinion of the Court

sion. *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992). In other words, for a federal court to have authority under the Constitution to settle a dispute, the party before it must seek a remedy for a personal and tangible harm. "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Diamond*, *supra*, at 62.

The doctrine of standing, we recently explained, "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper* v. *Amnesty Int'l USA*, 568 U. S. ___, ___ (2013) (slip op., at 9). In light of this "overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, we must put aside the natural urge to proceed directly to the merits of [an] important dispute and to 'settle' it for the sake of convenience and efficiency." *Raines* v. *Byrd*, 521 U. S. 811, 820 (1997) (footnote omitted).

Most standing cases consider whether a plaintiff has satisfied the requirement when filing suit, but Article III demands that an "actual controversy" persist throughout all stages of litigation. *Already, LLC* v. *Nike, Inc.*, 568 U. S. ___, ___ (2013) (slip op., at 4) (internal quotation marks omitted). That means that standing "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 64 (1997). We therefore must decide whether petitioners had standing to appeal the District Court's order.

Respondents initiated this case in the District Court against the California officials responsible for enforcing Proposition 8. The parties do not contest that respondents had Article III standing to do so. Each couple expressed a desire to marry and obtain "official sanction" from the State, which was unavailable to them given the declaration in Proposition 8 that "marriage" in California is solely

Opinion of the Court

between a man and a woman. App. 59.

After the District Court declared Proposition 8 unconstitutional and enjoined the state officials named as defendants from enforcing it, however, the inquiry under Article III changed. Respondents no longer had any injury to redress—they had won—and the state officials chose not to appeal.

The only individuals who sought to appeal that order were petitioners, who had intervened in the District Court. But the District Court had not ordered them to do or refrain from doing anything. To have standing, a litigant must seek relief for an injury that affects him in a "personal and individual way." *Defenders of Wildlife*, *supra,* at 560, n. 1. He must possess a "direct stake in the outcome" of the case. *Arizonans for Official English*, *supra,* at 64 (internal quotation marks omitted). Here, however, petitioners had no "direct stake" in the outcome of their appeal. Their only interest in having the District Court order reversed was to vindicate the constitutional validity of a generally applicable California law.

We have repeatedly held that such a "generalized grievance," no matter how sincere, is insufficient to confer standing. A litigant "raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Defenders of Wildlife*, *supra*, at 573–574; see *Lance* v. *Coffman*, 549 U. S. 437, 439 (2007) (*per curiam*) ("Our refusal to serve as a forum for generalized grievances has a lengthy pedigree."); *Allen* v. *Wright*, 468 U. S. 737, 754 (1984) ("an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court"); *Massachusetts* v. *Mellon*, 262 U. S. 447, 488 (1923) ("The party who invokes

the [judicial] power must be able to show . . . that he has sustained or is immediately in danger of sustaining some direct injury . . . and not merely that he suffers in some indefinite way in common with people generally.").

Petitioners argue that the California Constitution and its election laws give them a "'unique,' 'special,' and 'distinct' role in the initiative process—one 'involving both authority and responsibilities that differ from other supporters of the measure.'" Reply Brief 5 (quoting 52 Cal. 4th, at 1126, 1142, 1160, 265 P. 3d, at 1006, 1017–1018, 1030). True enough—but only when it comes to the process of enacting the law. Upon submitting the proposed initiative to the attorney general, petitioners became the official "proponents" of Proposition 8. Cal. Elec. Code Ann. §342 (West 2003). As such, they were responsible for collecting the signatures required to qualify the measure for the ballot. §§9607–9609. After those signatures were collected, the proponents alone had the right to file the measure with election officials to put it on the ballot. §9032. Petitioners also possessed control over the arguments in favor of the initiative that would appear in California's ballot pamphlets. §§9064, 9065, 9067, 9069.

But once Proposition 8 was approved by the voters, the measure became "a duly enacted constitutional amendment or statute." 52 Cal. 4th, at 1147, 265 P. 3d, at 1021. Petitioners have no role—special or otherwise—in the enforcement of Proposition 8. See *id.,* at 1159, 265 P. 3d, at 1029 (petitioners do not "possess any official authority . . . to directly enforce the initiative measure in question"). They therefore have no "personal stake" in defending its enforcement that is distinguishable from the general interest of every citizen of California. *Defenders of Wildlife, supra,* at 560–561.

Article III standing "is not to be placed in the hands of 'concerned bystanders,' who will use it simply as a 'vehicle for the vindication of value interests.'" *Diamond,* 476

U. S., at 62. No matter how deeply committed petitioners may be to upholding Proposition 8 or how "zealous [their] advocacy," *post,* at 4 (KENNEDY, J., dissenting), that is not a "particularized" interest sufficient to create a case or controversy under Article III. *Defenders of Wildlife*, 504 U. S., at 560, and n. 1; see *Arizonans for Official English*, 520 U. S., at 65 ("Nor has this Court ever identified initiative proponents as Article-III-qualified defenders of the measures they advocated."); *Don't Bankrupt Washington Committee* v. *Continental Ill. Nat. Bank & Trust Co. of Chicago*, 460 U. S. 1077 (1983) (summarily dismissing, for lack of standing, appeal by an initiative proponent from a decision holding the initiative unconstitutional).

