1  Tom Myers (SBN 176008)
   E-Mail: tom.myers@aidshealth.org
2  Samantha R. Azulay (SBN 283424)
   E-Mail: samantha.azulay@aidshealth.org
3  Christina Yang (SBN 266363)
   E-Mail: christina.yang@aidshealth.org
4
5  AIDS Healthcare Foundation
   6255 W. Sunset Blvd., 21st FL
6  Los Angeles, CA90028
7  Phone: 323-860-5200
   Fax: 323-467-8450
8  *Attorneys for Intervenors*

9              UNITED STATES DISTRICT COURT
10    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11  VIVID ENTERTAINMENT, LLC;          )  Case No.:  13-CV-00190-DDP-AGR
12  CALIFA PRODUCTIONS, INC.;          )  **INTERVENORS' OPPOSITION TO**
    JANE DOE a/k/a Kayden Kross; and   )  **PLAINTIFFS' MOTION FOR**
13  JOHN DOE a/k/a Logan Pierce,       )  **JUDGMENT ON THE PLEADINGS**
14                                     )
                                       )  Date:       August 12, 2013
15              Plaintiffs,            )  Time:       10:00 a.m.
                                       )  Judge:      Dean D. Pregerson
16         vs.                         )  Location:   Courtroom 3
                                       )
17  JONATHAN FIELDING, Director of     )  *[Filed concurrently with Intervenors'*
18  Los Angeles County Department of   )  *Request for Judicial Notice]*
    Public Health, JACKIE LACEY, Los   )
19  Angeles County District Attorney, and )
    COUNTY OF LOS ANGELES,             )
20                                     )
21              Defendants, and        )
                                       )
22                                     )
    MICHAEL WEINSTEIN, MARIJANE        )
23  JACKSON, ARLETTE DE LA CRUZ,       )
    MARK MCGRATH, WHITNEY              )
24  ENGERAN, and the CAMPAIGN          )
    COMMITTEE YES ON B, MAJOR          )
25  FUNDING BY THE AIDS                )
26  HEALTHCARE FOUNDATION              )
27                                     )
28              Defendants-Intervenors. )

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF FACTS ......................................................................... 1

    A.    History of Measure B. ...................................................... 1

    B.    The Operation of Measure B. ............................................ 2

    C.    Measure B Is Just One Piece of Los Angeles County's
           Regulation And Permitting of Commercial Filmmaking. .............. 3

ARGUMENT ........................................................................................ 4

    A.    The Pleadings Are Not Closed.  This Motion Is Improper. ............. 4

    B.    Defendants Have Denied Virtually All of Plaintiffs'
           Allegations.  There Are Insufficient Facts To Support a
           Judgment. ............................................................... 5

    C.    Measure B Does Not Violate Plaintiffs' First Amendment
           Rights. .................................................................. 6

        1.    The *Erie* Case. ....................................................... 6

        2.    Measure B Does Not Regulate Speech At All. ..................... 8

        3.    Under The Holdings of *O'Brien* And *Erie*, Measure B is
              Constitutionally Sound. ............................................ 8

            a.    Like The Ordinance in *Erie*, Measure B is
                   Content-Neutral. ............................................. 8

            b.    Preventing STD Infection Is Within The County's
                   Police Powers. ............................................... 9

            c.    Measure B Furthers An Important Government
                   Interest. ..................................................... 9

            d.    Los Angeles County's Interest In Preventing STD
                   Infection Is Unrelated To The Suppression Of
                   Expression. ................................................. 12

            e.    Measure B is No More Restrictive Than Is
                   Essential to the Furtherance of Preventing STD
                   Infection. ................................................... 12

---

D.      Measure B Is Not A Prior Restraint. ................................................. 15

E.      Measure B's Permit Fee Is Permissible. ........................................... 16

F.      Measure B Is Not Vague. .................................................................. 17

G.      Measure B Does Not Violate Plaintiffs' Due Process Rights. ........... 18

H.      Measure B Is Not Preempted By Cal/OSHA Standards. .................... 20

        1.      Local Regulation Of Traditional Local Interests Are
                Presumptively Valid And Preemption Is Disfavored.............. 21

        2.      Public Health And Safety, and Filmmaking Are
                Traditional Local Interests; Their Regulation Is
                Presumptively Valid............................................................... 21

        3.      There Is No Express Preemption. ......................................... 22

        4.      There Is No Implied Preemption............................................ 23

        5.      Measure B Does Not Duplicate Or Contradict State
                Laws........................................................................................ 23

I.      Measure B Contains A Severability Provision................................... 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Cardio-Medical Assocs., Ltd. v. Crozer-Chester Med. Ctr.,*
  536 F. Supp. 1065 (E.D. Pa. 1982) .................................................. 6

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837 (1984) ................................................................ 22

*City of Erie, et al. v. Pap's A.M., TDBA "Kandyland,"*
  529 U.S. 277 (2000) ........................................................... *passim*

*Connally v. General Constr. Co.,*
  269 U.S. 385 (1926) ............................................................... 18

*Cox v. New Hampshire,*
  312 U.S. 569 (1941) ........................................................... 16, 17

*Fajardo v. County of Los Angeles,*
  179 F.3d 698 (9th Cir. 1999) ....................................................... 5

*Fireman's Fund Ins. Co. v. City of Lodi,*
  2002 U.S. App. LEXIS 20999 (9th Cir. Aug. 6, 2002) .............................. 24

*Free Speech Coalition, Inc. v. Holder,*
  No. 09-cv-04607 (E.D. Pa. July 18, 2013) ......................................... 20

*G.K. Ltd. Travel v. City of Lake Oswego,*
  436 F.3d 1064 (9th Cir. 2006) ..................................................... 15

*Kristensons-Petroleum, Inc. v. Sealock Tanker Co.,*
  304 F. Supp. 2d 584 (S.D.N.Y. 2004) ............................................... 5

*Lakewood v. Plain Dealer Pub. Co.,*
  486 U.S. 750 (1988) ............................................................... 24

*Murdock v. Pennsylvania,*
  319 U.S. 105 (1943) ........................................................... 16, 17

*Ne. Clackamas Cnty Elec. Coop., Inc. v. Cont'l Cas. Co.*
  221 F. 2d 329 (9th Cir. 1955) ...................................................... 5

*New York v. Burger,*
  482 U.S. 691 (1987) ............................................................... 20

*Renton v. Playtime Theatres,*
  475 U.S. 41 (1986) ................................................................ 15

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
  547 U.S. 47 (2006) ................................................................ 12

*S.D. Myers Inc. v. San Francisco,*
   336 F. 3d 1174 (9th Cir. 2003) .................................................. 22

*Thomas v. Chicago Park District,*
   534 U.S. 316 (2002) ................................................................ 15

