1

2

3                                                                    O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  VIVID ENTERTAINMENT, LLC;     )   Case No. CV 13-00190 DDP (AGRx)
    CALIFA PRODUCTIONS, INC.;     )
12  JANE DOE a/k/a KAYDEN KROSS,  )   ORDER DENYING IN PART AND
                                  )   GRANTING IN PART INTERVENERS'
13              Plaintiff,        )   MOTION TO DISMISS; DENYING IN
                                  )   PART AND GRANTING IN PART
14      v.                        )   PLAINTIFFS' MOTION FOR A
                                  )   PRELIMINARY INJUNCTION; AND
15  JONATHAN FIELDING, DIRECTOR   )   VACATING PLAINTIFFS' MOTION FOR
    OF LOS ANGELES COUNTY         )   JUDGMENT ON THE PLEADINGS
16  DEPARTMENT OF PUBLIC HEALTH;  )
    JACKIE LACEY, LOS ANGELES     )   [Docket Nos. 49, 55, 64]
17  COUNTY DISTRICT ATTORNEY,     )
    and COUNTY OF LOS ANGELES,    )
18                                )
                Defendants.       )
19  _____ )

20  **I. Background**

21       Plaintiffs Vivid Entertainment, LLC ("Vivid") and Califa

22  Productions, Inc., produce adult films. (Compl. ¶¶ 8-9, Docket No.

23  1.)  Plaintiffs Jane Doe, known professionally as Kayden Kross

24  ("Ms. Kross"), and John Doe, known professionally as Logan Pierce

25  ("Mr. Pierce"), are performers who appear in adult films. (Id. ¶¶

26  10-11.)

27       The adult film industry regularly tests actors for sexually

28  transmitted infections ("STIs"). (Id. ¶¶ 20-31.)  During the

November 2012 elections, Los Angeles County passed, via referendum, The County of Los Angeles Safer Sex in the Adult Film Industry Act ("Measure "B"). (Id. ¶ 36; Docket No. 58-1 Ex. B text of Measure B); Los Angeles County Code § 11.39 ("§ 11.39"), et seq. (codifying Measure B). Measure B forces producers of adult films, before any production can occur, to pay a fee and obtain a permit from the County Department of Public Health (the "Department"), which is tasked with enforcing Measure B. (Id. ¶ 41-43.) The Department of Public Health, set the permit fee in the range of $2,000 to $2,500 per year. (Compl. ¶ 48.) Once approved, the film producers must display the permit at all times during filming. (Id. ¶ 41.) A permit is valid for two years, but is, at all times, subject to immediate revocation. (Id.) Once a permit is granted, Measure B requires that performers engaging in anal or vaginal sexual intercourse to use condoms during filming. (Compl. ¶ 42.)

Department inspectors are granted access to "any location suspected of conducting any activity regulated by" Measure B, without notice. § 11.39.130. Inspectors can look at personal property or private documents from any person present at any location if there is suspicion of a Measure B violation. See id.

Plaintiffs have sued various County officials for Declaratory and Injunctive Relief. (See generally Compl.) Because Defendants have declined to defend Measure B's constitutionality, this Court has allowed Michael Weinstein, Marijane Jackson, Arlette De La Cruz, Mark McGrath, Whitney Engeran, and the Campaign Committee Yes on B, Major Funding by the AIDS Healthcare Foundation ("Interveners") to intervene. (See generally Order Granting Motion to Intervene, Docket No. 44; Order Denying Plaintiffs' Motion for

1  Reconsideration, Docket No. 78.)  Interveners were Measure B's

2  official proponents.  (Id. at 2:19-20.)  Presently before the Court

3  is Interveners' Motion to Dismiss and Plaintiffs' Motion for a

4  Preliminary Injunction.  (Docket Nos. 49, 55.)[1]

5  **II. Legal Standard**

6      **A. Motion to Dismiss**

7      A complaint will survive a motion to dismiss when it contains

8  "sufficient factual matter, accepted as true, to state a claim to

9  relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S.

10  662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

11  570 (2007)).  When considering a Rule 12(b)(6) motion, a court must

12  "accept as true all allegations of material fact and must construe

13  those facts in the light most favorable to the plaintiff."  Resnick

14  v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000).  Although a complaint

15  need not include "detailed factual allegations," it must offer

16  "more than an unadorned, the-defendant-unlawfully-harmed-me

17  accusation."  Iqbal, 556 U.S. at 678.  Conclusory allegations or

18  allegations that are no more than a statement of a legal conclusion

19  "are not entitled to the assumption of truth."  Id. at 679.  In

20  other words, a pleading that merely offers "labels and

21  conclusions," a "formulaic recitation of the elements," or "naked

22  assertions" will not be sufficient to state a claim upon which

23  _____

24      [1]Plaintiffs argue the motion to dismiss is untimely because
the County has already filed an answer in this case.  Generally,

25  motions to dismiss must be filed before an answer.  United States
v. Real Prop. Located at 41430 De Portola Rd., Rancho California,

26  959 F.2d 243 (9th Cir. 1992).  It is unclear, though, how this rule
is applied in the intervener context.  Regardless, should the rule

27  apply to Interveners, the Court uses its discretion to convert the
motion to dismiss into a motion for judgment on the pleadings,

28  which is analogous to a motion to dismiss except that it may be
filed after an answer.  See id.

1  relief can be granted.  Id. at 678 (citations and internal
2  quotation marks omitted).  "When there are well-pleaded factual
3  allegations, a court should assume their veracity and then
4  determine whether they plausibly give rise to an entitlement of
5  relief."  Id. at 679.
6      **B. Motion for Preliminary Injunction**
7      "[P]laintiffs seeking a preliminary injunction must establish
8  that (1) they are likely to succeed on the merits; (2) they are
9  likely to suffer irreparable harm in the absence of preliminary
10 relief; (3) the balance of equities tips in their favor; and (4) a
11 preliminary injunction is in the public interest."  Sierra Forest
12 Legacy v. Rey, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing Winter
13 v. Natural Resources Defense Council, Inc., 555 U.S. 7, 29 (2008)).
14 **III. Motion to Dismiss Analysis**
15     After reviewing Interveners' motion to dismiss, the Court
16 GRANTS dismissal of Plaintiffs' claim that ballot initiatives
17 cannot, as a matter of law, implicate First Amendment rights, that
18 state law preempts Measure B, and that Measure B violates
19 Plaintiffs' due process rights (with the exception of Plaintiffs'
20 Fourth Amendment claim).  The Court DENIES dismissal on the
21 remaining claims.
22     **A. Standing**
23     Interveners claim that Plaintiffs do not have standing.
24 Standing is a "threshold question."  Nat'l Org. for Women, Inc. v.
25 Scheidler, 510 U.S. 249, 255 (1994).  The doctrine "is founded in
26 concern about the proper-and properly limited role-of the courts in
27 a democratic society."  Wart v. Seldin, 422 U.S. 490, 498 (1975).
28 The constitutional requirements of standing are:

4

1
2
3
4
5
6
7
>(1) injury in fact, by which we mean an invasion of a
legally protected interest that is (a) concrete and
particularized, and (b) actual or imminent, not
conjectural or hypothetical; (2) a causal relationship
between the injury and the challenged conduct, by which
we mean that the injury fairly can be traced to the
challenged action of the defendant, and has not resulted
from the independent action of some third party not
before the court; and (3) a likelihood that the injury
will be redressed by a favorable decision, by which we
mean that the prospect of obtaining relief from the
injury as a result of a favorable ruling is not too
speculative.

Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 663-664 (1993).  Plaintiffs have the burden of showing they have standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 562 (1992).  "[I]t is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked against the plaintiff."  Arizona Right to Life Political Action Comm. v. Bayless, 320 F.3d 1002, 1006 (9th Cir. 2003) (internal quotation marks and citations omitted) (emphasis added).[2] "Thus, when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing."  Id.  Even outside the First Amendment context, pre-enforcement standing is appropriate when the issue is a purely legal one and it would be costly to comply with the challenged law or regulation.  See Abbott Labs v. Gardner, 387 U.S. 136, 149 (1967).

_____

[2]The word "arguably" is important because standing must be decided before the merits are reached.  George E. Warren Corp. v. U.S. E.P.A., 164 F.3d 676 (D.C. Cir. 1999).

5

1    Here, standing is appropriate.  Vivid and Califa,
2    collectively, make, produce, and distribute adult films, and their
3    principle place of business is Los Angeles.  (Compl. ¶¶ 8-9.)
4    Plaintiffs Kross and Pierce perform in adult films produced Los
5    Angeles.  (Id. ¶¶ 10-11.)  On December 14, 2012, the Department
6    sent a letter to the "Producers of Adult Films in Los Angeles
7    County, indicating what steps the Department would take in
8    implementing and enforcing Measure B."  (Docket No. 56 Ex. 1; see
9    also Compl. ¶¶ 55, 61, 76, 89, 97.)  Vivid has presented evidence
10   that, as a result of Measurer B's passage, it has stopped shooting
11   adult films in Los Angeles, and has thus lost the value of the non-
12   Measure B filming permits for which it has already paid.  (Hirsch
13   Decl. ¶¶  20-21.)[3]  Vivid has also presented evidence that filming
14   outside Los Angeles creates several difficulties: performers are
15   generally less available to film outside the County, fewer support
16   services are available outside the County, and fewer suitable
17   locations exist outside the County.  (Id. ¶¶ 28-32.)  Moreover,
18   Kross attests that she prefers to act with a partner not wearing a
19   condom, for reasons that range from comfort to the message she
20   wishes to portray, and she also attests that Measure B has reduced
21   the number of roles in which she has had the opportunity to act.

22

23        [3]"In evaluating a plaintiff's standing at the motion to
24   dismiss stage, a court may consider not only the allegations in the
     complaint, but also factual averments made by declaration or
25   affidavit."  Am. Tradition Inst. v. Colorado, 876 F. Supp. 2d 1222,
     1232 (D. Colo. 2012); Vildosola v. Hornbeak, No. CV 08-6590-VAP
26   JEM, 2010 WL 1507100, at *8 (C.D. Cal. Feb. 25, 2010) (looking to
     declarations to determine standing at the motion to dismiss stage).
27    "[A] suit will not be dismissed for lack of standing if there are
     sufficient allegations of fact—not proof—in the complaint or
28   supporting affidavits."  Gwaltney of Smithfield, Ltd. v.
     Chesapeake Bay, 484 U.S. 49, 65 (1987) (emphasis added).

1    (Kross Decl. ¶¶ 9-11, 15.)  Pierce makes similar attestations.

2    (Pierce Decl. ¶¶ 7-11.)  In light of the potential First Amendment

3    concerns that Measure B implicates, the costs and consequences of

4    complying with Measure B, and the County's expressed intent to

5    enforce Measure B, Plaintiffs have standing to challenge it.

6    <u>Bayless</u>, 320 F.3d at 1006; <u>see also</u> <u>Abbott Labs</u>, 387 U.S. at 149

7    (indicating that standing would be proper even outside the First

8    Amendment context).

9        **B. <u>Plaintiffs' State Law Preemption Claim</u>**

10       Plaintiffs contend that Cal. Labor Code § 144.7 and California

11   Code of Regulations Title 8 § 5193 preempt Measure B  (Compl. ¶

12   101.)  Diversity jurisdiction is not alleged, and, therefore,

13   supplemental jurisdiction, 28 U.S.C. § 1367, is the only means by

14   which this Court may preside over Plaintiffs' state law preemption

15   claim.  However, 28 U.S.C. § 1367, grants courts the discretion to

16   "decline to exercise supplemental jurisdiction" over matters that

17   "raise[] a novel or complex issue of State law."  <u>Id.</u>; <u>Dream Palace</u>

18   <u>v. Cnty. of Maricopa</u>, 384 F.3d 990, 1022 (9th Cir. 2004).  The

19   Ninth Circuit has upheld a decision to decline supplemental

20   jurisdiction over a claim that state law preempted a county

21   ordinance governing adult entertainment sites.  <u>Dream Palace</u>, 384

22   F.3d at 1022.  The district court in that case explained that "the

23   remaining state-law claims raise delicate issues involving the

24   interpretation and application of Arizona law and the balance of

25   powers within Arizona between state and local government."  <u>Id.</u>

26   Since similar concerns about the balance of power in California are

27   present in Plaintiffs' novel preemption claim, this Court declines

28   supplemental jurisdiction.

1        C. __Plaintiffs' First Amendment Claim__

2        Plaintiffs allege that requiring actors in adult films to wear

3   condoms violates their First Amendment rights. (Compl. ¶¶ 42, 51-

4   56.)  Such a requirement is a restriction on conduct.  However, not

5   all conduct receives First Amendment protection; only expressive

6   conduct is considered speech and implicates the First Amendment.

7   See Nordyke v. King, 319 F.3d 1185, 1189 (9th Cir. 2003).  The

8   Supreme Court has applied the First Amendment to restrictions on

9   nude dancing, adult movie theaters, adult bookstores, and live

10  adult theater performances because the First Amendment protects

11  sexually explicit speech.  FW/PBS, Inc. v. City of Dallas, 493 U.S.

12  215, 224 (1990) (citing cases).  Presently at issue is whether

13  engaging in sexual intercourse for the purpose of making a

14  commercial adult film receives First Amendment protections.  The

15  Court is aware of no case that has analyzed this issue.  However,

16  given the multitude of cases that have analyzed restrictions on

17  adult entertainment under the First Amendment, this Court concludes

18  that sexual intercourse engaged in for the purpose of creating

19  commercial adult films is expressive conduct, is therefore speech,

20  and therefore any restriction on this expressive conduct requires

21  First Amendment scrutiny.  See id.

22       Measure B's stated purpose "is to minimize the spread of

23  sexually transmitted infections resulting from the production of

24  adult films in Los Angeles."  (Docket No. 58-1 Ex. B, Docket No.

25  58-1.)  Because this purpose focuses on the secondary effects of

26  unprotected speech, rather than the message the speech conveys, it

27  will be reviewed under intermediate scrutiny.  See Fly Fish, Inc.

28  v. City of Cocoa Beach, 337 F.3d 1301, 1306-09 (11th Cir.

1   2003)(evaluating an ordinance that prohibited "totally nude"

2   dancing in "adult entertainment establishments" under the <u>Renton</u>

3   intermediate scrutiny framework); <u>Heideman v. S. Salt Lake City</u>,

4   348 F.3d 1182, 1196. (10th Cir. 2003) (evaluating a similar

5   ordinance under intermediate scrutiny); <u>see generally Renton v.</u>

6   <u>Playtime Theatres, Inc.</u>, 475 U.S. 41, 47-48 (1986) (holding that

7   an ordinance that treated "theaters that specialize in adult

8   films" differently should be analyzed under a content neutral,

9   intermediate scrutiny framework because the ordinance was aimed at

10  the secondary effects of those theaters, not their content).[4]