### III
#### A

Without a judicially cognizable interest of their own, petitioners attempt to invoke that of someone else. They assert that even if *they* have no cognizable interest in appealing the District Court's judgment, the State of California does, and they may assert that interest on the State's behalf. It is, however, a "fundamental restriction on our authority" that "[i]n the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers* v. *Ohio*, 499 U. S. 400, 410 (1991). There are "certain, limited exceptions" to that rule. *Ibid.* But even when we have allowed litigants to assert the interests of others, the litigants themselves still "must have suffered an injury in fact, thus giving [them] a sufficiently concrete interest in the outcome of the issue in dispute." *Id.,* at 411 (internal quotation marks omitted).

In *Diamond* v. *Charles*, for example, we refused to allow Diamond, a pediatrician engaged in private practice in Illinois, to defend the constitutionality of the State's abortion law. In that case, a group of physicians filed a con-

stitutional challenge to the Illinois statute in federal court. The State initially defended the law, and Diamond, a professed "conscientious object[or] to abortions," intervened to defend it alongside the State. 476 U. S., at 57–58.

After the Seventh Circuit affirmed a permanent injunction against enforcing several provisions of the law, the State chose not to pursue an appeal to this Court. But when Diamond did, the state attorney general filed a "'letter of interest,'" explaining that the State's interest in the proceeding was "'essentially co-terminous with the position on the issues set forth by [Diamond].'" *Id.,* at 61. That was not enough, we held, to allow the appeal to proceed. As the Court explained, "[e]ven if there were circumstances in which a private party would have standing to defend the constitutionality of a challenged statute, this [was] not one of them," because Diamond was not able to assert an injury in fact of his own. *Id.,* at 65 (footnote omitted). And without "any judicially cognizable interest," Diamond could not "maintain the litigation abandoned by the State." *Id.,* at 71.

For the reasons we have explained, petitioners have likewise not suffered an injury in fact, and therefore would ordinarily have no standing to assert the State's interests.

### B

Petitioners contend that this case is different, because the California Supreme Court has determined that they are "authorized under California law to appear and assert the state's interest" in the validity of Proposition 8. 52 Cal. 4th, at 1127, 265 P. 3d, at 1007. The court below agreed: "All a federal court need determine is that the state has suffered a harm sufficient to confer standing and that the party seeking to invoke the jurisdiction of the court is authorized by the state to represent its interest in remedying that harm." 671 F. 3d, at 1072. As petitioners

put it, they "need no more show a personal injury, separate from the State's indisputable interest in the validity of its law, than would California's Attorney General or did the legislative leaders held to have standing in *Karcher v. May,* 484 U. S. 72 (1987)." Reply Brief 6.

In *Karcher,* we held that two New Jersey state legislators—Speaker of the General Assembly Alan Karcher and President of the Senate Carmen Orechio—could intervene in a suit against the State to defend the constitutionality of a New Jersey law, after the New Jersey attorney general had declined to do so. 484 U. S., at 75, 81–82. "Since the New Jersey Legislature had authority under state law to represent the State's interests in both the District Court and the Court of Appeals," we held that the Speaker and the President, in their official capacities, could vindicate that interest in federal court on the legislature's behalf. *Id.,* at 82.

Far from supporting petitioners' standing, however, *Karcher* is compelling precedent against it. The legislators in that case intervened in their official capacities as Speaker and President of the legislature. No one doubts that a State has a cognizable interest "in the continued enforceability" of its laws that is harmed by a judicial decision declaring a state law unconstitutional. *Maine* v. *Taylor,* 477 U. S. 131, 137 (1986). To vindicate that interest or any other, a State must be able to designate agents to represent it in federal court. See *Poindexter* v. *Greenhow,* 114 U. S. 270, 288 (1885) ("The State is a political corporate body [that] can act only through agents"). That agent is typically the State's attorney general. But state law may provide for other officials to speak for the State in federal court, as New Jersey law did for the State's presiding legislative officers in *Karcher.* See 484 U. S., at 81–82.

What is significant about *Karcher* is what happened after the Court of Appeals decision in that case. Karcher and Orechio lost their positions as Speaker and President,

but nevertheless sought to appeal to this Court. We held that they could not do so. We explained that while they were able to participate in the lawsuit in their official capacities as presiding officers of the incumbent legislature, "since they no longer hold those offices, they lack authority to pursue this appeal." *Id.,* at 81.

The point of *Karcher* is not that a State could authorize *private parties* to represent its interests; Karcher and Orechio were permitted to proceed only because they were state officers, acting in an official capacity. As soon as they lost that capacity, they lost standing. Petitioners here hold no office and have always participated in this litigation solely as private parties.

The cases relied upon by the dissent, see *post,* at 11–12, provide petitioners no more support. The dissent's primary authorities, in fact, do not discuss standing at all. See *Young* v. *United States ex rel. Vuitton et Fils S. A.*, 481 U. S. 787 (1987); *United States* v. *Providence Journal Co.*, 485 U. S. 693 (1988). And none comes close to establishing that mere authorization to represent a third party's interests is sufficient to confer Article III standing on private parties with no injury of their own.