*United States v. Kilbride,*
   584 F.3d 1240 (9th Cir. 2009) ................................................ 17

*United States v. O'Brien,*
   391 U.S. 367 (1968) ......................................................... *passim*

*Warden, Md. Penitentiary v. Hayden,*
   387 U.S. 294 (1967) ................................................................ 20

### STATE CASES

*Big Creek Lumber Co. v. County of Santa Cruz,*
   38 Cal. 4th 1139 (2006).............................................. 21, 22, 23, 24

*Calfarm Ins. Co. v. Deukmejian,*
   48 Cal. 3d 805 (1989) ............................................................. 25

*McMahan v. City and County of San Francisco,*
   127 Cal. App. 4th 1368 (2005).......................................... 24, 25

*People v. White,*
   259 Cal. App. 2d Supp. 936 (1968)........................................ 19

*Sherwin-Williams Co. v. City of Los Angeles,*
   4 Cal. 4th 893 (1993)............................................................. 24

### CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES

Cal. Code Regs. § 5193 ............................................................. 24

Cal. Fire Code § 4801 ............................................................... 20

Cal. Gov't Code § 14999.20 ........................................................ 3

Cal. Health and Safety Code § 120175 .............................. 1, 2, 9, 22

Cal. Health and Safety Code §120575 ............................... 1, 2, 9, 22

Cal. Lab. Code § 142.3 .............................................................. 23

Cal. Lab. Code § 6307 ............................................................... 23

Cal. Lab. Code § 6316 ............................................................... 22

Federal Rules of Civil Procedure, Federal Rule 12(c)........................ 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Los Angeles County Code § 11.39.010 ........................................................ 2

Los Angeles County Code § 11.39.080 ................................................ 2, 3, 18

Los Angeles County Code § 11.39.080(4) ................................................... 3

Los Angeles County Code § 11.39.080(A), ................................................. 3

Los Angeles County Code § 11.39.080(C) ................................................. 19

Los Angeles County Code § 11.39.090 ........................................................ 2

Los Angeles County Code § 11.39.110 ........................................................ 3

Los Angeles County Code § 11.39.110(A) ................................................... 3

Los Angeles County Code § 11.39.110(B) ................................................. 19

Los Angeles County Code § 11.39.110(C) ................................................. 19

Los Angeles County Code § 11.39.110(D) ........................................... 15, 19

Los Angeles County Code § 11.39.130 ..................................................... 19

Los Angeles County Code § 11.39.150 ........................................................ 3

Los Angeles County Code § 22.56.1830 ............................................... 3, 16

Los Angeles County Code § 22.56.1850(A)(11) .................................... 4, 16

Los Angeles County Code § 22.56.1850(A)(9) ............................................ 4

Los Angeles County Code § 22.56.1860(A) ....................................... 4, 16, 18

Los Angeles County Code § 22.56.1870 ...................................................... 4

Los Angeles County Code § 22.56.1890 ................................................... 16

Los Angeles County Code § 31.100 ............................................................ 4

Los Angeles County Code § 32.105.6.36 ............................................... 4, 14

Los Angeles County Code § 32.105.6.47 .................................................... 4

Los Angeles County Code § 32.4803.4 ....................................................... 4

Los Angeles County Code § 32.4807.1.1 .............................................. 4, 18

Los Angeles Fire Code § 32.108.1 ............................................................ 19

Los Angeles Fire Code § 32.109.3 ............................................................ 19

Los Angeles Fire Code § 32.109.3.1 ......................................................... 19

1
2
Los Angeles Municipal Code § 12.22.1 .................................................................21
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# STATEMENT OF FACTS

## A.     History of Measure B.

As Plaintiffs state, Los Angeles County is the epicenter in the United States of the production of films where, during production, performers actually engage in sexual intercourse and other sexual acts. [1]  It also has been established that, in engaging in these acts during filming, performers are potentially exposed to blood, semen, and other bodily fluids that may contain gonorrhea, syphilis, and other viruses and diseases (sexually transmitted diseases, or STDs).  (Intervenors' Request for Judicial Notice ("RJN"), Ex. A, at p. 2.)  Further, those infected with STDs during filming may go on to infect other people in Los Angeles County including those who do not work in the filmmaking industry. Thus, the residents of Los Angeles County have a unique, and uniquely local, public health concern – STD infection occurring as a result of filmmaking.

In order to address these concerns, citizens of Los Angeles County have petitioned both the judicial and legislative branches of government to take steps to protect the public health.  Previously, citizens brought suit against Los Angeles County to compel enforcement of California Health and Safety Code Sections 120175 and 120575.  The County opposed the lawsuit, and the citizens were unsuccessful.  (RJN, Ex. B.)

In addition, citizens of Los Angeles County drafted the law that became Measure B, and presented it to the Los Angeles County Board of Supervisors for approval and enactment. The County opposed action for a second time, and refused to enact it into law.

It was only then that Measure B was submitted for adoption via ballot initiative.  It was certified for the ballot on approximately May 29, 2012, and election was held on November 6, 2012.  During this period, the voters of Los

---

[1]  It is Intervenors' understanding that the commercial filming of such acts is legal only in California and New Hampshire.

Angeles County had, at a minimum, at least the following information available to them when deciding whether to vote for the Measure:

- Los Angeles County Department of Health findings that STD infection among performers actually engaging in sexual intercourse during filmmaking was ten times higher than the general public, with many repeat infections (RJN, Ex. A, at p. 2);
- Statements from the Los Angeles County Department of Health stating that screening alone is insufficient to prevent STDs, and other measures such as condom use and vaccinations should be used when performers engage in sexual intercourse during filmmaking (RJN, Ex. A, at p. 3);
- Numerous national, statewide, and local public health organizations such as the American Medical Association, support the use of condoms during filming where actual sexual intercourse occurs, to protect against STD transmission (RJN, Ex. C (Measure B, Section 2 - Findings));
- Their own experience, and that of their friends and neighbors, on the impact of STD infection as a result of filming on the public health and quality of life in Los Angeles County; and
- Any statements, arguments, or evidence presented by those parties who opposed the Measure.

On November 6, 2012, Measure B passed by a 57% - 43% majority.

## B.    The Operation of Measure B.

STD infection and prevention is a classic public health problem, which the County of Los Angeles has the duty and authority to address.  Cal. Health and Safety Code §§ 120175 and 120575.

Measure B reduces and prevents STD infection during filmmaking in a number of ways.  First, it defines the filmmaking activities that pose risk of STD transmission and infection.  Los Angeles County Code § 11.39.010.  For those productions where such activities actually will be engaged in during filmmaking, producers are required to (1) obtain a permit to engage in such conduct during filming (§ 11.39.080), (2) post the permit (§ 11.39.090), (3) have their owners and management level employees undergo training regarding exposure to blood borne

pathogens (the type of pathogens the performers actually engaging sexual conduct during filming could be exposed to) (§ 11.39.080(A)), and (4) develop an exposure control plan which seeks to minimize exposure to STDs, and the material containing STDs, during film production (§ 11.39.150).  Finally, for those performers who actually engage in sexual intercourse during filming, condoms must be used.  § 11.39.110(A).