---

[4]Plaintiffs state that Measure B requires strict scrutiny
review for three reasons.  First, Measure B singles out adult
films.  But the Ordinance in <u>Renton</u> also involved a statute that
singled out adult theaters.  <u>Renton</u>, 475 U.S. at 47-48.
Plaintiffs' first argument, thus, fails.  Second, Plaintiffs argue
that <u>Renton</u>'s reasoning only applies in the context of zoning,
because zoning does not prohibit what can be shown, only where
something can be shown.  Several Circuits have rejected that
argument.  <u>See</u> <u>Fly Fish</u>, 337 F.3d at 1306-09; <u>Heideman</u>, 348 F.3d at
1196.  The Tenth Circuit has reasoned:
    The fallacy in Plaintiffs' argument is to assume that the
    "adequate alternative avenues of expression" required
    under the <u>Renton</u> line of cases refers exclusively to
    location.  Time, place, or manner regulations all are
    partial limitations, but each is partial in a different
    way. . . .  "[M]anner" limitations require alternative
    ways in which a message may be communicated.  A ban on
    nudity within sexually oriented businesses is a 'manner'
    regulation, and Plaintiffs have provided no reason to
    believe that there do not exist other ways to get their
    message across.
<u>Heideman</u>, 348 F.3d at 1196 (citations omitted).  Third, Plaintiffs
suggest that requiring condoms "so interferes with the message that
it essentially bans the message."  <u>City of Erie v. Pap's A.M.</u>, 529
U.S. 277, 293 (2000) (pl. op.).  Plaintiffs' third argument is
composed of two sub-arguments, one made at oral argument and the
other made in briefing.  During oral argument, Plaintiffs stated
that Measure B prevents them from making adult films depicting sex
during an historical period before condoms existed.  The Court
notes anachronisms need not detract from a story.  Even assuming
that condoms interfere with storylines, Plaintiffs' argument, if
accepted, would require every manner restriction to be reviewed
under strict scrutiny because any manner restriction inherently
(continued...)

Under intermediate scrutiny narrow tailoring, Interveners

---

[4](...continued)
interferes with a large number of storylines.  It is settled law,
though, that manner restrictions only trigger intermediate
scrutiny.  See Fly Fish, 337 F.3d at 1306-09; Heideman, 348 F.3d
at 1196; City of Erie v. Pap's A.M., 529 U.S. 277 (2000); Barnes v.
Glen Theatre, Inc., 501 U.S. 560, 576 (1991).  The condom
requirement is analogous to requirements that nude dancers wear
pasties and G-strings, both of which are de minimis restrictions on
a sexually explicit message that trigger intermediate scrutiny.
Pap's, 529 U.S. at 294 (pl. op.) ("Any effect on the overall
expression [on account of requiring dancers to wear pasties and
G-strings] is de minimis."); Schultz v. City of Cumberland, 228
F.3d 831, 847-48 (7th Cir. 2000) (noting that pasties and G-strings
are analyzed under intermediate scrutiny because they are de
minimis restrictions); Dream Palace, 384 F.3d at 1021 (favorably
discussing Schultz).

Plaintiffs' briefing argues and their declarations state that
not using a condom is intended to communicate a message.  (See
Kross Decl. ¶¶ 12-13 (attesting that [c]ondoms are a reminder of
real-world concerns" such as "pregnancy and disease," and that
requiring condoms in adult films' hinders those films' aim to
"suspend . . . concerns [about pregnancy and disease] and allow
audience members to suspend their disbelief".))  If condomless sex
in adult films is inherently expressive, then requiring condoms
would completely block that expression, and strict scrutiny would
be required.  Pap's, 529 U.S. at 293.

"[T]he Supreme Court has 'extended First Amendment protection
only to conduct that is inherently expressive.'"  Wong v. Bush, 542
F.3d 732, 736 (9th Cir. 2008) (quoting Rumsfeld v. Forum for
Academic and Institutional Rights, Inc., 547 U.S. 47, 66 (2006)).
An act is inherently expressive if the "likelihood [is] great that
the message would be understood by those who viewed it." Spence,
418 U.S. at 410-11.  The Supreme Court has cautioned that the
"inherently expressive" requirement means that words cannot be used
to explain the message that conduct is meant to communicate,
because "[i]f combining speech and conduct were enough to create
expressive conduct, a regulated party could always transform
conduct into 'speech' simply by talking about it."  Rumsfeld, 547
U.S. at 66.  Like nude dancing, sexual intercourse performed for
the production of adult films inherently expresses an erotic
message.  See Pap's, 529 U.S. at 301 (pl. op.) (recognizing erotic
message of nude dancing); Dream Palace, 384 F.3d at 1021 (same).
But, without the explanatory declarations, it is unclear what
message condom-less sex conveys.  Just as the requirement that nude
dancers wear pasties and G-strings is viewed as a restriction on
expressive conduct, so, too, is the requirement that adult film
actors wear condoms a restriction on expressive conduct.  Put
differently, sexual intercourse performed for adult films and nude
dancing both are expressive conduct, but requiring condoms for the
former and pasties for the latter are only de minimis restrictions
on expressive conduct.

10

1  must "demonstrate that the recited harms" to the substantial

2  governmental interest "are real, not merely conjectural, and that

3  the regulation will in fact alleviate those harms in a direct and

4  material way."[5]  <u>Turner I</u>, 512 U.S. at 664-65.  While an ordinance

5  is "not invalid simply because there is some imaginable

6  alternative that might be less burdensome on speech," <u>Turner II</u>,

7  520 U.S. at 217, the Interveners must prove that the statute does

8  not "burden substantially more speech than is necessary to further

9  the government's legitimate interests." <u>Turner I</u>, 512 U.S. at 665

10  (internal quotations omitted).  In light of the alleged effective,

11  frequent, and universal testing in the adult film industry,

12  Plaintiffs allege sufficient facts, which for purposes of this

13  motion must be assumed true and construed in the light most

14  favorable to Plaintiffs, to show that Measure B's condom

15  requirement does not alleviate the spread of STIs in a "direct and

16  material way."  <u>Turner I</u>, 512 U.S. at 664-65; (Compl. ¶¶ 18-31.)[6]

17  Thus, Interveners motion to dismiss Plaintiffs' First Amendment

18  claim is DENIED.

19  _____

20      [5]Public health is a substantial government interest. <u>Rubin v.</u>
21  <u>Coors Brewing Co.</u>, 514 U.S. 476, 485 (1995).

22      [6]Plaintiffs' over and under inclusive claims are also relevant
   to narrow tailoring.  (Compl. ¶¶ 78-90.)  Thus, these claims would
23  be more appropriately combined with Plaintiffs' First Amendment
   claim, which for the reasons discussed above, survives dismissal.
24  <u>Cf. Sec'y of State of Md. v. Joseph H. Munson Co., Inc.</u>, 467 U.S.
   947 n.13 (1984) ("Overbreadth has also been used to describe a
25  challenge to a statute that in all its applications directly
   restricts protected First Amendment activity and does not employ
26  means narrowly tailored to serve a compelling governmental
   interest. . . .  Whether that challenge should be called
27  'overbreadth' or simply a 'facial' challenge, the point is that
   there is no reason to limit challenges to case-by-case 'as applied'
28  challenges when the statute on its face and therefore in all its
   applications falls short of constitutional demands.")

1    **D. <u>Plaintiffs' Claim That Referendums May Not Implicate the</u>**
2       **<u>First Amendment</u>**

3       Plaintiffs claim that referendums that implicate the First
4    Amendment are inherently invalid, because they do not have
5    legislative records and their findings deserve no deference.  This
6    claim appears to focus on Measure B's condom requirement.  (Compl.
7    ¶¶ 51-56 (emphasizing Measure B's condom-related findings).)  As
8    one court stated, "no court has accorded legislative deference to
9    ballot drafters."  <u>Daggett v. Webster</u>, No. 98-223-B-H, 1999 WL
10   33117158, at *1 (D. Me. May 18, 1999).  Legislatures receive
11   deference because they are "better equipped than the judiciary to
12   'amass and evaluate the vast amounts of data' bearing upon ...
13   complex and dynamic" issues.  <u>Turner I</u>, 512 U.S. at 665-66.
14   Because the referendum process does not invoke the same type of
15   searching fact finding, a referendum's fact finding does not
16   "justif[y] deference."  <u>California Prolife Council Political</u>
17   <u>Action Comm. v. Scully</u>, 989 F. Supp. 1282, 1299 (E.D. Cal. 1998),
18   <u>aff'd</u>, 164 F.3d 1189 (9th Cir. 1999).