The dissent highlights the discretion exercised by special prosecutors appointed by federal courts to pursue contempt charges. See *post,* at 11 (citing *Young, supra,* at 807). Such prosecutors do enjoy a degree of independence in carrying out their appointed role, but no one would suppose that they are not subject to the ultimate authority of the court that appointed them. See also *Providence Journal, supra,* at 698–707 (recognizing further control exercised by the Solicitor General over special prosecutors).

The dissent's remaining cases, which at least consider standing, are readily distinguishable. See *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U. S. 765, 771–778 (2000) (justifying *qui tam* actions

Opinion of the Court

based on a partial assignment of the Government's dam-
ages claim and a "well nigh conclusive" tradition of such
actions in English and American courts dating back to the
13th century); *Whitmore* v. *Arkansas*, 495 U. S. 149, 162–
164 (1989) (justifying "next friend" standing based on a
similar history dating back to the 17th century, requiring
the next friend to prove a disability of the real party in
interest and a "significant relationship" with that party);
*Gollust* v. *Mendell*, 501 U. S. 115, 124–125 (1990) (requir-
ing plaintiff in shareholder-derivative suit to maintain a
financial stake in the outcome of the litigation, to avoid
"serious constitutional doubt whether that plaintiff could
demonstrate the standing required by Article III's case-or-
controversy limitation").

## C

Both petitioners and respondents seek support from
dicta in *Arizonans for Official English* v. *Arizona*, 520
U. S. 43. The plaintiff in *Arizonans for Official English*
filed a constitutional challenge to an Arizona ballot initia-
tive declaring English "'the official language of the State
of Arizona.'" *Id.,* at 48. After the District Court declared
the initiative unconstitutional, Arizona's Governor an-
nounced that she would not pursue an appeal. Instead,
the principal sponsor of the ballot initiative—the Arizo-
nans for Official English Committee—sought to defend the
measure in the Ninth Circuit. *Id.,* at 55–56, 58. Analogiz-
ing the sponsors to the Arizona Legislature, the Ninth
Circuit held that the Committee was "qualified to defend
[the initiative] on appeal," and affirmed the District Court.
*Id.,* at 58, 61.

Before finding the case mooted by other events, this
Court expressed "grave doubts" about the Ninth Circuit's
standing analysis. *Id.,* at 66. We reiterated that
"[s]tanding to defend on appeal in the place of an original
defendant . . . demands that the litigant possess 'a direct

stake in the outcome.'" *Id.,* at 64 (quoting *Diamond*, 476
U. S., at 62). We recognized that a legislator authorized
by state law to represent the State's interest may satisfy
standing requirements, as in *Karcher, supra,* at 82, but
noted that the Arizona committee and its members were
"not elected representatives, and we [we]re aware of no
Arizona law appointing initiative sponsors as agents of the
people of Arizona to defend, in lieu of public officials, the
constitutionality of initiatives made law of the State."
*Arizonans for Official English, supra,* at 65.

Petitioners argue that, by virtue of the California Su-
preme Court's decision, they *are* authorized to act "'as
agents of the people' of California." Brief for Petitioners
15 (quoting *Arizonans for Official English, supra,* at 65).
But that Court never described petitioners as "agents of
the people," or of anyone else. Nor did the Ninth Circuit.
The Ninth Circuit asked—and the California Supreme
Court answered—only whether petitioners had "the au-
thority to assert the State's interest in the initiative's
validity." 628 F. 3d, at 1193; 52 Cal. 4th, at 1124, 265
P. 3d, at 1005. All that the California Supreme Court
decision stands for is that, so far as California is con-
cerned, petitioners may argue in defense of Proposition 8.
This "does not mean that the proponents become de facto
public officials"; the authority they enjoy is "simply the
authority to participate as parties in a court action and to
assert legal arguments in defense of the state's interest in
the validity of the initiative measure." *Id.,* at 1159, 265
P. 3d, at 1029. That interest is by definition a generalized
one, and it is precisely because proponents assert such an
interest that they lack standing under our precedents.

And petitioners are plainly not agents of the State—
"formal" or otherwise, see *post,* at 7. As an initial matter,
petitioners' newfound claim of agency is inconsistent with
their representations to the District Court. When the
proponents sought to intervene in this case, they did not

purport to be agents of California.  They argued instead
that "no other party in this case w[ould] adequately rep-
resent *their interests as official proponents*."  Motion to
Intervene in No. 09–2292 (ND Cal.), p. 6 (emphasis
added).  It was their "unique legal status" as official
proponents—not an agency relationship with the people of
California—that petitioners claimed "endow[ed] them with
a significantly protectable interest" in ensuring that the
District Court not "undo[ ] all that they ha[d] done in
obtaining . . . enactment" of Proposition 8.  *Id.,* at 10, 11.