Those who violate these requirements may be subject, after an administrative review and adjudication process, to suspension or revocation of the permit, and may pay fines.  § 11.39.110.[2]

### C.   Measure B Is Just One Piece of Los Angeles County's Regulation And Permitting of Commercial Filmmaking.

It is well-settled that local governments, like Los Angeles County, may condition the filming of motion pictures on obtaining permits, *which themselves contain conditions on the filming process.*  Recognizing this, the State of California has sought to encourage local governments to adopt certain procedures for the issuance of these permits.  Cal. Gov't Code § 14999.20 *et seq.*

There are numerous Los Angeles County laws regulating the production of commercial films, and Measure B is just another such law, and which operates in a similar manner to these other laws.  Plaintiffs, **and all commercial filmmakers**, already are required to obtain a temporary use permit when filming on location. Los Angeles County Code § 22.56.1830 *et seq.* (RJN, Ex. D).The stated purpose of this requirement is "to regulate specified short-term land use activities to avoid or mitigate adverse effects or incompatibility between such . . . activities and the surrounding area. . . ."

---

[2]Plaintiffs' contentions in Section III.B of their Motion (pp. 11-12) that a permit must be obtained prior to filming, and that a permit revocation restrict **all** filmmaking is a misreading of Measure B – Section 11.39.080 expressly allows conditional permits, pending completion of training, and any permit revocation is limited to filming actual sexual intercourse.

In order to receive a permit, Plaintiffs must make a number of satisfactory showings, including, "The operating practices proposed to be used . . . to mitigate noise, dust, air, contaminants, garbage, and vibration associated with and as a result of the proposed temporary use." § 22.56.1850(A)(9).  Moreover, Plaintiffs are required to substantiate, "to the satisfaction of the [County]," numerous facts, including "that the operation of the requested use . . . will not jeopardize, endanger or otherwise constitute a menace *to the public health, safety or general welfare.*" § 22.56.1860(A) (emphasis added).

In addition, Plaintiffs must also meet other, currently undefined requirements.  §22.56.1850(A)(11).  Finally, issuance of a film permit also is conditioned on the payment of a permit fee.  § 22.56.1870.

Similarly, filmmaking involving pyrotechnics and special effects is separately regulated by the Los Angeles County Fire Code.  A conditional permit is required to be obtained from the County for use and handling of this material.  Los Angeles County Code § 32.105.6.36 (RJN, Ex. E). Under Section 32.105.6.47, additional permits may be required as well.

Further, at the discretion of the County, to preserve "life or property," the County "shall require the [filmmaker] to employ or cause the employment of one or more approved fire safety officers or advisors to be on duty at such place during [a] hazardous activity" as a condition for obtaining a permit. § 32.4807.1.1.  And under Section 32.4803.4, fees are charged for these permits.

Finally, Chapter 48 of the California Fire Code (RJN, Ex. F), which has been adopted by Los Angeles County (§ 31.100), sets out very specific requirements concerning the size of film sets, electrical engineering, wiring, fire detectors, etc. that must be met in order for a permit to issue.

## ARGUMENT

**A.    The Pleadings Are Not Closed.  This Motion Is Improper.**

Plaintiffs' instant motion violates both the Federal Rules of Civil Procedure and the Rules of this Court.  Federal Rule 12(c) explicitly states that a Motion for Judgment on the Pleadings can be filed only "[a]fter the pleadings are closed. . ." It is well-settled that, as an intervenor, Intervenors enjoy the status of parties, and have the right to answer the complaint. *See, e.g.*, *Kristensons-Petroleum, Inc. v. Sealock Tanker Co.*, 304 F. Supp. 2d 584, 590 (S.D.N.Y. 2004) ("As an intervenor-party defendant, Blanc enjoys the status of a party and shares Sealock's rights as a defendant. 'Once the right to intervene is established, the intervenor's status is equivalent to that of a party.'  Accordingly, Blanc has standing to answer and assert affirmative defenses." (citations omitted)); *see also Ne. Clackamas Cnty Elec. Coop., Inc. v. Cont'l Cas. Co.*, 221 F. 2d 329, 332–33 (9th Cir. 1955) (contractor intervening in a matter was able to take all necessary steps to file and pursue complaint against Plaintiff, and recover damages).

As Intervenors have the right to file an answer, but have not done so pending resolution of a Motion to Dismiss filed by Intervenors, the pleadings are not closed. Plaintiffs' Motion is premature, and should be denied.

In addition, as there is no attached declaration to Plaintiffs' Motion consistent with District Court Rule 7-3, it is apparent that Plaintiffs failed to meet and confer with Intervenors prior to filing this Motion. If they had, Intervenors could have raised this issue, and possibly avoided this Motion altogether.

## B.   Defendants Have Denied Virtually All of Plaintiffs' Allegations. There Are Insufficient Facts To Support a Judgment.

"A judgment on the pleadings is properly granted when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law." *Fajardo v. County of Los Angeles*, 179 F.3d 698, 699 (9th Cir. 1999).

As is apparent, this is a difficult standard for Plaintiffs to meet.  As a disfavored motion, "Motions for judgment on the pleadings should not be 'lightly

given.' The applicable standard for ruling on a 12(c) motion has been summarized as follows in Professor Moore's treatise: . . . [a motion] must be sustained by the *undisputed* facts appearing in all the pleadings, supplemented by any facts of which the court will take judicial notice. For the purposes of the motion, all well-pleaded material allegations of the opposing party's pleading are to be taken as true, *and all allegations of the moving party which have been denied are taken as false.* Conclusions of law are not deemed admitted. Judgment on the pleadings may be granted only if, on the facts as so admitted, the moving party is clearly entitled to judgment. *Cardio-Medical Assocs., Ltd. v. Crozer-Chester Med. Ctr.,* 536 F. Supp. 1065, 1070 (E.D. Pa. 1982) (citations omitted) (emphasis added).

In their answer, Defendants have denied virtually all of Plaintiffs' factual allegations, including those that would establish standing and this court's jurisdiction. *See, e.g.,* Defs.' Answers to Pls.' Compl. ¶¶ 4-11. The pleadings do not establish all the facts required to sustain a judgment.

C.    **Measure B Does Not Violate Plaintiffs' First Amendment Rights.**

    1.    **The *Erie* Case.**

Plaintiffs' claim in this matter essentially boils down to the argument that, because Measure B requires them to use condoms when filming actual sexual intercourse, their First Amendment rights are violated.[3] Controlling Supreme Court precedent makes clear that this is incorrect.