19      However, an undeferential review of Measure B's findings does
20   not equate to an automatic resolution in Plaintiffs' favor.  It
21   means that Interveners must have a record sufficient for Measure B
22   to withstand intermediate scrutiny, without the benefit of
23   deference.  <u>Yniquez v. Arizonans for Official English</u>, 69 F.3d
24   920, 945 (9th Cir. 1995), <u>vacated on other grounds</u>, <u>Arizonans for</u>
25   <u>Official English v. Arizona</u>, 520 U.S. 43(1997)[7] ("There is no basis

26   _____

27      [7]"[A]t minimum, a vacated opinion still carries informational
     and perhaps even persuasive or precedential value."  <u>DHX, Inc. v.</u>
28   <u>Allianz AGF MAT, Ltd.</u>, 425 F.3d 1169, 1176 (9th Cir. 2005).

                                    12

in the record to support the proponents' assertion that any of the broad societal interests on which they rely  are served by the provisions of Article XXVIII.  The absence of any evidence to this effect is of particular significance given that . . . Article XXVIII is a ballot initiative and thus was subjected to neither extensive hearings nor considered legislative analysis before passage.")  Accordingly, the Court GRANTS dismissal of Plaintiffs' claim that referendums may not implicate the First Amendment.

**E. <u>Plaintiffs' Prior Restraint Claim</u>**

"The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." <u>Alexander v. United States</u>, 509 U.S. 544 (1993).  "A permitting requirement is a prior restraint on speech and therefore bears a heavy presumption against its constitutionality." <u>Berger v. City of Seattle</u>, 569 F.3d 1029, 1037 (9th Cir. 2009) (internal quotation marks and citation omitted).  Courts in this district have found that a prior restraint exists when an individual must obtain a permit to engage in nude dancing. <u>Dease v. City of Anaheim</u>, 826 F. Supp. 336, 342 (C.D. Cal. 1993); <u>Santa Fe Springs Realty Corp. v. City of Westminster</u>, 906 F. Supp. 1341, 1363 (C.D. Cal. 1995) (citing <u>Dease</u> and applying that case's logic).

Interveners claim that Measure B is not a prior restraint because it does not require a permit to show films, it only requires a permit to film certain types of films.  This distinction is unhelpful.  Prior restraints are presumptively invalid because they chill speech from occurring.  "The presumption against prior restraints is heavier-and the degree of protection

1    broader-than that against limits on expression imposed by criminal

2    penalties.   Behind the distinction is a theory deeply etched in

3    our law: a free society prefers to punish the few who abuse rights

4    of speech after they break the law than to throttle them and all

5    others beforehand." Se. Promotions, Ltd. v. Conrad, 420 U.S. 546,

6    559 (1975).   This policy concern would be upended if it were a

7    prior restraint to require a permit for a film to be shown, a book

8    to be published, or a painting to be displayed but not a prior

9    restraint to require a permit for a movie to be filmed, a book to

10   be written, or a painting to be painted.   Therefore, Measure B,

11   which requires producers to obtain a permit before shooting "any

12   film, video, multimedia or other representation of sexual

13   intercourse" is a prior restraint.[8]

14        Plaintiffs argue that Measure B does not provide sufficient

15   procedural safeguards, does not have narrowly tailored

16   requirements, and gives the County unbridled discretion.   The

17   Court generally agrees.[9]

18   

19        [8]Interveners are incorrect in arguing that Plaintiffs must
     allege that they have applied for a permit in order to challenge
20   Measure B.   "Plaintiffs who challenge a permitting system are not
     required to show that they have applied for, or have been denied, a
     permit. . . .   They must only have declined to speak, or have
21   modified their speech, in response to the permitting system."
     Kaahumanu v. Hawaii, 682 F.3d 789, 796 (9th Cir. 2012); see id.
22   (striking down a broad revocation and suspension provision even
     though "the record indicate[d] that permits . . . have been issued
23   as a matter of course, and that the discretionary power reserved in
     [the revocation and suspension provisions] has never been
24   exercised.")   As outlined in the "Background" section and
     "Standing" subsection, Plaintiffs have modified their speech
25   because of Measure B.

26        [9] Plaintiffs' Opposition to the Motion to Dismiss makes a
     broad, although conclusory, argument that requiring a permit itself
27   is an invalid prior restraint.   Docket No. 53 at 13-14.   This
     argument, was not made in Plaintiffs' Preliminary Injunction brief.
28                                                        (continued...)

1    **1. <u>Procedural Safeguards</u>**

2        Plaintiffs focus on the procedural safeguards relating to

3    revoking Measure B permits.[10]  Prior restraints that target adult

4    entertainment, as Measure B does, must provide the following

5    procedural safeguards: "the licensor must make the decision

6    whether to issue the license within a specified and reasonable

7    time period during which the status quo is maintained, and there

8    must be the possibility of prompt judicial review in the event

9    that the license is erroneously denied."  <u>FW/PBS, Inc. v. City of</u>

10   <u>Dallas</u>, 493 U.S. 215, 228 (1990) <u>modified on other grounds</u>, <u>City</u>

11   <u>of Littleton</u>, <u>Colo. v. Z.J. Gifts D-4, L.L.C.</u>, 541 U.S. 774, 776

12   (2004) (a prior restraint targeting adult businesses must "assure

13   prompt judicial review of an administrative decision denying a

14   license").  "[T]hese considerations apply to license suspensions

15   and revocations as well as license denials."  <u>4805 Convoy, Inc. v.</u>

16   <u>City of San Diego</u>, 183 F.3d 1108, 1114 (9th Cir. 1999).  License

17   suspensions and revocations differ from the denial of a license

18   application in that "preservation of the status quo means that the

19   suspension or revocation cannot be enforced, and the business is

20   allowed to continue to operate under its license," until there has

21   been a judicial determination.  <u>Id.</u>  Measure B allows for the

22   Department to revoke and suspend a permit, and once revocation or

23

24        [9](...continued)
     Docket No. 55 at 8-10.  Because Plaintiffs state a valid prior
25   restraint claim without this argument, the Court need not analyze
     it now.

26        [10] The procedural safeguards claims were raised in the
27   complaint, and argued, though only with respect to revocations and
     suspensions, in Plaintiffs' preliminary injunction motion.  (Compl.
28   ¶ 96; Docket No. 55 at 9:7-14 (citing provision of Measure B
     regarding suspensions and revocations).

1    suspension has occurred, a permit holder must "cease filming any

2    adult film."  § 11.39.110 (D), (H).  These provisions of Measure B

3    are, thus, unconstitutional because they provide for suspensions

4    and revocations before a judicial determination.

5            **2. <u>Unbridled Discretion</u>**

6        Additionally, Government officials cannot have unbridled

7    discretion over permits that implicate First Amendment activity.

8    <u>G.K. Ltd. Travel v. City of Lake Oswego</u>, 436 F.3d 1064, 1082 (9th

9    Cir. 2006).  Here, in order to receive and keep a permit, the

10   following is required: pay for the permit, complete an

11   application, conduct blood-borne pathogen training, post the

12   permit on the worksite, and use condoms during anal and vaginal

13   sex.  § 11.39.080-11.39.110; (<u>see</u> Compl. ¶ 58.)  These criteria

14   are clear and do not leave much, if any, room for discretion.