  More to the point, the most basic features of an agency
relationship are missing here.  Agency requires more than
mere authorization to assert a particular interest.  "An
essential element of agency is the principal's right to
control the agent's actions."  1 Restatement (Third) of
Agency §1.01, Comment *f* (2005) (hereinafter Restate-
ment).  Yet petitioners answer to no one; they decide for
themselves, with no review, what arguments to make and
how to make them.  Unlike California's attorney general,
they are not elected at regular intervals—or elected at all.
See Cal. Const., Art. V, §11.  No provision provides for
their removal.  As one *amicus* explains, "the proponents
apparently have an unelected appointment for an unspeci-
fied period of time as defenders of the initiative, however
and to whatever extent they choose to defend it."  Brief for
Walter Dellinger 23.

  "If the relationship between two persons is one of agency
. . . , the agent owes a fiduciary obligation to the princi-
pal."  1 Restatement §1.01, Comment *e.*  But petitioners
owe nothing of the sort to the people of California.  Unlike
California's elected officials, they have taken no oath of
office.  *E.g.,* Cal. Const., Art. XX, §3 (prescribing the oath
for "all public officers and employees, executive, legisla-
tive, and judicial").  As the California Supreme Court
explained, petitioners are bound simply by "the same
ethical constraints that apply to all other parties in a legal

proceeding." 52 Cal. 4th, at 1159, 265 P. 3d, at 1029. They are free to pursue a purely ideological commitment to the law's constitutionality without the need to take cognizance of resource constraints, changes in public opinion, or potential ramifications for other state priorities.

Finally, the California Supreme Court stated that "[t]he question of who should bear responsibility for any attorney fee award . . . is *entirely distinct* from the question" before it. *Id.,* at 1161, 265 P. 3d, at 1031. (emphasis added). But it is hornbook law that "a principal has a duty to indemnify the agent against expenses and other losses incurred by the agent in defending against actions brought by third parties if the agent acted with actual authority in taking the action challenged by the third party's suit." 2 Restatement §8.14, Comment *d*. If the issue of fees is entirely distinct from the authority question, then authority cannot be based on agency.

Neither the California Supreme Court nor the Ninth Circuit ever described the proponents as agents of the State, and they plainly do not qualify as such.

IV

The dissent eloquently recounts the California Supreme Court's reasons for deciding that state law authorizes petitioners to defend Proposition 8. See *post,* at 3–5. We do not "disrespect[ ]" or "disparage[ ]" those reasons. *Post,* at 12. Nor do we question California's sovereign right to maintain an initiative process, or the right of initiative proponents to defend their initiatives in California courts, where Article III does not apply. But as the dissent acknowledges, see *post,* at 1, standing in federal court is a question of federal law, not state law. And no matter its reasons, the fact that a State thinks a private party should have standing to seek relief for a generalized grievance cannot override our settled law to the contrary.

Opinion of the Court

The Article III requirement that a party invoking the jurisdiction of a federal court seek relief for a personal, particularized injury serves vital interests going to the role of the Judiciary in our system of separated powers. "Refusing to entertain generalized grievances ensures that . . . courts exercise power that is judicial in nature," *Lance*, 549 U. S., at 441, and ensures that the Federal Judiciary respects "the proper—and properly limited—role of the courts in a democratic society," *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 341 (2006) (internal quotation marks omitted). States cannot alter that role simply by issuing to private parties who otherwise lack standing a ticket to the federal courthouse.

\*      \*      \*

We have never before upheld the standing of a private party to defend the constitutionality of a state statute when state officials have chosen not to. We decline to do so for the first time here.

Because petitioners have not satisfied their burden to demonstrate standing to appeal the judgment of the District Court, the Ninth Circuit was without jurisdiction to consider the appeal. The judgment of the Ninth Circuit is vacated, and the case is remanded with instructions to dismiss the appeal for lack of jurisdiction.

*It is so ordered.*

Cite as: 570 U. S. ____ (2013)    1

KENNEDY, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

No. 12–144

————

## DENNIS HOLLINGSWORTH, ET AL., PETITIONERS *v.* KRISTIN M. PERRY ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 26, 2013]

JUSTICE KENNEDY, with whom JUSTICE THOMAS, JUS-TICE ALITO, and JUSTICE SOTOMAYOR join, dissenting.

The Court's opinion is correct to state, and the Supreme Court of California was careful to acknowledge, that a proponent's standing to defend an initiative in federal court is a question of federal law. Proper resolution of the justiciability question requires, in this case, a threshold determination of state law. The state-law question is how California defines and elaborates the status and authority of an initiative's proponents who seek to intervene in court to defend the initiative after its adoption by the electorate. Those state-law issues have been addressed in a metic-ulous and unanimous opinion by the Supreme Court of California.

Under California law, a proponent has the authority to appear in court and assert the State's interest in defend-ing an enacted initiative when the public officials charged with that duty refuse to do so. The State deems such an appearance essential to the integrity of its initiative pro-cess. Yet the Court today concludes that this state-defined status and this state-conferred right fall short of meeting federal requirements because the proponents cannot point to a formal delegation of authority that tracks the re-quirements of the Restatement of Agency. But the State Supreme Court's definition of proponents' powers is bind-

2                     HOLLINGSWORTH *v.* PERRY

ing on this Court. And that definition is fully sufficient to establish the standing and adversity that are requisites for justiciability under Article III of the United States Constitution.