The seminal case in this area of law is *City of Erie, et al. v. Pap's A.M., TDBA "Kandyland,"* 529 U.S. 277 (2000). In *Erie,* the Supreme Court upheld the validity of a city ordinance prohibiting public nudity from a challenge that it prohibited expressive nude dancing in violation of the First Amendment. While the Court agreed that the ordinance did ban nude dancing (dancers were required

---

[3]   Again, as Plaintiffs claim these restrictions *are already required under California State law* (Compl. ¶¶ 5, 32-35, 101), it is unclear what their First Amendment claim is.

to wear, at a minimum, pasties and G-strings), and that nude dancing is expressive conduct, the ordinance did not violate respondents' First Amendment right to free expression.

First, the Court made the following two findings regarding the ordinance:

- The ordinance regulates conduct (public nudity), and not any message intended to be conveyed by the conduct; and
- A purpose of the ordinance is to prevent and control harmful "secondary effects" stemming from the conduct – here, crime and "other deleterious effects" cause by the presence of establishments offering nude dancing. *Id.* at 290, 293.

As a result, the Court analyzed the constitutionality of the ordinance according to the four factors set out in *United States v. O'Brien*, 391 U.S. 367, 377 (1968),

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

and found that it passed constitutional muster.

First, the Court found that "Erie's efforts to protect public health and safety are clearly within the city's police powers." 529 U.S. at 296. Second, the Court found that "combating the harmful secondary effects associated with nude dancing" is an important government interest (*id.*), and that banning such dancing furthered this interest. *Id.* at 299-300. Third, the Court found that the government's interest in combating the secondary effects was unrelated to the suppression of free expression.

Finally, and perhaps most importantly, the Court found that the restriction on nude dancing inherent in the ordinance is no greater than is essential to the furtherance of the government interest in combating the secondary effects of nude dancing:

---

The ordinance regulates conduct, and any incidental impact on the expressive element of nude dancing is *de minimis*.  The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message. *Id.* at 301.

### 2.     Measure B Does Not Regulate Speech At All.

It is obvious that Measure B's requirement that performers actually engaging in intercourse use a condom when filming is even **less restrictive** than the ordinance at issue in *Erie*.  The *Erie* ordinance limited what type of dancing may be shown and viewed in Erie.  Measure B, by contrast, *in no way limits what films may be viewed by the residents of Los Angeles County*.  It also in no way limits what films Plaintiffs may wish to show in Los Angeles County.  Measure B does not ban, punish, or regulate any messages regarding condom-less sex in any film.  Measure B is not directed at, and is uninterested in, whatever message condom-less sex may communicate.  As such, Measure B is not a speech-related measure, and is not subject to First Amendment scrutiny in the first instance.

### 3.     Under The Holdings of *O'Brien* And *Erie*, Measure B is Constitutionally Sound.

#### a.     Like The Ordinance in *Erie*, Measure B is Content-Neutral.

Even assuming Measure B warrants First Amendment analysis, it can and should be analyzed according to the factors set out in *Erie, O'Brien*, etc., under which framework it certainly passes constitutional muster.

As in *Erie*, Measure B only regulates conduct – actual sexual intercourse – not speech.  To paraphrase *Erie*, like public nudity, it "is not an inherently expressive condition."  Even assuming that, like nude dancing, sexual intercourse during the making of film is expressive conduct, "it falls only within the outer ambit of the First Amendment's protection." *Id.* at 289.

Moreover, as discussed above, Measure B does not regulate any message conveyed by that conduct and, like in *Erie*, Measure B is unrelated to the suppression of expression.  While Measure B does not target sexual intercourse in

general, or even sexual intercourse during the making of all films,[4] it *also* does not target sexual intercourse that conveys an erotic message, or indeed *any* message. The requirements of Measure B are applicable to *any* commercial film production where actual sexual intercourse occurs, regardless of the message of the movie, or even if it is a "Disney" type movie.

As in *Erie,* "Put another way [Measure B] does not attempt to regulate the primary effects of the expression, *i.e.*, the effect on the audience of watching [condom-less sexual intercourse], but rather the secondary effects such as the impacts on public health safety, and welfare [arising from actual sexual intercourse during filming]. . . ." *Id.* at 291. The purpose of Measure B is to prevent STD infection during the making of commercial films, and the adverse public health harms from such infections.  As was found in *Erie, O'Brien,* etc., this type of important government interest "'is not at all inherently related to expression.'" *Id.* at 291 (citation omitted).

### b.  Preventing STD Infection Is Within The County's Police Powers.

Because Measure B is a content neutral law aimed at addressing the secondary effects of the conduct regulated, it is analyzed for First Amendment issues under the four-part *O'Brien* test.  First, just as in *Erie* (*id.* at 296)*,* Los Angeles County has the ability, duty, and obligation to protect the public health, as well as having the ability to regulate the commercial filmmaking process to achieve that end.  *See, e.g*., Cal. Health and Safety Code §§ 120175 and 120575. Measure B clearly is within the County's police powers.

### c.  Measure B Furthers An Important Government Interest.

---

[4]  Indeed, as discussed in Section C.3.e below, this narrow tailoring of Measure B to target just the conduct that creates the secondary effect sought to be eliminated, is a feature – not a bug – restricting only expressive conduct essential to the purpose of the law.

1    Measure B meets the second *O'Brien* factor; the regulation furthers an

2    important government interest.  Clearly, Los Angeles County has an important

3    government interest in limiting STD infection.  Measure B furthers this interest.

4    In this case, Plaintiffs try to make great hay from their allegation that,

5    because Measure B passed via ballot initiative rather than the "traditional"

6    legislative process, no "findings" regarding STD infection during the making of

7    films was made, and thus there was no basis for Measure B's passage.  Factually

8    and, as set out in *Erie*, this is incorrect.

9    At a minimum, the voters of Los Angeles County had numerous facts and

10   findings available to them.  First, the Measure itself includes findings, including

11   that sexually transmitted infections occurring during filming "has caused a

12   negative impact on public health and the quality of life of citizens living in Los

13   Angeles County," and safe sex practices are an effective way to prevent STD

14   infections.  Like the city council members who enacted the ordinance in *Erie*, the

15   residents of Los Angeles County, who live and work in, around, and among

16   commercial filmmaking and conduct occurring during filmmaking, "would likely

17   have first-hand knowledge of what took place . . ., and can make particularized,

18   expert judgments about the resulting harmful secondary effects" (*id.* at 297-98),

19   and can certainly do that at least as well as a traditional legislative body.