15   Another Measure B provision, though, is more problematic.  (Docket

16   No. 53 at 14:17-15:4.)[11]

17   _____

18       [11]Measure B states: "Upon successful completion of the permit
     application process described in subsection A of this section, the
19   department shall issue an adult film production public health
     permit to the applicant.  The adult film production public health
20   permit will be valid for two years from the date of issuance,
     unless revoked."  § 11.39.080(B).  In analyzing another statute
21   that singled out adult entertainment, the Supreme Court held that
     "the licensor must make the decision whether to issue the license
22   within a specified and reasonable time period."  <u>FW/PBS, Inc. v.
     City of Dallas</u>, 493 U.S. 215, 228, 1990).  Here, in light of the
23   obligation to, when possible, interpret an ordinance in a way that
     maintains its constitutionality, the Court construes the word
24   "upon" to place sufficiently specific and reasonable time limit for
     permit authorizations.  <u>See</u> <u>New York v. Ferber</u>, 458 U.S. 747, 769
25   (1982) (discussing the importance of interpreting federal law to
     preserve its constitutionality); <u>see also</u> <u>Beaulieu v. City of
26   Alabaster</u>, 454 F.3d 1219, 1232 (11th Cir. 2006) (essentially
     applying the maxim to ordinances); <u>Int'l Soc. for Krishna
27   Consciousness of Atlanta v. Eaves</u>, 601 F.2d 809, 822 (5th Cir.
     1979) (same).  Because Webster's (available at
28   http://www.merriam-webster.com/) defines "upon" to mean "on,"
                                                      (continued...)

16

1    Measure B, also, provides that after an administrative

2    review, "[t]he Department may . . . modify, suspend, revoke or

3    continue all such action previously imposed upon a permittee

4    pursuant to this chapter or impose any fine imposed by law for

5    violations of this chapter or any other law <u>or standards affecting</u>

6    <u>public health and safety</u>, including <u>but not limited to</u> [certain

7    laws and regulations]." § 11.39.110(F).   Thus, Measure B allows,

8    under some circumstances, for the denial of permits when adult

9    film makers violate unnamed, undescribed "standards affecting

10   public health."   This is unbridled discretion.[12]

11       For similar reasons, portions of § 11.39.110(E) are

12   unconstitutional.   If there is "any immediate danger to the public

13   health or safety is found or is reasonably suspected," that

14   provision allows the department to "immediately suspend . . . [a]

15   permit, initiate a criminal complaint and/or impose any fine

16

_____

17       [11](...continued)
18   Measure B indicates that applications will be immediately reviewed.

19       [12]Plaintiffs also argue that the Department has unbridled
20   discretion in determining which blood-borne pathogen training class
     meets Departmental approval. (Docket No. 53 at 15:5-11.)   The
21   Court need not address this issue because Plaintiffs have otherwise
     stated a valid prior restraint claim. (<u>See</u> Docket No. 55 at 8-10).
22   However, the proper issue is whether the Department has too much
     discretion in terms of who receives a permit, not whether they have
23   too much discretion in selecting appropriate training classes.
     <u>G.K. Ltd.</u>, 436 F.3d at 1082 (9th Cir. 2006) ("The requirement of
24   sufficient direction for City officials seeks to alleviate the
     threat of content-based, discriminatory enforcement that arises
25   where the licensing official enjoys unduly broad discretion in
     determining whether to grant or deny a permit") (internal quotation
26   marks and citation omitted).   The appropriate way to challenge the
     training course requirement, or any other requirement (including
27   the requirement to get a permit), is to do so on narrow tailoring
     grounds. <u>Berger</u>, 569 F.3d at 1041.   Since Plaintiffs do not argue
28   that the blood training course fails a narrow tailoring analysis,
     the Court will not analyze the issue.

permitted by [Measure B]." The provision also states: "Immediate danger to the public health and/or safety shall include any condition, based upon inspection findings or other evidence, that can cause, or is reasonably suspected of causing, infection or disease transmission, or any known or reasonably suspected hazardous condition." This provision is too broad—it is not limited to Measure B's requirements, and it applies to conditions "reasonably suspected" to be "suspected of causing" the transmission of unnamed diseases. The department is given no guidance as what types or diseases or what types of transmission methods § 11.39.110(E) applies. Indeed, § 11.39.110(E) would seem to authorize revoking a permit if a cameraman were working with a cold. The discussed portions of § 11.39.110(E), therefore, are unconstitutional.

### 3. **Narrow Tailoring**

Pursuant to the most lenient scrutiny that Measure B could be reviewed under, a prior restraint's provisions must be narrowly tailored such that they do "not burden substantially more speech than is necessary to achieve a substantial government interest." Berger, 569 F.3d at 1041. Plaintiffs allege that "Measure B also prohibits the production of any adult film by any entity that has had a permit suspended or revoked." (Compl. ¶ 58.)[13] Because Interveners bear the burden of justifying a prior restraint's restrictions, because an alternative to revoking the permit

---

[13] A Measure B permit is issued to adult film producers. See generally § 11.39.080(A). The permit extends for two years, and is applicable to all films a producer makes. See § 11.39.080(B). Thus, revocation or suspension means a permit holder cannot produce any adult film.

completely would be revoking the permit only as to the offending film, and because Interveners do not address Plaintiffs' claim that a total revocation is improper, Plaintiffs' prior restraint claim survives.  <u>Id.</u> at 1035 (discussing the burden), 1041 (holding that "the existence of obvious, less burdensome alternatives is a relevant consideration in determining whether the 'fit' between ends and means is reasonable") (internal quotation marks omitted); Docket No. 49 at 12-15 (ignoring Plaintiffs' revocation argument).

Plaintiffs claim that Measure B is not narrowly tailored because, although the condom requirement applies only to vaginal and anal sex, a Measure B permit is required to film much more.  A permit is required for "adult films," which are defined as "any film, video, multimedia or other representation of sexual intercourse in which performers actually engage in oral, vaginal, or anal penetration, including, but not limited to, penetration by a penis, finger, or inanimate object; oral contact with the anus or genitals of another performer; and/or any other sexual activity that may result in the transmission of blood and/or any other potentially infectious materials."[14]  The Court finds Plaintiffs have stated a claim on this issue.

_____

[14]Although Plaintiffs have not raised the issue, the following clause of the "adult films" definition is problematic: "and/or any other sexual activity that may result in the transmission of blood and/or any other potentially infectious materials."  The use of "or" indicates that filmed "sexual activity" that "results in the transmission of . . . other potentially infectious materials" requires a Measure B permit.  Sexual activity could mean many things.  Potentially, kissing could qualify, as saliva may contain infectious materials.  Therefore, the portion of adult film's definition discussed in this footnote is unconstitutionally overbroad and vague.

As discussed, Measure B's purpose is to prevent the spread of STIs, and requiring condoms is the means by which Measure B seeks to prevent their spread. (See Docket No. 58 Ex. B § 2 (Measure B's "findings and declarations"), § 3 ("purpose and intent"). Since Measure B only requires condoms for vaginal and anal sexual intercourse, and since Measure B's purpose is condoms-focused, Plaintiffs have stated a claim that the permit requirement is not narrowly tailored because it applies to adult films without vaginal or anal sexual intercourse.[15]

**F. Plaintiffs' Fees Claim**

Prior restraints may only impose permit fees if they are revenue neutral, because the Government may not charge for the privilege of exercising a constitutional right. See Murdock v. Pennsylvania, 319 U.S. 105, 113-14 (1943); Cox v. New Hampshire, 312 U.S. 569, 577 (1941). The Sixth and Eleventh Circuits have applied this revenue-neutral rule to permit fees on adult entertainment businesses. Fly Fish, 337 F.3d at 1314; 729, Inc. v. Kenton Cnty. Fiscal Court, 515 F.3d 485, 510 (6th Cir. 2008). The Eighth Circuit, though, declined to do so. Jakes, Ltd., Inc. v. City of Coates, 284 F.3d 884, 890-891 (8th Cir. 2002). In analyzing the contrary Eighth Circuit authority, the Eleventh

---

[15]The Court rejects Plaintiffs' argument in its preliminary injunction brief that Measure B's criminal and civil penalties are not narrowly tailored, and, therefore, constitute an invalid prior restraint. Prior restraint analysis looks to the requirements of and processes associated with obtaining and keeping a permit, not criminal penalties. Cf Conrad, 420 U.S. at 559 ("The presumption against prior restraints is heavier-and the degree of protection broader-than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.")