In my view Article III does not require California, when deciding who may appear in court to defend an initiative on its behalf, to comply with the Restatement of Agency or with this Court's view of how a State should make its laws or structure its government. The Court's reasoning does not take into account the fundamental principles or the practical dynamics of the initiative system in California, which uses this mechanism to control and to bypass public officials—the same officials who would not defend the initiative, an injury the Court now leaves unremedied. The Court's decision also has implications for the 26 other States that use an initiative or popular referendum system and which, like California, may choose to have initiative proponents stand in for the State when public officials decline to defend an initiative in litigation. See M. Waters, Initiative and Referendum Almanac 12 (2003). In my submission, the Article III requirement for a justiciable case or controversy does not prevent proponents from having their day in court.

These are the premises for this respectful dissent.

                                 I

As the Court explains, the State of California sustained a concrete injury, sufficient to satisfy the requirements of Article III, when a United States District Court nullified a portion of its State Constitution. See *ante,* at 11 (citing *Maine* v. *Taylor*, 477 U. S. 131, 137 (1986)). To determine whether justiciability continues in appellate proceedings after the State Executive acquiesced in the District Court's adverse judgment, it is necessary to ascertain what persons, if any, have "authority under state law to represent the State's interests" in federal court. *Karcher* v. *May*, 484

KENNEDY, J., dissenting

U. S. 72, 82 (1987); see also *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 65 (1997).

As the Court notes, the California Elections Code does not on its face prescribe in express terms the duties or rights of proponents once the initiative becomes law. *Ante,* at 8. If that were the end of the matter, the Court's analysis would have somewhat more force. But it is not the end of the matter. It is for California, not this Court, to determine whether and to what extent the Elections Code provisions are instructive and relevant in determining the authority of proponents to assert the State's interest in postenactment judicial proceedings. And it is likewise not for this Court to say that a State must determine the substance and meaning of its laws by statute, or by judicial decision, or by a combination of the two. See *Sweezy* v. *New Hampshire*, 354 U. S. 234, 255 (1957) (plurality opinion); *Dreyer* v. *Illinois*, 187 U. S. 71, 84 (1902). That, too, is for the State to decide.

This Court, in determining the substance of state law, is "bound by a state court's construction of a state statute." *Wisconsin* v. *Mitchell*, 508 U. S. 476, 483 (1993). And the Supreme Court of California, in response to the certified question submitted to it in this case, has determined that State Elections Code provisions directed to initiative proponents do inform and instruct state law respecting the rights and status of proponents in postelection judicial proceedings. Here, in reliance on these statutes and the California Constitution, the State Supreme Court has held that proponents do have authority "under California law to appear and assert the state's interest in the initiative's validity and appeal a judgment invalidating the measure when the public officials who ordinarily defend the measure or appeal such a judgment decline to do so." *Perry* v. *Brown*, 52 Cal. 4th 1116, 1127, 265 P. 3d 1002, 1007 (2011).

The reasons the Supreme Court of California gave for its

4                 HOLLINGSWORTH *v.* PERRY

                    KENNEDY, J., dissenting

holding have special relevance in the context of determining whether proponents have the authority to seek a
federal-court remedy for the State's concrete, substantial,
and continuing injury. As a class, official proponents are
a small, identifiable group. See Cal. Elec. Code Ann.
§9001(a) (West Cum. Supp. 2013). Because many of their
decisions must be unanimous, see §§9001(b)(1), 9002(b),
they are necessarily few in number. Their identities
are public. §9001(b)(2). Their commitment is substantial.
See §§9607–9609 (West Cum. Supp. 2013) (obtaining petition signatures); §9001(c) (monetary fee); §§9065(d),
9067, 9069 (West 2003) (drafting arguments for official
ballot pamphlet). They know and understand the purpose
and operation of the proposed law, an important requisite
in defending initiatives on complex matters such as taxation and insurance. Having gone to great lengths to convince voters to enact an initiative, they have a stake in the
outcome and the necessary commitment to provide zealous
advocacy.

   Thus, in California, proponents play a "unique role . . .
in the initiative process." 52 Cal. 4th, at 1152, 265 P. 3d,
at 1024. They "have a unique relationship to the voter-
approved measure that makes them especially likely to be
reliable and vigorous advocates for the measure and to
be so viewed by those whose votes secured the initiative's
enactment into law." *Ibid.*; see also *id.,* at 1160, 265 P. 3d,
at 1030 (because of "their special relationship to the initiative measure," proponents are "the most obvious and
logical private individuals to ably and vigorously defend
the validity of the challenged measure on behalf of the
interests of the voters who adopted the initiative into
law"). Proponents' authority under state law is not a
contrivance. It is not a fictional construct. It is the product of the California Constitution and the California Elections Code. There is no basis for this Court to set aside
the California Supreme Court's determination of state

law.