20   Second, the voting public had access to a County report, *presented to the*

21   *County's legislative body*, stating the higher incidence of infection relative to the

22   general population, as well as the conclusion that further preventive measures

23   would be effective in reducing STD infection. (RJN, Ex. A.)  And, like the city of

24   Erie in relying on the experience of other cities in determining the harmful

25   secondary effects of nude dancing that might occur in Erie, it is reasonable for the

26   voters of Los Angeles County to conclude that the problem *outlined by its own*

27   *government* did in fact exist, and that additional preventive measures would help

28   address this problem.  *Id.* at 296-97.  Given the unique situation of the County as

the primary locus for this activity *in the entire country*, it must be given a "reasonable opportunity to experiment" with the best solutions to this problem, and Measure B is just such a reasonable, and reasonably effective, approach.  *Id.* at 301.

Third, as in *Erie*, Plaintiffs were well aware of the above information, and could have contested it if they wished during the months-long electoral campaign for Measure B.  Either they did not or, assuming they did, these facts and arguments were rejected by the voters.  As stated in *Erie*,

> [I]t is well established that, as long as a party has an opportunity to respond, an administrative agency may take official notice of such 'legislative facts' within its special knowledge, and is not confined to the evidence in the record in reaching its expert judgment.  *Id.* at 298.

Finally, given the ability of a legislative body's ability to rely on its unique, local, particularized knowledge, the *Erie* court cites to *O'Brien* to make clear that the record establishing that a content neutral ordinance furthers an important government interest need not be particularly comprehensive or detailed:

> The Court [in *O'Brien*] did not require evidence that the integrity of the Selective Service System would be jeopardized by the knowing destruction or mutilation of draft cards.  It simply reviewed to government's various administrative interests in issuing the cards, and then concluded that 'Congress has a legitimate and substantial interest in preventing their . . . destruction . . . by punishing people who knowingly and willfully destroy or mutilate them.'  There was no study documenting instances of draft card mutilation of the actual effect of such mutilation on the government's asserted efficiency interests. . . .  As we have said so long as the regulation is unrelated to the suppression of expression, 'the government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word.  *Id.* at 298-99.

It is clear that the "findings" required to justify Measure B are minimal. Under this analysis, and based on the County's findings, it is clear that Measure B

would be valid were it passed by a legislature.  It is equally valid, for the same reasons, when passed by a majority of citizens.[5]

### d.   Los Angeles County's Interest In Preventing STD Infection Is Unrelated To The Suppression Of Expression.

As set out in Section C.3.a above, Measure B also satisfies the third *O'Brien* factor, in that Los Angeles County's interest in preventing STD infection is unrelated to the suppression of free expression; preventing STD infection is "inherently unrelated" to suppressing speech.  Measure B does not require that any message be sent.  Residents are still able to view and show whatever films, containing whatever messages, they want.

### e.   Measure B is No More Restrictive Than Is Essential to the Furtherance of Preventing STD Infection.

Measure B satisfies the fourth *O'Brien* factor – that the restriction is no greater than is essential to the furtherance of the government interest – as well.  In defining this factor, the Supreme Court has stated:

> '[A]n incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc*., 547 U.S. 47, 67 (2006) (citation omitted).

---

[5]Indeed, by its very nature, it is clear that no citizen's ballot initiative would have the kind of legislative "record" demanded by Plaintiffs.  Their position implies that virtually all such initiatives would be vulnerable to constitutional challenge and invalidation due to lack of a record, which calls into question the validity of the entire initiative process.

Plaintiffs may also claim that the alleged lack of findings, and explicit reference to "adult films" in the Measure, show an "illicit" content-based motive for passing Measure B.  However, a valid law will not be stricken down due to an alleged illicit motive.  *Erie*, 529 U.S. at 292.

As stated above, condom use will help reduce STD infection.  Further, Measure B is, by design, extremely limited in scope, so as to minimize any potential impact on expressive conduct.  First, Measure B targets only the acknowledged problem – STD infection during the making of commercial films, which is significantly higher than the general population.  Second, Measure B only targets the source of that infection – actual sexual contact during commercial filmmaking.  Third, Measure B imposes different requirements based on different risks of infection during filmmaking.  For actual sexual intercourse, the riskiest act, condoms are required.  For lower risk acts, only bloodborne pathogen training is required to help prevent infection during filming.

Finally, Measure B *does not ban the filming of actual sexual intercourse or any other sexual act*.  Performers are allowed to engage in, and can be filmed engaging in, sexual intercourse.  The only limitation is the use of condoms, and condoms are required precisely because condom use prevents STD transmission.

Measure B allows the filming of the *entire range* of expressive sexual conduct, *including sexual intercourse*, save one – actual sexual intercourse without condoms (and, again, Measure B does not prohibit the final *depiction* of sexual intercourse without condoms, or the *message* of sexual intercourse without condoms, or the *viewing* of sexual intercourse without condoms).  As in *Erie*, any such restriction is *de minimis*, and allowable:

> [E]ven if Erie's public nudity ban has some minimal effect on the erotic message by muting that portion of the expression that occurs when the last stitch is dropped, the dancers at Kandyland and other such establishments are free to perform wearing pasties and G-strings.  Any effect on overall expression is *de minimis*.  And as Justice Stevens eloquently stated for the plurality in *Young v. American Mini Theatres, Inc*, 'even though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled

political debate. . . .'  If States are to be able to regulate secondary effects, then *de minimis* intrusions on expression such as those at issue here cannot be sufficient to render the ordinance content based.

The requirement that dancers wear pasties and G-strings is a minimal restricting in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message.  *Id.* at 294, 301.

As in *Erie*, Measure B's impact on potential expressive conduct is *de minimis*, and leaves Plaintiffs' with ample capacity to convey whatever message they wish, including messages regarding sexual intercourse without condoms.

Given the above, Plaintiffs' "underinclusiveness" argument in Section III.E. of their Brief that Measure B's limitation to regulating only actual sexual intercourse during commercial filmmaking is evidence of its content-based intent or effect misses the point.  Los Angeles County already regulates numerous aspects of commercial filmmaking, to prevent and mitigate the harms that may arise from it, whether it is noise, potential fire hazards, etc.  Like the regulation and permitting required for pyrotechnic special effects found in Los Angeles County Code § 32.105.6.36 (RJN, Ex. E), which applies regardless of the content of the film or the reason pyrotechnics are being deployed during filming, Measure B applies whenever actual sexual intercourse occurs during filming, regardless of the meaning or content of the film or the reason actual sexual intercourse is being deployed.  Any film, even a "Disney' film, is subject to Measure B if sexual intercourse occurs during filmmaking.

Further, contrary to Plaintiffs' arguments, Measure B need not be an ordinance of general applicability, regulating actual sexual intercourse far beyond commercial filmmaking, in order to establish its content-neutrality.  The law upheld in *O'Brien* only prohibited the destruction or mutilation of Selective Service System Forms ("draft cards") (391 U.S. at 370), and not other categories of government documents or identification cards.  Moreover, it was enacted in

---

1965, precisely during the Vietnam War and protests surrounding it.  Similarly, the Court in *Renton v. Playtime Theatres*, 475 U.S. 41 (1986) upheld an ordinance targeting only "adult motion picture theaters" from First Amendment challenge.