Circuit noted that even though nude dancing was at the "outer perimeters of the First Amendment," because the government could not completely ban erotic dancing, the government cannot tax it without limit.  <u>Fly Fish</u>, 337 F.3d at 1315.  The Court agrees with the Eleventh Circuit's logic and finds it applies to Measure B's fees.

Courts applying the revenue-neutral rule to adult entertainment require the government to prove that revenues merely cover "the costs of administering [the] licensing program."  <u>Id.</u> at 1314-15; <u>729</u>, 515 F.3d at 510.  Even though the permit fee in this case, $2,000-$2,500, is relatively minimal, the Court will not assume that it is constitutionally permissible.  See <u>Fly Fish</u>, 337 F.3d at 1315 (holding as unconstitutional a $1,250 fee per adult business because the "City . . . conducted no real accounting of the costs of administering its licensing program").  Since the Complaint does not allege facts suggesting that the fees are revenue neutral, the fees' claim survives the motion to dismiss.  The Court notes, for reasons that will be relevant later, that Interveners provide no evidence of revenue neutrality.  (<u>See</u> Docket No. 57 at 15:14-18.)

**G. <u>Plaintiffs' Vagueness Claim</u>**

Under the void-for-vagueness doctrine, "legislatures [are required] to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement."  <u>Smith v. Goquen</u>, 415 U.S. 566, 572-73 (1974).  "Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands

a greater degree of specificity than in other contexts." Id. at
573.  All that is required is that there be "reasonably clear
lines" such that "men of common intelligence [are] not forced to
guess at the meaning of the criminal law." Id. at 574 (internal
quotation marks and citations omitted).

Plaintiffs' opposition brief and complaint conclusorily state
that some of the terms in Measure B are unconstitutionally vague.
(Docket No. 53 at 16:14-17; Compl. ¶¶ 71-77.)  This is a
sufficient reason to dismiss the claim.  See Iqbal, 556 U.S. at
678-79.

Measure B defines three of Plaintiffs' challenged terms:
"adult film," "exposure control plan," and "producer of adult
film."[16]  Several other terms are not defined.  When statutory
terms are undefined, they are given their "ordinary and natural
meaning," and courts employ "general usage dictionaries to
determine" that meaning.  Castro v. Terhune, 712 F.3d 1304, 1312
(9th Cir. 2013).  Measure B requires that "principal and
management-level employees" complete blood borne pathogen
training.  § 11.39.080.  Plaintiffs claim that the terms
"principal" and "management-level employees" are unclear.  Webster

---

[16]For reasons discussed in the prior restraint analysis,
"adult film" must be narrowed in scope.  After striking the
offending portions of that term's statutory definition, and adding
no new terms, it would be defined as "any film, video, multimedia
or other representation of sexual intercourse in which performers
actually engage in vaginal or anal penetration by a penis."  §
11.39.010.
    "Exposure control plan" is defined as: "a written plan that
meets all requirements of Title 8 California Code of Regulations
sections 3203 and 5193, to minimize employees' risk of exposure to
blood or potentially infectious material."  § 11.39.050.
    "Producer of adult film" is defined as: "any person or entity
that produces, finances, or directs, adult films for commercial
purposes."  § 11.39.075.

defines "principal," in relevant part, as "a person who has controlling authority or is in a leading position."  Management is defined as "the collective body of those who manage or direct an enterprise," and manage is defined as "to exercise executive, administrative, and supervisory direction of <manage a business>." These terms are sufficiently clear.[17]

Plaintiffs also challenge the following terms: "commercial purposes," "reasonably suspected," "hazardous condition," and "interference."  (Docket No. 53 at 16:15-16.)  Because Plaintiffs do not analyze these terms' meaning or their potential for confusion, for purposes of this Motion the Court finds that they are not vague.

**I.  <u>Plaintiffs' Due Process Claim</u>**

Plaintiffs assert that Measure B violates their due process rights.  The Fourteenth Amendment prohibits the deprivation "of life, liberty, or property without due process of law."  Due process requires "some form of hearing before an individual is finally deprived of [a protected] interest."  <u>Matthews v. Eldridge</u>, 424 U.S. 319, 333 (1976).  Due process claims should be analyzed under the <u>Mathews v. Eldridge</u> weighing test.  <u>See</u> <u>id.</u> at 335.  However, Plaintiffs do not engage in such a weighing, and their due process claims generally dismiss the review procedures to which license holders and applicants are entitled under Measure B.  (Compl. ¶¶ 91-98); § 11.39.110(B),(D),(E)(2); <u>see also</u> Cent. Dist. L.R. 7-5 (moving papers must provide "a brief but complete memorandum in support thereof and the points and authorities upon

---

[17]All definitions are available at
http://www.merriam-webster.com/.

which the moving party will rely."). The Court, therefore, GRANTS
dismissal of Plaintiffs' due process claims, with one exception
discussed below. Regardless, Plaintiffs' due process arguments
largely duplicate of their prior restraint arguments.

However, Plaintiffs make a Fourth Amendment challenge in the
due process section of the Complaint that warrants further
consideration. (Compl. ¶ 95.)[18] Plaintiffs claim that Measure B
authorizes an unconstitutional system of warrantless searches and
seizures. In a closely regulated industry, administrative
warrantless searches are permitted so long as the following
conditions are met: (1) "[t]here is [a] 'substantial' government
interest that informs the regulatory scheme pursuant to which
inspection is made," (2) "warrantless inspection is necessary to

---

[18]It is an open question whether a facial challenge of an
administrative search scheme on Fourth Amendment grounds is
permissible. 832 Corp. v. Gloucester Twp., 404 F. Supp. 2d 614,
620 (D.N.J. 2005) (noting the issue is unresolved, but assuming
that such a challenge is allowable). In preliminarily enjoining an
ordinance that permitted warrantless administrative searches of
"Adult-Oriented Businesses," a district court in this circuit
noted:

> There is arguably a question as to whether a party can
> assert a facial challenge to a statute permitting
> warrantless administrative searches. See, e.g., S & S.
> Pawn Shop Inc. v. City of Del City, 947 F.2d 432, 439-40
> (10th Cir.1991) (identifying the issue, but declining to
> decide it). Despite some hesitation, the court
> entertains such a challenge here because the ordinances
> vest too much discretion in City officials conducting the
> inspection to qualify as a valid administrative
> inspection scheme. See City of Chicago v. Morales, 119
> S.Ct. 1849, 1999 WL 373152 *15 (June 10, 1999) (Breyer,
> J., Concurring) ("The ordinance is unconstitutional, not
> because a policeman applied this discretion wisely or
> poorly in a particular case, but rather because the
> policeman enjoys too much discretion in every case").

Le v. City of Citrus Heights, No. CIV.S-98-2305WBS/DAD, 1999 WL
420158, at *6 n.6 (E.D. Cal. June 15, 1999). Finding Le's facts
sufficiently analogous and its reasoning persuasive, this Court
concludes a facial challenge is permissible.

further the regulatory scheme," and (3) the "inspection program, in terms of certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant" (i.e. "it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers"). New York v. Burger, 482 U.S. 691, 703 (1987) (citations omitted). "In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope." Id. (internal quotation marks and citation omitted).