The Supreme Court of California explained that its holding was consistent with recent decisions from other States.  *Id.,* at 1161–1165, 265 P. 3d, at 1031–1033.  In *Sportsmen for I–143* v. *Fifteenth Jud. Ct.,* 2002 MT 18, 308 Mont. 189, 40 P. 3d 400, the Montana Supreme Court unanimously held that because initiative sponsors "may be in the best position to defend their interpretation" of the initiative and had a "direct, substantial, legally protectable interest in" the lawsuit challenging that interpretation, they were "entitled to intervene as a matter of right." *Id.,* at 194–195, 40 P. 3d, at 403.  The Alaska Supreme Court reached a similar unanimous result in *Alaskans for a Common Language Inc.,* v. *Kritz*, 3 P. 3d 906 (2000).  It noted that, except in extraordinary cases, "a sponsor's direct interest in legislation enacted through the initiative process and the concomitant need to avoid the appearance of [a conflict of interest] will ordinarily preclude courts from denying intervention as of right to a sponsoring group." *Id.,* at 914.

For these and other reasons, the Supreme Court of California held that the California Elections Code and Article II, §8, of the California Constitution afford proponents "the authority . . . to assert the state's interest in the validity of the initiative" when State officials decline to do so.  52 Cal. 4th, at 1152, 265 P. 3d, at 1024.  The court repeated this unanimous holding more than a half-dozen times and in no uncertain terms.  See *id.,* at 1126, 1127, 1139, 1149, 1151, 1152, 1165, 256 P. 3d, at 1006, 1007, 1015, 1022, 1024, 1025, 1033; see also *id.,* at 1169–1170, 265 P. 3d, at 1036–1037 (Kennard, J., concurring).  That should suffice to resolve the central issue on which the federal question turns.

6                 HOLLINGSWORTH *v.* PERRY

II

A

The Court concludes that proponents lack sufficient ties to the state government.  It notes that they "are not elected," "answer to no one," and lack "'a fiduciary obligation'" to the State.  *Ante,* at 15 (quoting 1 Restatement (Third) of Agency §1.01, Comments *e, f* (2005)).  But what the Court deems deficiencies in the proponents' connection to the State government, the State Supreme Court saw as essential qualifications to defend the initiative system.  The very object of the initiative system is to establish a law-making process that does not depend upon state officials.  In California, the popular initiative is necessary to implement "the theory that all power of government ultimately resides in the people."  52 Cal. 4th, at 1140, 265 P. 3d, at 1016 (internal quotation marks omitted).  The right to adopt initiatives has been described by the California courts as "one of the most precious rights of [the State's] democratic process."  *Ibid.* (internal quotation marks omitted).  That historic role for the initiative system "grew out of dissatisfaction with the then governing public officials and a widespread belief that the people had lost control of the political process."  *Ibid.*  The initiative's "primary purpose," then, "was to afford the people the ability to propose and to adopt constitutional amendments or statutory provisions that their elected public officials had refused or declined to adopt."  *Ibid.*

The California Supreme Court has determined that this purpose is undermined if the very officials the initiative process seeks to circumvent are the only parties who can defend an enacted initiative when it is challenged in a legal proceeding.  See *id.,* at 1160, 265 P. 3d, at 1030; cf. *Alaskans for a Common Language, supra,* at 914 (noting that proponents must be allowed to defend an enacted initiative in order to avoid the perception, correct or not, "that the interests of [the proponents] were not being

KENNEDY, J., dissenting

defended vigorously by the executive branch"). Giving the
Governor and attorney general this *de facto* veto will erode
one of the cornerstones of the State's governmental struc-
ture. See 52 Cal. 4th, at 1126–1128, 265 P. 3d, at 1006–
1007. And in light of the frequency with which initiatives'
opponents resort to litigation, the impact of that veto
could be substantial. K. Miller, Direct Democracy and the
Courts 106 (2009) (185 of the 455 initiatives approved in
Arizona, California, Colorado, Oregon, and Washington
between 1900 and 2008 were challenged in court). As a
consequence, California finds it necessary to vest the re-
sponsibility and right to defend a voter-approved initiative
in the initiative's proponents when the State Executive
declines to do so.

Yet today the Court demands that the State follow the
Restatement of Agency. See *ante,* at 15–16. There are
reasons, however, why California might conclude that a
conventional agency relationship is inconsistent with the
history, design, and purpose of the initiative process. The
State may not wish to associate itself with proponents or
their views outside of the "extremely narrow and limited"
context of this litigation, 52 Cal. 4th, at 1159, 265 P. 3d, at
1029, or to bear the cost of proponents' legal fees. The
State may also wish to avoid the odd conflict of having a
formal agent of the State (the initiative's proponent) argu-
ing in favor of a law's validity while state officials (*e.g.,* the
attorney general) contend in the same proceeding that it
should be found invalid.

Furthermore, it is not clear who the principal in an
agency relationship would be. It would make little sense if
it were the Governor or attorney general, for that would
frustrate the initiative system's purpose of circumventing
elected officials who fail or refuse to effect the public will.
*Id.,* at 1139–1140, 265 P. 3d, at 1016. If there is to be a
principal, then, it must be the people of California, as the
ultimate sovereign in the State. See *ibid.,* 265 P. 3d, at

1015–1016 (quoting Cal. Const., Art. II, §1) ("'All political power is inherent in the people'"). But the Restatement may offer no workable example of an agent representing a principal composed of nearly 40 million residents of a State. Cf. 1 Restatement (Second) of Agency, p. 2, Scope Note (1957) (noting that the Restatement "does not state the special rules applicable to public officers"); 1 Restatement (First) of Agency, p. 4, Scope Note (1933) (same).