In combating STD infection, Los Angeles County may deploy numerous stratagems.  Measure B is one, which not only precisely targets a specific source of infection, but does so in a way that is least restrictive of speech or other rights.

### D.     Measure B Is Not A Prior Restraint.

In Section III.B. of their Motion, Plaintiffs argue that Measure B's permit requirement works as an unconstitutional prior restraint on speech.[6]  It is well-established that governments may require obtaining permits for various types of conduct, even conduct that may have an expressive element.  *See, e.g., G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064 (9th Cir. 2006) (city Sign Code, requiring permits before the erection of any sign, not a prior restraint).  The constitutional limit placed on a permit regime is only that it must be "reasonably specific and objective, and []not leave the decision to the whim of the [permitting official]." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002).  Because Measure B contains objective standards for its permitting scheme (*i.e.*, pay for a permit, conduct bloodborne pathogen training, post the permit on the work site, and use condoms during vaginal and anal sex), there is no "unbridled discretion" placed in the hands of County officials.  Measure B also limits the time that a decision maker has to act.  § 11.39.110(D) (written notice of decision shall be issued within five days of the administrative review).

The permit requirements are clear and concise, and at least as clear, if not more so, than other film permit requirements Plaintiffs already are subject to, but do not complain of.  Again, Plaintiffs are required to obtain a permit for *any* on

---

[6]Plaintiffs also claim the requirement of condom use is also a prior restraint. However, as shown in Section C above, Measure B's condom requirement is constitutionally sound.

location filming, regardless of what activity is being filmed.  As a condition for

obtaining that permit, Plaintiffs are required to substantiate, "to the satisfaction of

the [County]," numerous facts, including "That the operation of the requested use

. . . will not jeopardize, endanger or otherwise constitute a menace to the public

health, safety or general welfare." § 22.56.1860(A).  Plaintiffs must also meet

other, currently undefined requirements.  Plaintiffs must provide "such other

information as the [County] may require."  §22.56.1850(A)(11).  Further, the

County may impose additional conditions "as [it] deems necessary" on granting a

permit "as will make possible the operation of the proposed temporary use in an

orderly and efficient manner and in accord with the intent and purpose of this

title."  § 22.56.1890.  As Measure B has clear requirements for permits, and does

not rely on whatever message is sought to be conveyed, it is not a prior restraint.

### E.      Measure B's Permit Fee Is Permissible.

In Section III.C of their Motion, Plaintiffs claim Measure B's permit fee is

an "unconstitutional tax" on their speech.  They make this claim even though they

concede that the Supreme Court has expressly upheld such fees (*Cox v. New

Hampshire*, 312 U.S. 569 (1941)), and even though Plaintiffs are already subject

to a general permit fee for on location filmmaking, regardless of what activities

are being filmed, of which they do not complain. Los Angeles County Code §

22.56.1830 *et seq*. (RJN, Ex. D).

As the cases cited by Plaintiffs hold, such fees are obviously allowable

when they are set in an amount so as "to defray the expenses of policing the

activities in question" (*Murdock v. Pennsylvania*, 319 U.S. 105, 114 (1943)), and

are "not a revenue tax, but one to meet the expense incident to the administration

of the Act and to the maintenance of public order in the matter licensed." *Cox*, 312

U.S. at 577.

The fee allowed by Measure B is expressly limited to "an amount sufficient

to provide for the cost of any necessary enforcement" of it.  Plaintiffs do not, nor

1   can they, state how this limit is inconsistent with the requirements in *Murdock* and

2   *Cox* that the fee defray the expense of policing the activities in question, or meet

3   the expense incident to the administration of Measure B.

4       While Plaintiffs may claim that the current fee set for Measure B does not

5   meet these requirements (even though the time period covered by the fee is two

6   years, as opposed to the per-shoot, short-term periods the other permit fees for

7   filming cover), that is a separate, factual issue involving the actual application of

8   the fee.  It in no way means Measure B's fee provision is itself unconstitutional.

9       **F.**    **Measure B Is Not Vague.**

10       The "'[v]agueness doctrine is an outgrowth not of the First Amendment, but

11   of the Due Process Clause of the Fifth Amendment.' 'Vague statutes are

12   invalidated for three reasons: (1) to avoid punishing people for behavior that they

13   could not have known was illegal; (2) to avoid subjective enforcement of laws

14   based on "arbitrary and discriminatory enforcement" by government officers; and

15   (3) to avoid any chilling effect on the exercise of First Amendment freedoms.' A

16   statute is unconstitutionally vague as applied if it failed to put a defendant on

17   notice that his conduct was criminal.  A statute is unconstitutionally vague on its

18   face if it 'fails to provide a person of ordinary intelligence fair notice of what is

19   prohibited, or is so standardless that it authorizes or encourages seriously

20   discriminatory enforcement.'" *United States v. Kilbride*, 584 F.3d 1240, 1256-57

21   (9th Cir. 2009) (citations omitted).

22       Further,

23   
24   The question whether given legislative enactments have been thus
25   wanting in certainty has frequently been before this court. In some of
     the cases the statutes involved were upheld; in others, declared
26   invalid. The precise point of differentiation in some instances is not
     easy of statement. But it will be enough for present purposes to say
27   generally that the decisions of the court upholding statutes as
     sufficiently certain, rested upon the conclusion that they employed
28   words or phrases having a technical or other special meaning, well

enough known to enable those within their reach to correctly apply them, or a well-settled common law meaning, notwithstanding an element of degree in the definition as to which estimates might differ, or, "that, for reasons found to result either from the text of the statutes involved or the subjects with which they dealt, a standard of some sort was afforded." *Connally v. General Constr. Co.*, 269 U.S. 385, 391- 93 (1926).

No provisions or terms in Measure B are such that a person of common intelligence must guess at their meaning.  The conduct required – permit, training, and use of condoms for actual sexual intercourse – is clear.  Further, certain key terms of which Plaintiffs complain, such as "adult film," "producer of adult film," and "commercial purposes" are specifically defined in Part I of Measure B, and other terms, such as "commercial purposes" and "reasonably suspected," are capable of general understanding, and are found in many statutes.

Plaintiffs also allege that Measure B contains numerous "discretionary mandates" that are vague.  These "mandates" are commonly found in statutes, and are capable of general understanding. As discussed above, the County general film permit law requires substantiation of certain things "to the satisfaction of the [County]."  Los Angeles County Code § 22.56.1860(A).  Likewise, the Fire Code mandates that, at the discretion of the County, in order to preserve "life or property," the County shall require fire safety officers or advisors on duty when certain hazardous activities take place during filming.  § 32.4807.1.1.