Plaintiffs' Fourth Amendment allegations and briefing focus on Burger's requirement that administrative searches be limited in time, place, and scope. (Compl. ¶ 95.)  Specifically, Measure B states:

> The county health officer may enter and inspect any location suspected of conducting any activity regulated by this chapter, and, for purposes of enforcing this chapter, the county health officer may issue notices and impose fines therein and take possession of any sample, photograph, record or other evidence, including any documents bearing upon adult film producer's compliance with the provision of the chapter.  Such inspections may be conducted as often as necessary to ensure compliance with the provisions of this chapter.

§ 11.39.130.  The "any location" language of § 11.39.130 violates the Fourth Amendment.  In upholding warrantless administrative searches, courts emphasize the limited nature of what may be searched.  United States v. Delgado, 545 F.3d 1195, 1203 (9th Cir. 2008) (holding that a statute was constitutional in part because it was "limited to commercial vehicles,"); Burger, 482 U.S. at 711 (emphasizing that the statute was limited to "vehicle dismantling

business[es]").  Given that adult filming could occur almost anywhere, Measure B would seem to authorize a health officer to enter and search any part of a private home in the middle of the night, because he suspects violations are occurring.  This is unconstitutional because it is akin to a general warrant.  Therefore, the Court DENIES dismissal of Plaintiffs' Fourth Amendment claim.  See Rush v. Obledo, 756 F.2d 713, 717, 722 (9th Cir. 1985) (holding that a statute "authoriz[ing] any officer, employee, or agent of the Department to enter and inspect any place providing personal care, supervision, and services at any time, with or without notice, to secure compliance with, or to prevent a violation of, any applicable statute" unconstitutional because it "permitt[ed] general searches at any time of any place providing care and supervision to children"); United States v. 4,432 Mastercases of Cigarettes, More Or Less, 448 F.3d 1168, 1180 (9th Cir. 2006) (stating that the procedural safeguards of warrantless administrative searches that implicate homes must be strong and citing Rush as "str[iking] down as unconstitutional a regulation that enabled warrantless searches of family-home day care facilities because it failed to place any limits on the time of searches, the area that could be searched, or the regularity of searches").[19]

IV. **Preliminary Injunction Analysis**

Because Plaintiffs' First Amendment claim regarding Measure B's condom requirement is unlikely to succeed on the merits, the

---

[19]Under very different circumstances, a narrow and constrained warrantless administrative search of a home is permissible.  See Rush, 756 F.2d at 717 (upholding such a search when regulations limited a statute's reach).

Court DENIES a preliminary injunction on that issue.  As detailed below, the Court GRANTS a preliminary injunction on Plaintiffs' other claims that survived the motion to dismiss.

## A. **Plaintiffs' First Amendment Claim**

The First Amendment claim, which focuses on narrow tailoring (and specifically testing as an adequate alternative to condoms), is unlikely to succeed on the merits.  Plaintiffs focus their First Amendment analysis on arguing that Measure B's condom requirement should be reviewed under strict scrutiny.  (Docket No. 55 at 7-8.)  However, for the reasons discussed in the motion to dismiss analysis, intermediate scrutiny should be employed.

Plaintiffs also make a narrow tailoring argument.  <u>Id.</u> at 5:3-6.  Interveners have presented evidence that the harms Measure B targets "are real, not merely conjectural, and that [Measure B] will in fact alleviate those harms in a direct and material way." <u>Turner I</u>, 512 U.S. at 664-65.  Jonathan Fielding, the Director and Health Officer at the Los Angeles County Department of Public Health, has stated:

> Since 2004 DPH received reports of 2,396 cases of Chlamydia (CT), 1389 cases of gonorrhea (GC), and five syphilis cases among AFI performers; 20.2% of performers diagnosed with STD had one or more repeat infections within a one year period. Between 2004 and 2008, repeat infections were reported for 25.5% of individuals. Due to the failure to routinely screen for rectal and oral pharyngeal infections, a sustained high level of endemic disease among AFT workers persists. Furthermore, these disease rates and reinfection rates are likely to be significantly underestimated as rectal and oral screening is not done routinely and these anatomic sites are likely to be a reservoir for repeat reinfection. Analyses of 2008 data also indicated that AFI performer experience significantly higher rates of infection (20%) than the general public (2.4%) or in the area of the County (SPA 6) experiencing the highest rates of STDs (4.5%).

Data is less clear for HIV since occupation is not reported in HIV/AIDS reports. Since 2004, AIM has reported 25 cases of HIV. However, it is difficult to confirm the number of actual performers infected with HIV/AIDS as not all those tested are current performers and may have other roles in tlle AFI, or are partners of an AFI performer, or may otherwise be referred to AIM for testing. AIM claims that a minority of the 25 cases are performers, but even if this is accurate, it is reasonable to assume that some of the remaining 25 infected individuals were tested because they wished to work in the AFI in Los Angeles or were partners of AFI performers.

(Docket No. 58-1 Ex. A at 2.)  Plaintiffs, by contrast, have presented evidence from individuals in the adult film industry, but not in the public health or medical profession, who claim testing is so effective and universal that condoms are unnecessary.  (<u>See, e.g.</u>, Hirsch Decl. ¶¶ 8-16).  Plaintiffs' and Interveners' evidence are in tension.  However, the Court finds the Department of Public Health's detailed explanation compelling, especially in light of its unique role in protecting the community's health.

Interveners' evidence also indicates that Measure B does not "burden substantially more speech than is necessary to further the government's legitimate interests." <u>Turner I</u>, 512 U.S. at 665.  Measure B "need not be the least restrictive or least intrusive means available." <u>Berger</u>, 569 F.3d at 1041.  Here, Interveners' evidence indicates that testing for STIs has proven insufficient to prevent their spread.  (Docket No. 58-1 Ex. A at 2.)  Because testing is Plaintiffs' proffered alternative, and because evidence indicates it may be ineffective, requiring condoms is a permissible way (at least at this stage) to target and prevent the

1  spread of STIs.   For these reasons, Plaintiffs' claim challenging

2  the condom requirement is not likely to succeed on the merits.[20]

3     **B. Plaintiffs' Remaining Claims**

4     Plaintiffs' claims concerning the following Measure B

5  provisions are likely to succeed on the merits: the fees

6  provision, the administrative search provision, and the prior

7  restraint provisions explicitly found to have survived the motion

8  to dismiss.   The fees provision and the prior restraint provision

9  concerning Measure B's broad revocation policy (i.e. that a

10 revoked permit means a producer cannot work on any adult films,

11 instead of simply the offending film) are likely to succeed on the

12 merits because Interveners' have offered no evidence that these

13 provisions are narrowly tailored.   (See Docket No. 57 at 14-15

14 (not discussing the broad revocation policy), 15:14-18 (faulting

15 Plaintiffs for providing no evidence concerning the fee's

16 _____

17    [20]Plaintiffs' over and under inclusive arguments also bear on
narrow tailoring.  However, these arguments fail to show that

18 Plaintiffs are likely to succeed on the merits.  Plaintiffs fault
Measure B for not applying generally to the entire population of

19 Los Angeles County.  (Docket No. 55 at 13:14-16.)  However, Measure
B would be patently unconstitutional if it applied to individuals

20 having sex in a private place for non-commercial purposes.
Griswold v. Connecticut, 381 U.S. 479 (1965); Lawrence v. Texas,

21 539 U.S. at 562 (2003).  Sex in public places appears to be already
prohibited by public decency laws.  See Los Angeles County Code §

22 13.22.020.  Plaintiffs' also claim that Measure B "applies only to
adult films produced for a commercial purpose, to the exclusion of

23 non-commercial films whose performers are exposed to risks
(accepting arguendo the Measure's assumptions) that are the same as

24 those for performers in commercial adult entertainment."  (Docket
No. 55 at 13:14-16.)  But Plaintiffs provide no evidence about

25 these "non-commercial" films, such as the percent of adult films
that are non-commercial and that could be regulated without

26 violating the type of privacy rights expressed in Griswold and
Lawrence.  Besides, intermediate scrutiny does not require a

27 perfect fit, Berger, 569 F.3d at 1041, and at this stage
Interveners have provided evidence that the adult film industry is

28 uniquely problematic in the spread of STIs.  (Docket No. 58-1 Ex.
A.)