And if the Court's concern is that the proponents are unaccountable, that fear is neither well founded nor sufficient to overcome the contrary judgment of the State Supreme Court. It must be remembered that both elected officials and initiative proponents receive their authority to speak for the State of California directly from the people. The Court apparently believes that elected officials are acceptable "agents" of the State, see *ante,* at 11–12, but they are no more subject to ongoing supervision of their principal—*i.e.,* the people of the State—than are initiative proponents. At most, a Governor or attorney general can be recalled or voted out of office in a subsequent election, but proponents, too, can have their authority terminated or their initiative overridden by a subsequent ballot measure. Finally, proponents and their attorneys, like all other litigants and counsel who appear before a federal court, are subject to duties of candor, decorum, and respect for the tribunal and co-parties alike, all of which guard against the possibility that initiative proponents will somehow fall short of the appropriate standards for federal litigation.

## B

Contrary to the Court's suggestion, this Court's precedents do not indicate that a formal agency relationship is necessary. In *Karcher* v. *May*, 484 U. S. 72 (1987), the Speaker of the New Jersey Assembly (Karcher) and President of the New Jersey Senate (Orechio) intervened in

KENNEDY, J., dissenting

support of a school moment-of-silence law that the State's Governor and attorney general declined to defend in court. In considering the question of standing, the Court looked to New Jersey law to determine whether Karcher and Orechio "had authority under state law to represent the State's interest in both the District Court and Court of Appeals." *Id.,* at 82. The Court concluded that they did. Because the "New Jersey Supreme Court ha[d] granted applications of the Speaker of the General Assembly and the President of the Senate to intervene as parties-respondent on behalf of the legislature in defense of a legislative enactment," the *Karcher* Court held that standing had been proper in the District Court and Court of Appeals. *Ibid.* By the time the case arrived in this Court, Karcher and Orechio had lost their presiding legislative offices, without which they lacked the authority to represent the State under New Jersey law. This, the Court held, deprived them of standing. *Id.,* at 81. Here, by contrast, proponents' authority under California law is not contingent on officeholder status, so their standing is unaffected by the fact that they "hold no office" in California's Government. *Ante,* at 12.

*Arizonans for Official English* v. *Arizona*, 520 U. S. 43 (1997), is consistent with the premises of this dissent, not with the rationale of the Court's opinion. See *ante,* at 13–14. There, the Court noted its serious doubts as to the aspiring defenders' standing because there was "no Arizona law appointing initiative sponsors as agents of the people of Arizona to defend, in lieu of public officials, the constitutionality of initiatives made law of the State." 520 U. S., at 65. The Court did use the word "agents"; but, read in context, it is evident that the Court's intention was not to demand a formal agency relationship in compliance with the Restatement. Rather, the Court used the term as shorthand for a party whom "state law authorizes" to "represent the State's interests" in court. *Ibid.*

KENNEDY, J., dissenting

Both the Court of Appeals and the Supreme Court of California were mindful of these precedents and sought to comply with them. The state court, noting the importance of *Arizonans for Official English*, expressed its understanding that "the high court's doubts as to the official initiative proponents' standing in that case were based, at least in substantial part, on the fact that the court was not aware of any 'Arizona law appointing initiative sponsors as agents of the people of Arizona to defend . . . the constitutionality of initiatives made law of the State.'" 52 Cal. 4th, at 1136–1137, 265 P. 3d, at 1013–1014 (quoting 520 U. S., at 65). Based on this passage, it concluded that "nothing in [*Arizonans for Official English*] indicates that if a state's law does authorize the official proponents of an initiative to assert the state's interest in the validity of a challenged state initiative when the public officials who ordinarily assert that interest have declined to do so, the proponents would not have standing to assert the state's interest in the initiative's validity in a federal lawsuit." *Id.,* at 1137, 265 P. 3d, at 1014.

The Court of Appeals, too, was mindful of this requirement. *Perry* v. *Brown*, 671 F. 3d 1052, 1072–1073 (CA9 2012). Although that panel divided on the proper resolution of the merits of this case, it was unanimous in concluding that proponents satisfy the requirements of Article III. Compare *id.,* at 1070–1075 (majority opinion), with *id.,* at 1096–1097 (N. R. Smith, J., concurring in part and dissenting in part). Its central premise, ignored by the Court today, was that the "State's highest court [had] held that California law provides precisely what the *Arizonans* Court found lacking in Arizona law: it confers on the official proponents of an initiative the authority to assert the State's interests in defending the constitutionality of that initiative, where state officials who would ordinarily assume that responsibility choose not to do so." *Id.,* at 1072 (majority opinion). The Court of Appeals and the

KENNEDY, J., dissenting

State Supreme Court did not ignore *Arizonans for Official English*; they were faithful to it.