### G.     Measure B Does Not Violate Plaintiffs' Due Process Rights.

Plaintiffs' due process argument – that training must occur before permits are issued,[7] and permits may be revoked for any alleged violation *prior to any notice or opportunity to be heard,* and that once a permit is suspended, Plaintiffs

---

[7] This is a misreading of Measure B – Section 11.39.080 expressly allows conditional permits, pending completion of training.  As another reason this Motion is premature, Plaintiffs' complaint also asserts this, and Intervenors would deny that allegation in their answer.

may engage in no filming *whatsoever* (Motion, pp. 11-12, 18-20) – appears to be based on a complete misreading of Measure B.  The plain language of Measure B puts Plaintiffs on sufficient notice of what constitutes prohibited activity, and what Plaintiffs can do prior to the imposition of penalties to avoid those penalties.

Measure B sets forth five clear main requirements for compliance: obtain a permit, post the permit on set, develop an exposure control plan, get bloodborne pathogen training, and use condoms for vaginal and anal sex.  Measure B also gives adequate notice of how Plaintiffs may cure or contest any alleged deficiencies in complying with the regulation *prior to the imposition of a penalty*.

First, a Notice to Comply, stating alleged deficiencies, is issued.  Sanctions may be avoided simply by complying with the Notice.  § 11.39.110(B).  Second, if a Notice is contested, a full administrative review is engaged, and any penalty is imposed only *after* completion of the review. § 11.39.110(C) and (D).  Finally, even if, at the end of this process, a permit is suspended, the permittee is not banned from **all** filmmaking – just those filmmaking activities where performers actually engage in the activities set out in Measure B during production of the film.  Section 11.39.080(C).[8]

The notice, notice to cure, opportunity to be heard *prior to the imposition of any penalty*, and level of penalty contained in Measure B are more than sufficiently protective of Plaintiff's due process rights.

Plaintiffs also fail to demonstrate that Measure B, Section 11.39.130, subjects them to any unreasonable search or seizure.  First, inspections on property that are subject to regulation, *for purposes of ensuring compliance with the regulation*, are not considered *per se* unconstitutional.  *People v. White*, 259 Cal. App. 2d Supp. 936, 942 (1968).  And warrantless administrative inspections are permissible in well-regulated industries, such as filmmaking.  This includes

---

[8]The Los Angeles Fire Code has a similar penalty and administrative review provisions for permits.  *See, e.g.*, §§ 32.108.1, 32.109.3, 109.3.1 (RJN, Ex. E).

the specific type of filmmaking at issue here, as set out in the recently decided *Free Speech Coalition, Inc. v. Holder*, No. 09-cv-04607 (E.D. Pa. July 18, 2013), slip op. at 65-66 (RJN, Ex. G).  *See also New York v. Burger*, 482 U.S. 691, 710-11 (1987) ("if inspection is to be effective . . . , unannounced, even *frequent*, inspections are essential") (internal citation omitted) (emphasis in original).  Other film regulations *already* allow for government employees to be present during working hours to ensure compliance.  *See, e.g.,* Cal. Fire Code § 4801*et seq.* Finally, Measure B meets the three prong test set out in *Holder,* slip op. at 65, including providing adequate notice of potential inspections.

Moreover, as Measure B is limited in its scope only to those filming for commercial purposes, the search provisions (as well as the permit and other provisions) do not apply to purely private, noncommercial activity.  Further, for those producers whose filming may take place in a home or private residence, it remains to be seen how any search in Measure B will be applied.  As written, because the Measure is concerned in large part with activities *during filming*, it is entirely rational to conceive that most if not all inspections will be done during filming.  At that point any privacy expectation, even in a home, is severely diminished, as well as any burdens on privacy.  This is distinctly different from *Holder*, where inspections could occur at homes at any time during business hours, and required producers to be at home up to 20 hours per week.  Slip op. at 69-70 (RJN, Ex. G).  And as in *Holder*, should any such application of Measure B intrude further than as described above, anyone subject to it would still have an *as applied* challenge to the law.  As the law can be applied in a valid manner, it is not facially invalid due to an as yet hypothetical application.  *See, e.g., id.* at 59.

It is also well-established that the government may seize items that it has probable cause to believe are evidence of a crime or violation of law. *See Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967).

### H.      Measure B Is Not Preempted By Cal/OSHA Standards.

Plaintiffs' assertion that Measure B is preempted by California Labor Code and regulations ("State Laws") is incorrect.[9]  This was briefed at length in the papers addressing Plaintiffs' request for a preliminary injunction.  As Cal/OSHA itself explains, in a letter reviewing a city permit ordinance similar to Measure B in that it requires the use of condoms during filming of actual sexual intercourse (Los Angeles Municipal Code § 12.22.1(RJN, Ex. H)), the preemptive reach of the State Laws is expressly limited only to explicit enforcement of Cal/OSHA's own regulations and standards.  They contain no express limitations of local laws, and explicitly provide that local governments may regulate workplaces.

### 1.    Local Regulation Of Traditional Local Interests Are Presumptively Valid And Preemption Is Disfavored.

The California Supreme Court in *Big Creek Lumber Co. v. County of Santa Cruz* upheld local laws in the face of a state regulatory scheme, noting that it was "particularly reluctant to infer legislative intent to preempt a field covered by municipal regulation *when there is a significant local interest to be served that may differ from one locality to another*[,]" and further held that "when local government regulates in an area over which it traditionally has exercised control . . . courts will presume, absent a clear indication of preemptive intent from the Legislature, that such regulation is *not* preempted by state statute. . . ." 38 Cal. 4th 1139, 1149 (2006) (citations omitted) (emphasis added).

### 2.    Public Health And Safety, and Filmmaking Are Traditional Local Interests; Their Regulation Is Presumptively Valid.

It is well-established that local governments, under their police power, can and do regulate film sets to protect public health and safety.  They are allowed to do so even if those regulations affect the occupational safety of employees on

---

[9] Again, Plaintiffs state that the State Laws already require them to use barrier protection when filming acts of sexual intercourse or other sexual acts. (Compl.¶¶ 5, 32-35, 101.)  This undercuts all of their First Amendment claims.

those sets.  Moreover, local governments have a statutory duty to detect and prevent STD infections.  This duty is not limited to non-workplace settings.  Cal. Health and Safety Code §§ 120175, 120575.