29

reasonableness, but providing no evidence that the fee is revenue neutral)); <u>Turner I</u>, 512 U.S. at 664-65 (indicating that Interveners bear the burden of proving narrow tailoring).  The remaining provisions are likely to succeed on the merits because, as discussed previously, Measure B's text indicates they are unconstitutional.

Once a Plaintiff shows that a constitutional rights claim is likely to succeed, the remaining preliminary injunction factors weigh in favor of granting an injunction.  <u>Melendres v. Arpaio</u>, 695 F.3d 990, 1002 (9th Cir. 2012))([T]he deprivation of constitutional rights unquestionably constitutes irreparable injury. . . .  [I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks and citations omitted); <u>Klein v. City of San Clemente</u>, 584 F.3d 1196, 1208 (9th Cir. 2009) ("The balance of equities and the public interest thus tip sharply in favor of enjoining the ordinance.  As our caselaw clearly favors granting preliminary injunctions to a plaintiff like Klein who is likely to succeed on the merits of his First Amendment claim, we see no reason to remand for further proceedings with respect to Klein's motion in this case.")

**C. <u>Severability</u>**

Whether Measure B's offending provisions are severable is a "a matter of state law." <u>Leavitt v. Jane L.</u>, 518 U.S. 137, 139 (1996).  "Invalid provisions of a statute should be severed whenever possible to preserve the validity of the remainder of the statute." <u>Briseno v. City of Santa Ana</u>, 6 Cal. App. 4th 1378, 1384 (1992).  "The California Supreme Court has held that there

are three criteria for severability under California law: the provision must be grammatically, functionally, and volitionally separable." <u>Valley Outdoor, Inc. v. Cnty. of Riverside</u>, 337 F.3d 1111, 1114 (9th Cir. 2003). However, "[t]he final determination depends on whether the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute . . . or constitutes a completely operative expression of the legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable." <u>Id.</u> (quoting <u>Calfarm Ins. Co. v. Deukmejian</u>, 48 Cal.3d 805, 821 (1989).

As an initial matter, Measure B contains an unambiguous severability clause: "If any provision of this Act, or part thereof, is for any reason held to be invalid or unconstitutional, the remaining provisions shall not be affected, but shall remain in full force and effect, and to this end the provisions of the Act are severable." Docket No. 58 Ex. B § 8.[21]   This clause establishes that the voters wanted Measure B, even if portions were found unconstitutional, to survive, if at all possible. "Although not conclusive, a severability clause normally calls for sustaining the valid part of the enactment." <u>Calfarm Ins. Co. v. Deukmejian</u>, 48 Cal. 3d 805, 821 (1989)

"An enactment passes the grammatical test where the language of the statute is mechanically severable, that is where the valid and invalid parts can be separated by paragraph, sentence, clause, phrase or even single words." <u>Barlow v. Davis</u>, 72 Cal. App. 4th

---

[21]It is unclear where this severability clause was codified within the Los Angeles County Code.

1258 (1999).  The permit fee requirement is easily separable from its relevant provisions.  The same is true of the provisions concerning revoking and suspending Measure B permits.[22]

The provision authorizing administrative searches is self contained, so enjoining it creates no grammatical issues.  § 11.39.130.

In § 11.39.110(F), which concerns the Department's authority to revoke a permit and levy other penalties against a permittee after an administrative review,  the following words can be stricken without any grammatical problems: "modify, suspend, revoke or any other laws or standards affecting public health and safety, including but not limited to the Los Angeles County Code, the California Health and Safety Code, the blood borne pathogen standard, California Code of Regulations Title 8, section 5193 or the exposure control plan of the permittee, or any combination thereof, or for interference with a county health officer's performance of duty."[23]  The provision requiring permits for

_____

[22]Had the Court only enjoined the revocation and suspension provisions of Measure B on grounds that the status quo is disrupted before judicial review, the Court would have only enjoined the County from "enforcing a license suspension or revocation for ninety days after an administrative appeal becomes final, the time allowed for filing a writ of administrative mandamus under the California statutory scheme."  Convoy, 183 F.3d at 1116.

[23]That is to say, § 11.39.110(F) paragraph makes grammatical sense when read as follows: "The department may, after an administrative review or waiver thereof continue all such action previously imposed upon a permittee pursuant to this chapter or impose any fine imposed by law for violations of this chapter." Thus, what remains of § 11.39.110(F) is the Department's authority to initiate fines or criminal charges, as provided for in Measure B for Measure B violations only, against Measure B violators.  Of course, this order affects no other provision of law outside of Measure B.  Although the term "modify" has not previously been discussed, it is also unconstitutional as its vagueness permits
(continued...)

32

anything other than vaginal or anal sexual intercourse can be similarly successfully edited.[24]  The provision concerning emergency fines and revocations, § 11.39.110(E), is not completely self contained, as it continues to § 11.39.110(E)(1)-(2).  Therefore, subsections (1) and (2) of § 11.39.110(E) are also be enjoined.

Under the functionality test, the Court must decide whether Measure B remains "operational" without the offending language.  Valley Outdoor, 337 F.3d at 1114.  Here, adult film actors must still use condoms.  A permit is still required.  Although the permit may not be modified, suspended, or revoked, fines and criminal charges may still be brought against offenders, as described in footnote 23.

While administrative searches cannot occur, nothing prevents law enforcement from obtaining a warrant to enforce Measure B.

Regarding fees, since there is no evidence that Measure B's fees are revenue neutral, there is no reason to believe the Department's Measure B duties cannot be performed without fees–or performed at least until the fees' defect is cured, either by enacting a new, constitutional ordinance or providing this Court with evidence of revenue neutrality.  See Wal Juice Bar, Inc. v. City of Oak Grove, No. CIV.A. 5:02CV-252-R, 2005 WL 2333636, at

[23](...continued)
unbridled discretion, and, given its undefined scope, allows the Department to effectively suspend or revoke a license.  See G.K. Ltd., 436 F.3d 1082 (discussing unbridled discretion).

[24] § 11.39.010 then reads: "An 'adult film' is defined as any film, video, multimedia or other representation of sexual intercourse in which performers actually engage in vaginal, or anal penetration by a penis."

33

*5-6 (W.D. Ky. Sept. 22, 2005) (deciding that a license fee for sexually-oriented businesses was unconstitutional, but stating that the fee was severable in part because the ordinance remained functional without the fee provision).  For these reasons, Measure B remains operational.

The volitional test asks "whether it can be said with confidence that the electorate's attention was sufficiently focused upon the  parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions." Gerken v. Fair Political Practices Com., 6 Cal. 4th 707, 714-15 (1993).  A ballot initiative passes the volitional test when "it seems eminently reasonable to suppose that those who favored the proposition would be happy to achieve at least some substantial portion of their purpose." Id. at 715.  Here, in light of Measure B's stated purpose of preventing the spread of STIs and for the reasons discussed above in the operational analysis, it seems that those who "favored [Measure B] would be happy to achieve" what remains of it." Id.

**V. Conclusion**

As set forth above, this Court GRANTS in part and DENIES in part Interveners' Motion to Dismiss, and GRANTS in part and DENIES on part Plaintiffs' Motion for a Preliminary Injunction.

In light of this Order, Plaintiffs' motion for judgment on the pleadings is vacated.  (Docket No. 64.)

IT IS SO ORDERED.

Dated:  August 16, 2013

DEAN D. PREGERSON
United States District Judge