## C

The Court's approach in this case is also in tension with other cases in which the Court has permitted individuals to assert claims on behalf of the government or others. For instance, Federal Rule of Criminal Procedure 42(a)(2) allows a court to appoint a private attorney to investigate and prosecute potential instances of criminal contempt. Under the Rule, this special prosecutor is not the agent of the appointing judge; indeed, the prosecutor's "determination of which persons should be targets of the investigation, what methods of investigation should be used, what information will be sought as evidence," whom to charge, and other "decisions . . . critical to the conduct of a prosecution, are all made outside the supervision of the court." *Young* v. *United States ex rel. Vuitton et Fils S. A.*, 481 U. S. 787, 807 (1987). Also, just as proponents have been authorized to represent the State of California, "'[p]rivate attorneys appointed to prosecute a criminal contempt action *represent the United States*,'" *United States* v. *Providence Journal Co.*, 485 U. S. 693, 700 (1988). They are "appointed solely to pursue the public interest in vindication of the court's authority," *Young*, *supra*, at 804, an interest that—like California's interest in the validity of its laws—is "unique to the sovereign," *Providence Journal Co.*, *supra*, at 700. And, although the Court dismisses the proponents' standing claim because initiative proponents "are not elected" and "decide for themselves, with no review, what arguments to make and how to make them" in defense of the enacted initiative, *ante*, at 15, those same charges could be leveled with equal if not greater force at the special prosecutors just discussed. See *Young*, *supra*, at 807.

Similar questions might also arise regarding *qui tam*

actions, see, *e.g., Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U. S. 765, 771–778 (2000); suits involving "next friends" litigating on behalf of a real party in interest, see, *e.g., Whitmore* v. *Arkansas*, 495 U. S. 149, 161–166 (1990); or shareholder-derivative suits, see, *e.g., Gollust* v. *Mendell*, 501 U. S. 115, 125–126 (1991).  There is no more of an agency relationship in any of these settings than in the instant case, yet the Court has nonetheless permitted a party to assert the interests of another.  That *qui tam* actions and "next friend" litigation may have a longer historical pedigree than the initiative process, see *ante,* at 12–13, is no basis for finding Article III's standing requirement met in those cases but lacking here.  In short, the Court today unsettles its longtime understanding of the basis for jurisdiction in representative-party litigation, leaving the law unclear and the District Court's judgment, and its accompanying state-wide injunction, effectively immune from appellate review.

### III

There is much irony in the Court's approach to justiciability in this case.  A prime purpose of justiciability is to ensure vigorous advocacy, yet the Court insists upon litigation conducted by state officials whose preference is to lose the case.  The doctrine is meant to ensure that courts are responsible and constrained in their power, but the Court's opinion today means that a single district court can make a decision with far-reaching effects that cannot be reviewed.  And rather than honor the principle that justiciability exists to allow disputes of public policy to be resolved by the political process rather than the courts, see, *e.g., Allen* v. *Wright*, 468 U. S. 737, 750–752 (1984), here the Court refuses to allow a State's authorized representatives to defend the outcome of a democratic election.

The Court's opinion disrespects and disparages both the

Kᴇɴɴᴇᴅʏ, J., dissenting

political process in California and the well-stated opinion
of the California Supreme Court in this case. The Califor-
nia Supreme Court, not this Court, expresses concern for
vigorous representation; the California Supreme Court,
not this Court, recognizes the necessity to avoid conflicts
of interest; the California Supreme Court, not this Court,
comprehends the real interest at stake in this litigation
and identifies the most proper party to defend that inter-
est. The California Supreme Court's opinion reflects a
better understanding of the dynamics and principles of
Article III than does this Court's opinion.

Of course, the Court must be cautious before entering a
realm of controversy where the legal community and
society at large are still formulating ideas and approaches
to a most difficult subject. But it is shortsighted to mis-
construe principles of justiciability to avoid that subject.
As the California Supreme Court recognized, "the question
before us involves a fundamental procedural issue that
may arise with respect to *any* initiative measure, without
regard to its subject matter." 52 Cal. 4th, at 1124, 265
P. 3d, at 1005 (emphasis in original). If a federal court
must rule on a constitutional point that either confirms or
rejects the will of the people expressed in an initiative,
that is when it is most necessary, not least necessary, to
insist on rules that ensure the most committed and vigor-
ous adversary arguments to inform the rulings of the
courts.

*     *     *

In the end, what the Court fails to grasp or accept is the
basic premise of the initiative process. And it is this. The
essence of democracy is that the right to make law rests in
the people and flows to the government, not the other way
around. Freedom resides first in the people without need
of a grant from government. The California initiative
process embodies these principles and has done so for over

14                    HOLLINGSWORTH *v.* PERRY

a century. "Through the structure of its government, and the character of those who exercise government authority, a State defines itself as sovereign." *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991). In California and the 26 other States that permit initiatives and popular referendums, the people have exercised their own inherent sovereign right to govern themselves. The Court today frustrates that choice by nullifying, for failure to comply with the Restatement of Agency, a State Supreme Court decision holding that state law authorizes an enacted initiative's proponents to defend the law if and when the State's usual legal advocates decline to do so. The Court's opinion fails to abide by precedent and misapplies basic principles of justiciability. Those errors necessitate this respectful dissent.