Local governments traditionally have exercised control over regulation of film sets and of public health and safety, and these matters are of significant local interest.  Indeed, in this case, Los Angeles County has an *exceedingly local*, exceedingly significant interest, in that it is the primary locality where certain types of film work, involving actual sexual intercourse, occurs.  Thus, California state law has a general policy against finding preemption, and the Ninth Circuit has recognized that it should not be found unless "the purported conflict (between two laws) is in fact a genuine one, *unresolvable short of choosing between one enactment and the other.*"  *S.D. Myers Inc. v. San Francisco*, 336 F. 3d 1174, 1177 (9th Cir. 2003) (citation omitted; emphasis added).

### 3.    There Is No Express Preemption.

In construing the scope of possible preemptive language in statutes, "*'[E]ach phrase* within [an express preemption provision] *limits* the universe of [local action] pre-empted by the statute.'" *Big Creek Lumber*, 38 Cal.4th at 1155 (emphasis added). In the process of establishing occupational safety and health standards, the California Legislature expressly validated and maintained the ability of local governments to regulate workplaces pursuant to their police power:

> Except as limited . . ., nothing in this part shall deprive the governing body of any county, city, or public corporation, board, or department, of any power or jurisdiction over or relative to any place of employment.

Cal. Lab. Code § 6316. As understood by Cal/OSHA,[10] the above means that "For example, [local] building permits are issued and [local] fire codes are enforced . . .

---

[10]Cal/OSHA's interpretations of its statutes and regulations are entitled to judicial deference. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984).

1   even though that enforcement may affect occupational safety and may overlap

2   with Cal OSHA jurisdiction."  RJN, Ex. I, at p. 3-4 (Cal/OSHA Letter).

3          The limitation reserved above is codified in Labor Code Section 144(e),

4   which states that the preemptive reach of these laws is expressly limited only to

5   explicit enforcement of Cal/OSHA's own regulations and standards

6   ("occupational safety and health standards adopted by the board").

7          As stated by Cal/OSHA, "[t]he Legislature allows local safety action, other

8   than explicit enforcements of the Division's own regulations.  It has done so in

9   express and unambiguous terms." As also concluded by Cal/OSHA, "[L]ocalities

10  may adopt and enforce their own standards as long as long as that adoption is

11  within the localities' police powers.  This is true even if the local standards could

12  be construed as 'occupational safety and health standards.'"[11]

13         Finally, Cal/OSHA jurisdiction only extends to a relationship between

14  employee and employer, not independent contractors.  Cal. Lab. Code § 6307;

15  RJN, Ex. I at p. 3.  These express limitations on the scope of Cal/OSHA

16  jurisdiction make it clear that local regulation of local interests, even if they may

17  have some impact on occupational health and safety, has not been preempted.

18                  **4.      There Is No Implied Preemption.**

19         Both bars to implied preemption established in *Big Creek Lumber* exist

20  here.  38 Cal. 4th at 1157.  The Labor Code limits Cal/OSHA jurisdiction to

21  employees and to enforcement of Cal/OSHA standards.  Likewise, the Labor

22  Code expressly allows for local regulation of workplaces.

23              **5.      Measure B Does Not Duplicate Or Contradict State Laws.**

24         As a threshold matter, the doctrine of preemption by duplication does not

25  apply to Measure B, as the doctrine is largely confined to state penal ordinances,

26

27  [11]Plaintiffs' assertion that only Cal/OSHA may adopt occupational safety and

28  health standards (Cal. Lab. Code §142.3) is beside the point, as Measure B is not
    such a standard.

1   due to double jeopardy concerns. *See Fireman's Fund Ins. Co. v. City of Lodi*,

2   2002 U.S. App. LEXIS 20999, at *71-72 (9th Cir. Aug. 6, 2002).

3        And there is not sufficient duplication; any requirements in Measure B are

4   not coextensive with requirements in 8 Cal. Code Regs. 5193.  RJN, Ex. G at p. 3-

5   4.  *See Sherwin-Williams Co. v. City of Los Angeles*, 4 Cal. 4th 893, 897 (1993).

6   Should there be overlap between Cal/OSHA standards to protect employee health,

7   and Measure B's protection of public health and safety during filmmaking, such

8   overlap is allowable.  RJN, Ex. I at p. 3-4; *see also Big Creek Lumber,* 38 Cal. 4th

9   at 1159,1160.  And none of Measure B's requirements are inimical to or

10  contradict Cal/OSHA standards.  *See Sherwin-Williams*, 4 Cal. 4th at 902.

11       In sum, Section 5193 is a wide-ranging regulatory scheme regarding

12  bloodborne pathogen exposure and control, set out across all industries.  Measure

13  B, by contrast, is local regulation of filmmaking and public health that targets a

14  specific act in a specific industry, and directs specific persons not necessarily

15  covered by Section 5193, to take specific steps that are not necessarily required by

16  Section 5193.  The State specifically limited Section 5193's reach and scope in

17  order to allow local governments to regulate in this area.  There is no preemption.

18  **I.     Measure B Contains A Severability Provision.**

19       Measure B contains a severability provision ("If any provision of this Act,

20  or part thereof, is for any reason held to be invalid . . . the remaining provisions

21  shall not be affected").  The precise contours of the severability of a local

22  ordinance is a question of state law.  *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S.

23  750, 772 (1988).  Under California law, an ordinance is severable if "the invalid

24  provision [is] grammatically, functionally, and volitionally separable" from the

25  rest of the ordinance. *McMahan v. City and County of San Francisco*, 127 Cal.

26  App. 4th 1368, 1374 (2005).  Provisions of Measure B, and the parts thereof, are

27  severable.

28

"Volitional severability" means "the electorate's attention was sufficiently focused upon the parts to be severed [i.e., validated] so that it would have separately considered and adopted them in the absence of the invalid portions.' *Id*. (emphasis removed).  The purpose and intent of Measure B is to "minimize the spread of sexually transmitted diseases" during the making of films.  The Measure contains a number of requirements and methods that do just that.  As the overall aim is STD prevention, the invalidity of any one provision would not render the entire Measure ineffective, and the voters would prefer it to the status quo.  *See, e.g., Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 822 (1989) ("The voters who enacted Proposition 103 would presumably prefer rate setting and regulation under the balance of the initiative to the method of setting insurance rates which existed before the initiative was enacted.")

Measure B also is grammatically severable.  Its separate provisions and distinct requirements "can be removed as a whole without affecting the wording of any other provision." *Id*.  It also is functionally severable, in that its separate and distinct requirements (permit, training, etc.) are "capable of independent application" without the invalid part. *McMahan*, 127 Cal. App. 4th at 1378.

Therefore, to the extent finds any part of Measure B invalid, the remainder should be severed from any invalid portion.  If such is the case, Intervenors request the ability to address the extent of severability of any portion of Measure B found to be invalid.

Respectfully Submitted,

DATED:  July 22, 2013                INTERVENORS

By:/s/ Samantha R. Azulay
TOM MYERS
SAMANTHA R. AZULAY
CHRISTINA YANG
*Attorneys for Intervenors*