UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JAN 08 2015

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

VIVID ENTERTAINMENT, LLC; et al.,

              Plaintiffs - Appellants,

  v.

JONATHAN FIELDING, Director of Los Angeles County Department of Public Health; et al.,

              Defendants - Appellees,

MICHAEL WEINSTEIN, ARLETTE DE LA CRUZ, WHITNEY ENGERAN, MARK MCGRATH, MARIJANE JACKSON, AND THE CAMPAIGN COMMITTEE YES ON MEASURE B,

              Intervenor-Defendant - Appellee.

No. 13-56445

D.C. No. 2:13-cv-00190-DDP-AGR
U.S. District Court for Central California, Los Angeles

**MANDATE**



**RECEIVED**
CLERK, U.S. DISTRICT COURT

1/8/15

**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____MAT_____ DEPUTY

      The judgment of this Court, entered December 15, 2014, takes effect this date.

      This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:
Molly C. Dwyer
Clerk of Court

Rhonda Roberts
Deputy Clerk

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| VIVID ENTERTAINMENT, LLC; CALIFA PRODUCTIONS, INC.; KAYDEN KROSS; and LOGAN PIERCE, *Plaintiffs-Appellants*, | No. 13-56445 D.C. No. 2:13-cv-00190-DDP-AGR |
| v. | |
| JONATHAN FIELDING, Director of Los Angeles County Department of Public Health; JACKIE LACEY, Los Angeles County District Attorney; and COUNTY OF LOS ANGELES, *Defendants-Appellees*, | OPINION |
| and | |
| MICHAEL WEINSTEIN; ARLETTE DE LA CRUZ; WHITNEY ENGERAN; MARK MCGRATH; MARIJANE JACKSON; and THE CAMPAIGN COMMITTEE YES ON MEASURE B, *Intervenors/Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
March 3, 2014—Pasadena, California

Filed December 15, 2014

Before:  Alex Kozinski and Susan P. Graber, Circuit
Judges, and Jack Zouhary,[*] District Judge.

Opinion by Judge Graber

**SUMMARY**[**]

**Civil Rights**

The panel affirmed the district court's order denying, in part, plaintiffs' motion to enjoin the voter-initiated County of Los Angeles Safer Sex in the Adult Film Industry Act (commonly known as Measure B), which imposes a permitting system and additional production obligations on the makers of adult films, including a requirement that performers wear condoms in certain contexts.

Plaintiffs alleged that Measure B's permitting scheme and its condom requirement operate as prior restraints on plaintiffs' ability to create expression, in the form of adult films, which is protected by the First Amendment.   In granting partial preliminary injunctive relief, the district court severed one chapter of Measure B in its entirety and severed

---

[*] The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

portions of three other chapters. Plaintiffs appealed the district court's decision not to enjoin Measure B in full.

The panel held that it had jurisdiction over the appeal whether or not the intervenors-defendants demonstrated Article III standing because plaintiffs had standing, and they alone invoked the federal court's jurisdiction.

The panel held that the district court did not abuse its discretion in holding that the invalid portions of Measure B (allowing for modification, suspension, and revocation of permits; authorizing administrative searches; and allowing discretion in setting fees) were severable.

The panel held that the district court did not abuse its discretion in declining to enjoin the enforcement of Measure B's condom mandate. The panel concluded that the condom mandate survived intermediate scrutiny because it was only a de minimis effect on expression, was narrowly tailored to achieve the substantial governmental interest of reducing the rate of sexually transmitted infections, and left open adequate alternative means of expression.

The panel further held that Measure B's requirements that adult film producers complete training about blood-borne pathogens and post a permit during shooting served the County's interest in preventing sexually transmitted infections.

## COUNSEL

Robert Corn-Revere (argued) and Ronald G. London, Davis Wright Tremaine, LLP, Washington, D.C.; Janet L. Grumer and Matthew D. Peterson, Davis Wright Tremaine LLP, Los Angeles, California; Paul J. Cambria, Lipsitz Green Scime Cambria LLP, Buffalo, New York; and H. Louis Sirkin, Santen & Hughes LPA, Cincinnati, Ohio, for Plaintiffs-Appellants.

Thomas R. Freeman (argued) and Mitchell A. Kamin, Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Licenberg, P.C., Los Angeles, California; and Tom Myers, Laura Boudreau, Samantha R. Azulay, and Christina Yang, AIDS Healthcare Foundation, Los Angeles, California, for Intervenors/Defendants-Appellees.

No appearance for Defendants-Appellees.

## OPINION

GRABER, Circuit Judge:

Plaintiffs Vivid Entertainment, LLC; Califa Productions, Inc.; Kayden Kross; and Logan Pierce are organizations and individuals who make adult films in Los Angeles County. The Los Angeles County Department of Public Health, whose director is a defendant here, sent Plaintiffs a letter stating its intention to enforce the voter-initiated County of Los Angeles Safer Sex in the Adult Film Industry Act (2012) (commonly known as Measure B) (codified at Los Angeles County, Cal., Code tit. 11, div. 1, ch. 11.39, and amending tit. 22, div. 1, ch. 22.56.1925).  Measure B imposes a permitting system and

additional production obligations on the makers of adult films, including a requirement that performers wear condoms in certain contexts. Plaintiffs sued for declaratory and injunctive relief, arguing that Measure B burdens their freedom of expression in violation of the First Amendment. Defendant Los Angeles County answered that, although it would enforce the ordinance unless ordered by a court not to, it did not intend to defend Measure B because it took a "position of neutrality" with respect to the ordinance's constitutionality. The official proponents of Measure B intervened to defend it.

The district court issued a preliminary injunction forbidding Defendants from enforcing Measure B's fee-setting provision, which gave Defendants discretion to set fees for permits; a provision that allowed warrantless searches by county health officers of any location suspected of producing adult films; and the broad permit modification, suspension, and revocation process. The court denied preliminary injunctive relief, though, for much of the ordinance, including its condom and permitting requirements. Plaintiffs appeal the district court's decision not to enjoin Measure B in full.[1] We affirm.

## FACTUAL AND PROCEDURAL HISTORY

The citizens of Los Angeles County enacted Measure B in November 2012 by means of the initiative process; it became law on December 14, 2012. The text of the ordinance declared that it was passed in response to documentation by the Los Angeles County Department of Public Health of the widespread transmission of sexually

---

[1] No one challenges the partial grant of preliminary injunctive relief.

transmitted infections among workers in the adult film industry.  Under Measure B, producers of adult films[2] must obtain a newly designated "public health permit" before shooting an adult film in Los Angeles County.

Under Measure B as enacted, to obtain such a permit, producers of adult films must pay a fee, provide the Department with proof that certain employees have completed a county-approved training program concerning blood-borne pathogens, display the permit while filming, post a notice at the film site that the use of condoms is required, report to the Department any changes in the permitted business, and comply with all applicable laws, including title 8, section 5193 of the California Code of Regulations.  Measure B 11.39.080, .090, .100, .110.  Section 5193 mandates barrier protection for all employees who are exposed to blood-borne pathogens, which Measure B interprets to require condoms for performers who engage in vaginal or anal intercourse.  *Id.* 11.39.090.  Measure B also provides that a public health permit may be suspended or revoked, and fines or criminal penalties imposed, for failure to comply with all permitting requirements.  *Id.* 11.39.110.  A producer who faces modification, suspension, or revocation of a permit may apply for an undefined form of "administrative review."  *Id.* 11.39.110(C).

In addition to providing for monetary and criminal penalties, Measure B allows enforcement of the permitting requirements through a surprise inspection by a Los Angeles

---

[2] Measure B defines "producer of adult film" as "any person or entity that produces, finances, or directs, adult films for commercial purposes." Measure B, § 4, pt. 11.39.075 (all citations herein are to parts of section 4 unless otherwise noted).

County health officer at "any location suspected of conducting any activity regulated by this chapter." *Id.* 11.39.130. "[F]or purposes of enforcing this chapter," the health officer "may issue notices and impose fines therein and take possession of any sample, photograph, record or other evidence, including any documents bearing upon adult film producer's compliance with the provision of the chapter." *Id.* Measure B authorizes the district attorney to bring a civil enforcement action for injunctive relief against any producer who fails to cooperate with the health officer. *Id.* 11.39.140.

On the day that Measure B took effect, Defendant Department of Public Health mailed Plaintiffs a letter notifying them of the new ordinance and stating that it had established provisional permitting fees of $2,000 to $2,500 per year. Plaintiffs then filed this action challenging Measure B as facially unconstitutional under the First Amendment.[3] Plaintiffs allege that Measure B's permitting scheme and its condom requirement operate as prior restraints on Plaintiffs' ability to create expression, in the form of adult films, which is protected by the First Amendment.

Over Plaintiffs' objection, the district court allowed supporters of Measure B to intervene. Following the Supreme Court's decision in *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013), Plaintiffs asked the court to reconsider because, they argued, Intervenors lacked Article III standing. The district court denied the motion to reconsider.

The district court granted in part and denied in part Intervenors' motion to dismiss, and granted in part and denied

---

[3] Plaintiffs raised other theories as well, but they are not at issue in this appeal.

in part Plaintiffs' request for a preliminary injunction.  In granting preliminary injunctive relief, the district court severed one chapter of Measure B in its entirety and severed portions of three other chapters.    Appendix A contains Measure B and shows the parts that the district court enjoined and severed.

Plaintiffs timely appeal the denial of complete preliminary injunctive relief.[4]  They argue that the enjoined provisions are not properly severable, so the likely invalidity of some parts of the ordinance requires enjoining the entire ordinance.  In the alternative, Plaintiffs argue that the district court erred in denying preliminary injunctive relief with respect to Measure B's requirements that producers: (1) acquire a permit before beginning production on an adult film; (2) demonstrate that employees have completed a county-approved training program concerning blood-borne pathogens as a condition precedent to issuance of the permit; and (3) require performers to use condoms "during any acts of vaginal or anal sexual intercourse."

## STANDARD OF REVIEW

We review for abuse of discretion denial of a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  "As long as the district court got the law right, it will not be reversed simply because we would have arrived at a different result if we had applied the law to the facts of the case." *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1096 (9th Cir. 2002) (internal quotation marks and brackets omitted).  A district court abuses its discretion, however, if it applies an incorrect legal standard. *Does 1–5*

---

[4] We have jurisdiction under 28 U.S.C. § 1292(a)(1).

*v. Chandler*, 83 F.3d 1150, 1152 (9th Cir. 1996). Accordingly, we review de novo the "legal premises underlying a preliminary injunction." *A&M Records*, 284 F.3d at 1096.

## DISCUSSION

### A. Jurisdiction

Citing *Perry*, Plaintiffs argue that we lack jurisdiction over this appeal, because Intervenors lack Article III standing. We disagree with their reading of *Perry* and with their contention that Intervenors must have standing for this appeal to proceed.

The Supreme Court has held that a party must have Article III standing both to initiate an action and to seek review on appeal. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997). But an intervenor who performs neither of those functions and no other function that *invokes* the power of the federal courts need not meet Article III standing requirements. *Yniguez v. Arizona*, 939 F.2d 727, 731 (9th Cir. 1991), *vacated by Arizonans for Official English*, 520 U.S. at 80, *as recognized in League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1305 n.5 (9th Cir. 1997); *see also Perry*, 133 S. Ct. at 2661 (citing Art. III, § 2) (holding that "any person *invoking* the power of a federal court must demonstrate standing to do so" (emphasis added)). Nothing in *Perry*, which concerned the question whether an intervenor *who sought to appeal* had Article III standing, affects that conclusion. Plaintiffs have standing, and it is they alone who have invoked the federal courts' jurisdiction. For that reason, we need not and do not decide whether Intervenors satisfy the requirements of Article III standing.

To the extent that Plaintiffs contend that the district court erred in granting intervention, we cannot consider their challenge.   An order allowing intervention under Federal Rule of Civil Procedure 24(a) is not a final order and is not an interlocutory order appealable by statute, so an appeal on that issue is premature until entry of final judgment.  *Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1187 (9th Cir. 2004).

## B.  Severability

Plaintiffs next urge that, having held that they are likely to succeed on the merits with respect to some provisions of Measure B, the district court had to enjoin operation of the entire ordinance whether or not the remainder independently satisfies the standards for injunctive relief.  For the reasons that follow, we disagree.

Federal courts should avoid "judicial legislation"—that is, amending, rather than construing, statutory text—out of respect for the separation-of-powers principle that only legislatures ought to make positive law.   *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 479 (1995).  But, because of countervailing separation-of-powers principles, courts must respect the laws made by legislatures   and, therefore, should avoid nullifying an entire statute when only a portion is invalid.   *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502 (1985).  These concerns have led to the judicial doctrine of severability, that is, the "elementary principle that the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected."  *Id.* (internal quotation marks omitted).   The need for

deference and restraint in severing a state or local enactment is all the more acute because of our respect for federalism and local control.  *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988).

Because a court may not use severability as a fig leaf for judicial legislation, courts have fashioned limits on when a statute may be severed.  *See Yu Cong Eng v. Trinidad*, 271 U.S. 500, 518 (1926) ("[I]t is very clear that amendment may not be substituted for construction, and that a court may not exercise legislative functions to save the law from conflict with constitutional limitation.").  In keeping with federalism principles, the "[s]everability of a local ordinance is a question of state law."  *City of Lakewood*, 486 U.S. at 772.

California law directs courts to consider first the inclusion of a severability clause in the legislation.  *Cal. Redev. Ass'n v. Matosantos*, 267 P.3d 580, 607 (Cal. 2011).  "The presence of such a clause establishes a presumption in favor of severance."  *Id.*  "Although not conclusive, a severability clause normally calls for sustaining the valid part of the enactment . . . ."  *Santa Barbara Sch. Dist. v. Superior Court*, 530 P.2d 605, 618 (Cal. 1975) (internal quotation marks omitted).

Measure B contains this severability clause:

> If any provision of this Act, or part thereof, is for any reason held to be invalid or unconstitutional, the remaining provisions shall not be affected, but shall remain in full force and effect, and to this end the provisions of the Act are severable.

Measure B § 8. Section 8 states clearly that the people, acting in their legislative capacity, intended any provision and any part of a provision, if invalid or unconstitutional, to be severed from the ordinance. The district court thus properly held that Measure B's severability clause establishes a presumption of severability.

Next, California law directs courts to "consider three additional criteria:   The invalid provision must be grammatically, functionally, and volitionally separable." *Cal. Redev. Ass'n*, 267 P.3d at 607 (internal quotation marks and brackets omitted).  We will consider each criterion in turn.

"Grammatical separability, also known as mechanical separability, depends on whether the invalid parts can be removed as a whole without affecting the wording or coherence of what remains." *Id.* (internal quotation marks omitted). "[T]he 'grammatical' component of the test for severance is met by the severability clause considered in conjunction with the separate and discrete provisions of [the statute]." *Barlow v. Davis*, 85 Cal. Rptr. 2d 752, 757 (Ct. App. 1999).  "To be grammatically separable, the valid and invalid parts of the statute can be separated by paragraph, sentence, clause, phrase, or even single words." *People v. Nguyen*, 166 Cal. Rptr. 3d 590, 609 (Ct. App. 2014) (internal quotation marks omitted).  "[Where] the defect cannot be cured by excising any word or group of words, the problem is quite different and more difficult of solution." *Ex parte Blaney*, 184 P.2d 892, 900 (Cal. 1947); *Santa Barbara Sch. Dist.*, 530 P.2d at 617.

Here, Plaintiffs contend that the district court abused its discretion by striking individual words and groups of words

from the definition of an adult film.  Specifically, the district court struck part of 11.39.010 of Measure B as follows:

> An "adult film" is defined as any film, video, multimedia or other representation of sexual intercourse in which performers actually engage in ~~oral,~~ vaginal, or anal penetration, ~~including, but not limited to, penetration~~ by a penis ~~, finger, or inanimate object; oral contact with the anus or genitals of another performer; and/or any other sexual activity that may result in the transmission of blood and/or any other potentially infectious materials~~.

In large part, as can be seen, the district court severed distinct clauses.  The district court also severed some individual words but, grammatically, they are understood by the reader to include complete clauses.  For example, the compound clause "engage in oral, vaginal, or anal penetration" means—and easily could have been drafted to say—"engage in oral penetration, engage in vaginal penetration, or engage in anal penetration."  For that reason, the district court did, in fact, sever only distinct provisions from Measure B, and that severance did not alter the meaning of the remaining text in any way.  California courts have long held that parts of a compound clause are grammatically severable from a statute if their omission would not affect the meaning of the remaining text.  *Ex parte Blaney*, 184 P.2d at 900; *Santa Barbara Sch. Dist.*, 530 P.2d at 617; *see also Legislature v. Eu*, 816 P.2d 1309, 1335–36 (Cal. 1991) (holding as grammatically severable "or serving in" from "elected to or serving in the Legislature on or after November 1, 1990"); *Borikas v. Alameda Unified Sch. Dist.*, 154 Cal.

Rptr. 3d 186, 212 (Ct. App. 2013) (holding as grammatically severable "residential" from "[o]n each taxable, residential parcel at the rate of $120 per year"); *City of Dublin v. County of Alameda*, 17 Cal. Rptr. 2d 845, 850–51 (Ct. App. 1993) (holding as grammatically severable "incorporated and" from "the geographic entity, including both the incorporated and unincorporated areas").     In short, the district court permissibly held that the disputed portions of Measure B are grammatically severable.[5]

Our next consideration, functional severability, "depends on whether the remainder [of the statute] is complete in

---

[5] Plaintiffs rely on *Acosta v. City of Costa Mesa*, 718 F.3d 800, 820–21 (9th Cir. 2013) (per curiam), for the broad principle that a court necessarily abuses its discretion if it holds that a single word or group of words is grammatically severable under California law.   *Acosta* is distinguishable, and we decline to extend it in a way that would contradict governing California law.

In *Acosta*, the severability clause itself was narrow, providing that only "sections, paragraphs, clauses and phrases" were severable from the ordinance in question.  *Id.* at 820.  We interpreted that particularized list to prohibit, by inference, the severance of "individual words."  *Id.*  As directed by California law, we read that narrow severability clause "'in conjunction with the separate and discrete provisions of' the text to determine whether the 'grammatical component of the test for severance is met.'"  *Id.* (quoting *Barlow*, 85 Cal. Rptr. 2d at 757).  Reading the text and severance clause together, we held that the single adjective "insolent" and the list of adjectives "personal, impertinent, profane, insolent" were not grammatically severable from the ordinance because, in context, the words did not express a single "legislative thought."  *Id.* at 820–21.

Here, by contrast, Measure B contains a broad severability clause that does not prohibit the severance of individual words.  Under Measure B, *any* provision *or part* of any provision shall be severed.  Moreover, as noted, the challenged severance in this case involves discrete legislative thoughts.

itself." *Santa Barbara Sch. Dist.*, 530 P.2d at 618 (internal quotation marks omitted).  To be functionally severable, "[t]he remaining provisions must stand on their own, unaided by the invalid provisions nor rendered vague by their absence nor inextricably connected to them by policy considerations.  They must be capable of separate enforcement." *People's Advocate, Inc. v. Superior Court*, 226 Cal. Rptr. 640, 649 (Ct. App. 1986).  Here, the district court enjoined the provisions of Measure B that allowed for modification, suspension, and revocation of permits; that authorized administrative searches; and that allowed discretion in setting fees.  The rest of the ordinance remains intact:  the permitting scheme, with its condom and educational requirements; and enforcement through fines and criminal charges.  In addition, as the district court noted, even in the absence of the administrative search provision, Defendants can obtain a warrant to enforce Measure B.  Because the remaining parts of Measure B operate independently, are not rendered vague in the absence of the invalid provisions, and are capable of separate enforcement, the district court permissibly ruled that the provisions are functionally severable.

Our final consideration, volitional severability, "depends on whether the remainder [of the statute] is complete in itself and would have been adopted by the legislative body had [it] foreseen the partial invalidation of the statute." *Santa Barbara Sch. Dist.*, 530 P.2d at 618 (internal quotation marks omitted).  With respect to ballot initiatives, the test for volitional severability "is whether it can be said with confidence that the electorate's attention was sufficiently focused upon the parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions." *Gerken v. Fair Political Practices*

*Comm'n*, 863 P.2d 694, 699 (Cal. 1993) (internal quotation marks and emphasis omitted).

The district court preserved the requirements that producers of adult films in Los Angeles County obtain permits, train employees about the sexual transmission of disease, and require performers to wear condoms when engaged in vaginal or anal intercourse. The district court also preserved the enforcement mechanisms of fines and criminal penalties. As the court correctly noted, the "Findings and Declaration" section of the initiative emphasizes (1) a growing public concern over the spread of HIV/AIDS and other sexually transmitted infections in the adult film industry; (2) the importance of safe sex practices, and the use of condoms in particular, in limiting the spread of HIV/AIDS and other sexually transmitted infections; and (3) a failure to enforce current state laws mandating the use of condoms by performers in adult films. Measure B § 2. Thus, the Declaration demonstrates that the public's attention was focused primarily on heightening enforcement of the condom requirement. That is, even in the absence of the severed segments, the remaining provisions centrally address the voters' stated concerns. The district court permissibly concluded that the condom and permitting requirements are volitionally severable from the fee-setting, inspections, and administrative procedures.

Plaintiffs counter that the fee provisions are not volitionally severable, because the voters would not have passed Measure B as an "unfunded mandate." But the Declaration contained in Measure B says nothing about money or revenue neutrality. Rather, the text demonstrates that the core purpose of the initiative "was presented to the electorate as a distinct aim, separate and apart from the

measure's funding mandate." *McMahan v. City of San Francisco*, 26 Cal. Rptr. 3d 509, 513 (Ct. App. 2005) (holding that a funding provision was volitionally severable from the primary regulatory scheme).

In sum, the district court did not abuse its discretion in granting preliminary injunctive relief with respect to only certain parts of Measure B, while allowing enforcement of other provisions as severable. We now turn to Plaintiffs' assertion that, even if severance is permissible, the district court erred in denying preliminary injunctive relief with respect to additional parts of the ordinance: the condom mandate and the permitting requirement.

## C. Denial of Preliminary Injunctive Relief

In deciding whether a preliminary injunction should issue, a district court must consider four factors: (1) whether the plaintiff has shown a likelihood of success on the merits; (2) whether the plaintiff has shown a likelihood of irreparable harm in the absence of preliminary relief; (3) whether the balance of equities tips in the plaintiff's favor; and (4) whether preliminary relief is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

> Courts asked to issue preliminary injunctions based on First Amendment grounds face an inherent tension: the moving party bears the burden of showing likely success on the merits . . . and yet within that merits determination the government bears the burden of justifying its speech-restrictive law. . . .

18      VIVID ENTERTAINMENT V. FIELDING

> . . . .
>
> Therefore, in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, . . . at which point the burden shifts to the government to justify the restriction.

*Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115–16 (9th Cir. 2011).  But even if the plaintiff demonstrates likely success on the merits, the plaintiff still must demonstrate irreparable injury, a favorable balance of equities, and the tipping of the public interest in favor of an injunction.  *Id.* at 1128.  That is, although

> a First Amendment claim "certainly raises the specter" of irreparable harm and public interest considerations, proving the likelihood of such a claim is not enough to satisfy *Winter*. *Stormans, [Inc. v. Selecky*, 586 F.3d 1109,] 1138 [(9th Cir. 2009)]; *see also Klein v. City of San Clemente*, 584 F.3d 1196, 1207 (9th Cir. 2009) (even where the plaintiff was likely to succeed on the merits of his First Amendment claim, he "must also demonstrate that he is likely to suffer irreparable injury in the absence of a preliminary injunction, and that the balance of equities and the public interest tip in his favor") (citing *Winter*, 555 U.S. at 20).

*DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011).

### 1.  *Condom Mandate*

The district court held that Plaintiffs are unlikely to succeed on the merits of their First Amendment challenge to the condom requirement.   The court did not abuse its discretion in declining to enjoin the enforcement of the condom mandate.   The condom mandate survives intermediate scrutiny because it has only a de minimis effect on expression, is narrowly tailored to achieve the substantial governmental interest of reducing the rate of sexually transmitted infections, and leaves open adequate alternative means of expression.

As a threshold matter, Plaintiffs argue that the district court applied the wrong standard—intermediate scrutiny—and that the condom mandate should be subject to strict scrutiny.  We disagree.

The Supreme Court has recognized that nearly all regulation of the adult entertainment industry is content based.  *See City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring in the judgment).  Content-based regulation of speech generally receives strict scrutiny, but we have fashioned an exception, grounded in *Alameda Books*, that applies intermediate scrutiny if two conditions are met.  *Ctr. for Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153, 1161, 1164–65 (9th Cir. 2003) (citing *Alameda Books*, 535 U.S. at 434) (recognizing Justice Kennedy's concurrence as controlling).  First, the ordinance must regulate "speech that is sexual or pornographic in nature."  *Gammoh v. City of La Habra*, 395 F.3d 1114, 1123, *amended on denial of reh'g*, 402 F.3d 875 (9th Cir. 2005).  Second, "the primary motivation behind the regulation [must be] to prevent secondary effects."  *Id.*

But even if those two conditions are met, strict scrutiny may still apply if the regulation amounts to a complete ban on expression. *Dream Palace v. County of Maricopa*, 384 F.3d 990, 1021 (9th Cir. 2004).

We assume, but need not and do not decide, that Measure B's condom mandate is a content-based regulation of speech. Nonetheless, Measure B regulates *sexual* speech in order to prevent the *secondary effects* of sexually transmitted infections, thus falling within the *Alameda Books* exception. Plaintiffs argue that, despite that exception, the district court should have applied strict scrutiny because the condom mandate amounts to a complete ban on their protected expression.

As an initial matter, Plaintiffs' argument presupposes that their relevant expression for First Amendment purposes is the depiction of condomless sex. But "simply to define what is being banned as the 'message' is to assume the conclusion." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 293 (2000). In *Pap's A.M.*, a plurality of the Supreme Court concluded that a general ban on public nudity, which required erotic dancers to wear at least pasties and a G-string while dancing, did not violate the First Amendment. *Id.* at 302. In reaching that conclusion, the opinion rejected the argument that the pasties-and-G-string requirement functioned as a complete ban on the dancers' expression of "nude dancing." *Id.* at 292–93. Instead, the opinion defined the relevant expression more broadly as "the dancer's erotic message." *Id.* at 301. We undertook a similar analysis, albeit without reference to *Pap's A.M.*, in *Gammoh*, in which we upheld an ordinance that required dancers to stay at least two feet away from patrons during their performances. 395 F.3d at 1123. The plaintiffs there argued that the ordinance completely banned their

expression, which they defined as "proximate dancing."  *Id.*
In response, we stressed that "the 'expression' at issue could
always be defined to include the contested restriction," but
"virtually no ordinance would survive this analysis."  *Id.*  We
instead defined the relevant expression as "the dancer's erotic
message" and upheld the ordinance.  *Id.* at 1128.

In light of those cases, we must examine more carefully
whether Plaintiffs' relevant expression is the depiction of
condomless sex.  Plaintiffs submitted declarations stating that
condomless sex differs from sex generally because condoms
remind the audience about real-world concerns such as
pregnancy and disease.   Under this view, films depicting
condomless sex convey a particular message about sex in a
world without those risks.  The Supreme Court has cautioned,
however, that "'[i]t is possible to find some kernel of
expression in almost every activity a person undertakes—for
example, walking down the street or meeting one's friends at
a shopping mall—but such a kernel is not sufficient to bring
the activity within the protection of the First Amendment.'"
*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 570 (1991)
(quoting *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989)).

To determine whether conduct is protected by the First
Amendment, we ask not only whether someone intended to
convey a particular message through that conduct, but also
whether there is a "great" likelihood "that the message would
be understood by those who viewed it."    *Spence v.
Washington*, 418 U.S. 405, 410–11 (1974) (per curiam).
Here, we agree with the district court that, whatever unique
message Plaintiffs might intend to convey by depicting
condomless sex, it is unlikely that viewers of adult films will
understand that message.   So condomless sex is not the

relevant expression for First Amendment purposes;[6] instead, the relevant expression is more generally the adult films' erotic message.  *See Pap's A.M.*, 529 U.S. at 293; *Gammoh*, 395 F.3d at 1123.

With Plaintiffs' expression so defined, we conclude that strict scrutiny is inappropriate because the condom mandate does not ban the *relevant* expression completely.  Rather, it imposes a de minimis restriction.  In *Pap's A.M.*, the Supreme Court held that the pasties-and-G-string requirement did not violate the First Amendment because, even if the ban "has some minimal effect on the *erotic message* by muting that portion of the expression that occurs when the last stitch is dropped," that effect was de minimis.   529 U.S. at 294 (emphasis added).    That was so even though the ban "certainly ha[d] the effect of limiting one particular means of expressing the kind of erotic message being disseminated." *Id.* at 292–93; *see also Barnes*, 501 U.S. at 571 (noting that a requirement that erotic dancers wear pasties and G-strings "does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic").

---

[6] We also note that even if the relevant expression were the depiction of condomless sex, Measure B still might warrant intermediate scrutiny.  On its face, Measure B does not ban expression; it does not prohibit the *depiction* of condomless sex, but rather limits only the way the film is *produced*.  In that way, Measure B's condom mandate is akin to the two-foot required distance between exotic dancers and patrons that we upheld in *Gammoh*, which did not "ban any form of dance" or address the content of the dance.  395 F.3d at 1123.  When the district court adjudicates the First Amendment claim on the merits, if the court were to find that special effects could be used to edit condoms out of adult films, that would provide yet another reason to apply intermediate scrutiny.

Many of our sister circuits have relied on *Pap's A.M.* in upholding de minimis restrictions on speech using intermediate scrutiny. *See, e.g.*, *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 299 (6th Cir. 2008) (upholding a nudity ban under intermediate scrutiny because *Pap's A.M.* and *Barnes* had characterized a similar regulation as de minimis); *Fantasy Ranch Inc. v. City of Arlington*, 459 F.3d 546, 562 (5th Cir. 2006) (rejecting an argument that an ordinance requiring a certain distance between dancers and the audience enacted a "*complete* ban on *proximate* nude dancing"); *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1195–96 (10th Cir. 2003) (applying *Pap's A.M.* to conclude that a ban on nude erotic dancing was not a "total ban" on speech). And, as noted, we followed this same analytical approach in *Gammoh*, 395 F.3d at 1122–23.

A similar analysis applies to the condom mandate. The requirement that actors in adult films wear condoms while engaging in sexual intercourse might have "some minimal effect" on a film's erotic message, but that effect is certainly no greater than the effect of pasties and G-strings on the erotic message of nude dancing. In light of *Pap's A.M.* and the other precedent cited above, we conclude that the restriction on expression in this case is de minimis. And a de minimis restriction on expression is, by definition, not a complete ban on expression, and so does not trigger strict scrutiny. Accordingly, the mandate is subject to intermediate scrutiny.

The district court properly exercised its discretion in concluding that the condom requirement likely would survive intermediate scrutiny. "A statute will survive intermediate scrutiny if it: (1) is designed to serve a substantial government interest; (2) is narrowly tailored to serve that

24        VIVID ENTERTAINMENT V. FIELDING

interest; and (3) does not unreasonably limit alternative avenues of communication." *Gammoh*, 395 F.3d at 1125–26, *as amended on denial of reh'g*, 402 F.3d at 876.

The purpose of Measure B is twofold:  (1) to decrease the spread of sexually transmitted infections among performers within the adult film industry, (2) thereby stemming the transmission of sexually transmitted infections to the general population among whom the performers dwell.  Plaintiffs do not contest that the government has a substantial interest in preventing certain secondary effects of the adult film industry, including the spread of sexually transmitted infections.  *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 485 (1995) (stating that "the Government . . . has a significant interest in protecting the health, safety, and welfare of its citizens"); *Ctr. for Fair Pub. Policy*, 336 F.3d at 1166 ("It is beyond peradventure at this point in the development of the doctrine that a state's interest in curbing the secondary effects associated with adult entertainment establishments is substantial.").  Rather, Plaintiffs contend that Measure B's condom mandate is not narrowly tailored to serve the government's interest.

In order to be narrowly tailored for purposes of intermediate scrutiny, the regulation "'need not be the least restrictive or the least intrusive means' available to achieve the government's legitimate interests."  *Berger v. City of Seattle*, 569 F.3d 1029, 1041 (9th Cir. 2009) (en banc) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)).  "Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."  *Colacurcio v. City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998) (internal quotation marks and ellipsis

omitted).  This is not to say that narrow tailoring allows a regulation to burden more speech than is necessary to satisfy the interest, but we may not invalidate such a regulation "simply because there is some imaginable alternative that might be less burdensome on speech."  *United States v. Albertini*, 472 U.S. 675, 689 (1985).

Plaintiffs' narrow-tailoring argument rests largely on the proposition that Measure B duplicates a voluntary testing and monitoring scheme that already is in place in the industry. The adult film industry and its trade associations have established the Adult Protection Health & Safety Service, which has implemented a program whereby performers are tested, either monthly or more frequently, and the test results are made available in a database.  In addition, if the Safety Service receives notification of a positive test result, it must inform the Department of Public Health.    Adult film producers and performers have access to the database in order to verify that performers have been tested and that those tests have been negative.   Certain employers require their performers, by contract, to submit to testing at various intervals.  For example, Plaintiff Kross' contract requires testing every 15 days, Plaintiff Pierce is tested every 14 days, and all of Plaintiff Vivid Entertainment's performers are tested at least once every 28 days.

On the day of production, Plaintiff Vivid Entertainment requires each performer to provide identification, and each performer's test history is drawn from the Safety Service database.  Plaintiff Vivid Entertainment allows participation in the production only by performers with a current test status and a negative result.  Plaintiffs Kross and Pierce declare that they undertake this screening process before every explicit scene in which they perform, and both Plaintiffs Kross and

Pierce declare that they would not take part in an explicit scene if the screening measures were not in place.  Plaintiffs also provided testimony from industry officials that this testing system is effective.

The district court considered Plaintiffs' evidence and weighed it against contradictory evidence that the industry's testing scheme is ineffective.  In particular, the district court considered a 2009 letter from the County of Los Angeles Department of Public Health to support the conclusion that Measure B, passed in 2012, was designed to address the spread of disease and is narrowly tailored to that end.[7]  The Findings and Declaration section of Measure B refers specifically to documentation by the Los Angeles County Department of Public Health of the spread of HIV/AIDS and other sexually transmitted infections in the adult film industry.  Measure B § 2.

In the 2009 letter, the Department of Public Health reported that its analysis of 2008 data showed a markedly higher rate of sexually transmitted infections for performers within the adult film industry, 20%, than for the general public, 2.4%, and even for the county area with the highest rate of infection, 4.5%.  The Department of Public Health

---

[7] The district court properly relied on the letter because it is referred to in Measure B itself.  Moreover, the letter is "not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b); *see Sachs v. Republic of Austria*, 737 F.3d 584, 596 n.10 (9th Cir. 2013) (en banc) (taking notice of legislative facts necessary to discern legislative intent as directed by Rule 201(a), advisory note to 1972 amendments, but noting also that the court could properly notice such facts as adjudicative facts under Rule 201(b)), *petition for cert. filed*, 82 U.S.L.W. 3573 (U.S. Mar. 5, 2014) (No. 13-1067).

also found that 20.2% of performers in adult films diagnosed with an infection were reinfected within one year.  Further, the Department of Public Health opined that the data with respect to infection rates were likely underestimated, because rectal and oral screenings were not completed with regularity among workers in the industry.

The district court weighed all the evidence before it and, finding the 2009 letter especially compelling, held that Plaintiffs were unlikely to succeed on the merits in their First Amendment challenge to the condom mandate.  In so doing, the district court did not abuse its discretion.[8]

On appeal, Plaintiffs also argue that Measure B's condom mandate is not narrowly tailored, and is largely ineffective, because makers of adult films can produce films across county lines without having performers wear condoms.  As an initial matter, it bears noting that Plaintiffs offered evidence before the district court that Measure B has drastically reduced the number of adult films produced by the industry because the productions, which depend heavily on the "regular" film industry's infrastructure in Los Angeles County, *cannot* be moved elsewhere.  That evidence undermines Plaintiffs' new contention that Measure B is ineffective because of the adult film industry's ready mobility.

---

[8] That the condom mandate has a de minimis effect on expression also supports the conclusion that the ordinance is narrowly tailored.  *Cf. Sensations, Inc.*, 526 F.3d at 299 (citing *Pap's A.M.* and *Barnes* in holding that a ban on public nudity was narrowly tailored to suppress negative secondary effects).

But, more importantly, Plaintiffs' argument overstates the standard for narrow tailoring, which simply requires that the regulation "promote[] a substantial government interest that would be achieved less effectively absent the regulation." *Colacurcio*, 163 F.3d at 553. The regulation need not be the *most* effective way to achieve the government's substantial interest, nor must it be shown that the regulation cannot be circumvented. Rather, it suffices if the regulation helps to achieve the substantial government interest effectively. *Id.*

Finally, Plaintiffs contend that Measure B's condom mandate unconstitutionally forecloses alternative channels of communication. As we noted in *Gammoh*, "[t]his inquiry is analogous" to our analysis of whether the condom mandate is a complete ban on expression. 395 F.3d at 1128. In *Gammoh*, we held that the required two-foot separation between dancers and patrons left open alternative channels of communication because the requirement "slightly impaired [the message]," but "the dancer's erotic message [could] still be communicated from a slight distance." *Id.* The same is true here. Measure B is a minimal restriction on Plaintiffs' expression that "leaves ample capacity to convey [Plaintiffs'] erotic message." *Pap's A.M.*, 529 U.S. at 301. Accordingly, the district court did not abuse its discretion in holding that the condom requirement leaves alternative channels of expression available.

## 2. *Permitting System*

The portions of Measure B's permitting system left in place by the district court also survive constitutional

VIVID ENTERTAINMENT V. FIELDING          29

scrutiny.[9] Plaintiffs first argue that the remaining permitting requirements are impermissibly content based and therefore unconstitutional. But a licensing scheme that regulates adult entertainment is not unconstitutional simply because it is content based. *See Dream Palace*, 384 F.3d at 1001. Plaintiffs also argue "that the remnants of Measure B's permitting regime left intact are [not] narrowly tailored." *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (holding that "any permit scheme . . . must be narrowly tailored"). As discussed above, narrow tailoring requires only that the remaining portions of the permitting scheme "promote[] a substantial government interest that would be achieved less effectively absent the regulation." *Colacurcio*, 163 F.3d at 553 (internal quotation marks omitted). The permitting system's requirements that adult film producers complete training about blood-borne pathogens and post a permit during shooting still serve the County's interest in preventing sexually transmitted infections. That remains so even in light of the other portions of the permitting system that the district court enjoined. Finally, Plaintiffs argue that the permitting scheme grants county officials too much discretion, but the district court correctly concluded that the remaining permitting provisions leave little, if any, discretion to government officials. Accordingly, the district court did not abuse its discretion in

---

[9] Plaintiffs also argue that the district court failed to conduct a narrow-tailoring analysis with respect to the permitting provisions. We reject their procedural objection for two reasons. First, the district court analyzed the merits of this issue, albeit in the context of considering the motion to dismiss. Second, because Measure B's condom mandate, which the district court analyzed at length with specific reference to narrow tailoring, is part of the permitting process, the court necessarily conducted a narrow-tailoring analysis of the permitting scheme as part of its consideration of the condom mandate.

denying preliminary injunctive relief with respect to Measure B's remaining permitting requirements.

## CONCLUSION

We have jurisdiction over this appeal whether or not Intervenors have demonstrated Article III standing. The district court did not abuse its discretion in holding that the invalid portions of Measure B are severable. Nor did the district court abuse its discretion in denying a preliminary injunction with respect to the condom and permitting provisions of Measure B.

**AFFIRMED.**

APPENDIX A

    The district court did not provide a line-edited version of its severance analysis.  For purposes of clarity, we provide the attached interpretation of the district court's analysis.



**TEXT OF THE PROPOSED MEASURE**
**COUNTY OF LOS ANGELES SAFER SEX IN THE**
**ADULT FILM INDUSTRY ACT**

The people of the County of Los Angeles ordain as follows:

## SECTION 1. TITLE

This ordinance shall be known and may be cited as the County of Los Angeles Safer Sex in the Adult Film Industry Act.

## SECTION 2. FINDINGS AND DECLARATION

The people of the County of Los Angeles hereby find and declare all of the following:

(a)   The HIV/AIDS crisis, and the ongoing epidemic of sexually transmitted infections as a result of the making of adult films, has caused a negative impact on public health and the quality of life of citizens living in Los Angeles.

(b)   Safer sex practices are a prime method of preventing and reducing the spread of HIV I AIDS and other sexually transmitted infections.

(c)   The California Supreme Court has determined that the production of sexually explicit adult films is legal in the State of California.

(d)   The Los Angeles County Department of Public Health has documented widespread transmission of sexually transmitted infections associated with the activities of the adult film industry within Los Angeles County.

(e)   The Los Angeles County Department of Public Health has stated that the use of condoms is the best and most effective way to stem the spread of sexually transmitted infections within the adult film industry.

(f)   Multiple organizations committed to protecting the public health have called for use of condoms in the production of adult films, including the American Medical Association, the American Public Health Association, the California Conference of Local AIDS Directors, the California STD Controllers Association, the National Coalition of STD Directors, the National Association of City and County Health Officials, AIDS Healthcare Foundation and the California Medical Association.

(g)   Producers of adult films are required by California Code of Regulations Title 8, Section 5193 to use barrier protection, including condoms, to protect employees during the production of adult films.

(h)   The Los Angeles County Department of Public Health has found that many producers of adult films in Los Angeles consistently violate the worker safety provisions of California Code of Regulations Title 8, section 5193.

## SECTION 3. PURPOSE AND INTENT

The people of the County of Los Angeles hereby declare their purpose and intent in enacting this ordinance is to minimize the spread of sexually transmitted infections resulting from the production of adult films in the County of Los Angeles, which have caused a negative impact on public health and the quality of life of citizens living in Los Angeles. This Act will require the producers of adult films to obtain a permit from the Los Angeles County Department of Public Health to ensure that producers comply with preexisting law requiring, among other things, that performers are protected from sexually transmitted infections by condoms. The Act further authorizes the Los Angeles County Department of Public Health to take appropriate measures to



**TEXT OF THE PROPOSED MEASURE**
**COUNTY OF LOS ANGELES SAFER SEX IN THE**
**ADULT FILM INDUSTRY ACT**

## SECTION 3. PURPOSE AND INTENT (Cont.)

enforce the Act, and conditions any film permit issued by the County for the production of an adult film on the use of condoms and other safety precautions.

## SECTION 4.

Chapter 11.39 is hereby added to Division 1 of Title 11 of the Los Angeles County Code to read:

### CHAPTER 11.39

### ADULT FILMS

### ADULT FILMS, SHORT TITLE AND PUBLIC POLICY

**Part 1 DEFINITIONS**

11.39.005    *Definitions*

*Unless the provision or the context otherwise requires, the definitions in this part shall govern the construction of this chapter.*

11.39.010    *Adult film*

*An "adult film" is defined as any film, video, multimedia or other representation of sexual intercourse in which performers actually engage in ~~oral~~, vaginal, or anal penetration, ~~including, but not limited to, penetration~~ by a penis, ~~finger, or inanimate object; oral contact with the anus or genitals of another performer; and/or any other sexual activity that may result in the transmission of blood and/or any other potentially infectious materials~~.*

11.39.020    *County.*

*"County" means the County of Los Angeles.*

11.39.030    *Department.*

*"Department" means the Los Angeles County Department of Public Health.*

11.39.040    *Departmental regulations.*

*"Departmental regulations" means the regulations pertaining to filming of adult films promulgated by the department as currently written or as may from time to time be amended. When adopted by the department, these regulations are incorporated in and become part of this chapter.*



**TEXT OF THE PROPOSED MEASURE**
**COUNTY OF LOS ANGELES SAFER SEX IN THE**
**ADULT FILM INDUSTRY ACT**

**SECTION 4. (Cont.)**

11.39.050       *Exposure control plan.*

*"Exposure control plan" means a written plan that meets all requirements of Title 8 California Code of Regulations sections 3203 and 5193, to minimize employees' risk of exposure to blood or potentially infectious material.*

11.39.060       *Filmed or filming.*

*"Filmed" and "filming" means the recording or real-time broadcast of any adult film, regardless of the medium used.*

11.39.070       *Potentially infectious material.*

*"Potentially infectious material" shall have the same meaning as defined in Title 8 California Code of Regulations Section 519 3 (b), or any successor regulation.*

11.39.075       *Producer of adult film*

*"Producer of adult film" means any person or entity that produces, finances, or directs, adult films for commercial purposes.*

11.39.076       *Permittee*

*"Permittee " means any person or entity issued an adult film production public health permit pursuant to this chapter.*

**Part 2 GENERAL REQUIREMENTS**

11.39.080       *Adult film production public health permit.*

A.       *Producers of adult films shall obtain a public health permit by filing a completed application form with the department ~~and paying the required fee. The fee shall be set by the Department in an amount sufficient to provide for the cost of any necessary enforcement.~~*

   1.       *During the twelve (12) months immediately following the effective date of this chapter, adult film production public health permits may be issued on a conditional basis. An individual issued a conditional permit shall have up to six months from the date of application to provide the department with proof of successful completion of a blood borne pathogen training course that has been approved by the department. If permittee is a business entity rather than an individual, permittee shall have up to six months from the date of application to provide the department with proof of successful completion of a blood borne pathogen training course that has been approved by the department for all principals and management-level employees of permittee, including, but not limited to, all film directors. Failure to provide such proof within the prescribed time shall cause the conditional adult film production public health permit to be revoked immediately.*



**TEXT OF THE PROPOSED MEASURE**
**COUNTY OF LOS ANGELES SAFER SEX IN THE**
**ADULT FILM INDUSTRY ACT**

**SECTION 4. (Cont.)**

2.   *At all times after the twelve (12) months following the effective date of this chapter, each applicant who is an individual must also provide the department with proof of successful completion of a blood borne pathogen training course that has been approved by the department. Each applicant who is a business entity rather than an individual must provide the department with proof of successful completion of a blood borne pathogen training course that has been approved by the department for all principals and management-level employees of permittee, including but not limited to all film directors.*

B.   *Upon successful completion of the permit application process described in subsection A of this section, the partment shall issue an adult film production public health permit to the applicant. The adult film production public health permit will be valid for two years from the date of issuance, unless revoked.*

C.   *No producer of adult films may engage in the making of adult films in Los Angeles County for commercial purposes unless that producer of adult films has a valid adult film production public health permit issued by the department.*

D.   *An adult film production public health permit is nontransferable.*

11.39.090   *Posting requirements.*

A.   *The adult film production public health permit issued to the producer of adult films must be displayed at all times at the location where any adult film is filmed in an area that is visible to performers.*

B.   *A legible sign shall be displayed at all times at the location where any adult film is filmed in any conventional typeface with a font size not smaller than 36 points, that provides the following notice so as to be clearly visible to performers in said films:*

*The use of condoms is required for all acts of anal or vaginal sex during the production of adult films to protect performers from sexually tramsmitted infections.*

*Any public health concerns regarding any activities occurring during the production of any adult films should be directed to the Los Angeles County Department of Public Health:*

_____

_____

*(the program office address and telephone number to be provided by the county health officer).*

11.39.100   *Permit –Reporting requirements.*

*Every person that possesses a valid adult film production public health permit or registration shall report to the department any changes in status to the business made reportable by departmental regulations within fifteen (1 5) days of the change.*



**TEXT OF THE PROPOSED MEASURE**
**COUNTY OF LOS ANGELES SAFER SEX IN THE**
**ADULT FILM INDUSTRY ACT**

---

**SECTION 4. (Cont.)**

11.39.100   Permit --Reporting requirements.

Every person that possesses a valid adult film production public health permit or registration shall report to the department any changes in status to the business made reportable by departmental regulations within fifteen (15) days of the change.

11.39.110   Permit--Suspension and revocation and fines.

A.   ~~Any permit issued pursuant to this chapter may be suspended or revoked by the department and~~ *fines* consistent with the provisions of this chapter may be imposed by the department for a violation of this chapter or any other violation of law creating a risk of exposing performers to sexually transmitted infections, including any violation of applicable provisions of the Los Angeles County Code, the California Health and Safety Code, the blood borne pathogen standard, California Code of Regulations Title 8, section 519 3 or the exposure control plan of the producer of adult films, or any combination of such violations. The failure of a producer of adult films to require performers to use condoms during any acts of vaginal or anal sexual intercourse is a violation of this chapter.

B.   Whenever the department determines that a permittee has failed to comply with the requirements of this chapter, any other violation of law creating a risk of exposing performers to sexually transmitted infections, including any violation of applicable provisions of the Los Angeles County Code, the California Health and Safety Code, the blood borne pathogen standard, California Code of Regulations Title 8, section 5193 or the exposure control plan of the producer of adult films, or any combination thereof a written notice to comply shall be issued to the permittee. The notice to comply shall include a statement of the deficiencies found, set forth the corrective measures necessary for the permittee to be in compliance with this chapter, and inform the permittee that failure to comply may result in the imposition of a fine or other penalty, ~~including suspension and/or revocation of any and all permits.~~ The notice to comply shall also advise the permittee of his or her right to an administrative review.

C.   A written request for an administrative review must be made by the noticed permittee within fifteen (15) calendar days of the issuance of the notice to comply. The failure to request an administrative review within the prescribed time shall be deemed a waiver of the right to an administrative review. The administrative review shall be held within fifteen (15) calendar days of the receipt of a written request for a review. Upon the written request of permittee or on its own motion, the department may advance or postpone the scheduled administrative review date, if permittee demonstrates good cause.

D.   The department shall issue a written notice of decision specifying any penalties imposed on permittee to the permittee within five (5) days of the administrative review or waiver, excluding weekends and holidays. ~~For permits that have been suspended or revoked, the notice of decision shall specify the acts or omissions found to be in violation of this chapter; and, in the case of a suspended permit, shall state the extent of the suspension. The notice of decision shall also state the terms upon which the permit may be reinstated or reissued, if any.~~



**TEXT OF THE PROPOSED MEASURE**
**COUNTY OF LOS ANGELES SAFER SEX IN THE**
**ADULT FILM INDUSTRY ACT**

**MEASURE B**

---

**SECTION 4. (Cont.)**

E.    Notwithstanding any other provision of this chapter, if any immediate danger to the public health or safety is found or is reasonably suspected, the department ~~may immediately suspend the adult film production public health permit, initiate a criminal complaint and/or~~ impose any fine permitted by this chapter, pending a determination of an administrative review, as provided herein. Immediate danger to the public health and/or safety shall include any condition, based upon inspection findings or other evidence, that can cause, or is reasonably suspected of causing, infection or disease transmission, or any known or reasonably suspected hazardous condition.

1.    ~~Whenever an adult film production public health permit issued is immediately suspended or a fine is imposed pursuant to this subdivision E of this section, the department shall issue to the permittee so suspended or fined, a written notice to comply setting forth the acts or omissions with which the permittee is charged, specifying the sections of the Los Angeles County Code, California Health and Safety Code, blood borne pathogen standard, California Code of Regulations Title 8, section 5193 or the exposure control plan of the producer of adult films, or the combination of alleged violations, and informing the permittee of the right to an administrative review.~~

2.    ~~At any time within fifteen (15) calendar days of service of such notice to comply, the permittee may request, in writing, an administrative review by the department to show cause why the imposed suspension or fine is unwarranted. The administrative review shall be held within fifteen (15) calendar days of the receipt of a request. A failure to request an administrative review within fifteen (15) calendar days shall be deemed a waiver of the right to such review.~~

3.    At any time prior to an administrative review or waiver thereof the recipient of a notice to comply issued pursuant to this subsection F, may correct the deficiencies noted in the notice to comply and request a reinspection at any time when the producer of adult films is actually filming an adult film.

4.    In the case of a request for reinspection as set forth in subsection E.3 above, the department shall reinspect as soon as practical. In the event the deficiencies noted in the notice to comply are corrected to the satisfaction of the health officer, the department has discretion to ~~reinstate or modify any suspension of a permit and cancel or~~ modify any fine imposed pursuant to this subsection F. If the department determines that the deficiencies identified in the notice to comply have been corrected, but the department elects not to ~~reinstate the suspension or~~ cancel the fine imposed pursuant to this subsection F, the department shall notify the permittee of this decision in writing. The permittee shall have fifteen (15) calendar days from receipt of said notification to seek an administrative review of this decision.

F.    The department may, after an administrative review or waiver thereof, ~~modify, suspend, revoke or continue all such action previously imposed upon a permittee pursuant to this chapter or~~ impose any fine imposed by law for violations of this chapter ~~or any other laws or standards affecting public health and safety, including~~ but not limited to the Los Angeles County Code, the California Health and Safety Code, the blood borne pathogen standard, California Code of Regulations Title 8, section 5193 or the exposure control plan of the ~~permittee, or any combination thereof, or for interference with a county health officer's performance of duty.~~

### B   COUNTY OF LOS ANGELES SAFER SEX IN THE ADULT FILM INDUSTRY ACT

**SECTION 4. (Cont.)**

~~G.~~ ~~A permit issued pursuant to this chapter may be reissued or reinstated, if the department determines that~~ ~~the conditions~~ which ~~prompted the suspension or revocation no longer exist and any fine imposed pursuant~~ ~~to this chapter has been satisfied~~

~~H.~~ ~~In the event a permit is suspended or revoked, the producer of adult films whose permit was revoked shall~~ ~~cease filming any adult film unless and until the permit is reinstated or reissued.~~

**Part 3 COMPLIANCE AND ENFORCEMENT**

11.39.120    Compliance with the provisions in this chapter shall be mandatory:

A.    The provisions of this chapter are in full force and effect in the county.

B.    Any producer of adult films filming any adult films within the county, including any person or entity owning or operating any business regulated by this chapter, must comply with the provisions of this chapter.

C.    In addition to any other penalty provided for under this chapter, consistent with the process set forth hereinfor notice and administrative review, the department may impose a fine on persons violating any provision of this chapter or any law, regulation or standard incorporated into this chapter. The department may impose a civil fine upon such violators in an amount not to exceed $500.00 per violation, as appropriate. The imposition of such fines shall, in no way, limit the authority or ability to impose other requirements of this chapter or seek other remedies against alleged violators.

D.    Any person or entity who produces or films adult films for commercial purposes within the county without a valid adult film production public health permit, or any person, who violates any law, ordinance or regulation governing any activity regulated by this chapter, or who, upon demand of the county health officer, refuses or neglects to conform to a lawful order or directive of a county health officer pertaining to conduct regulated by this chapter, is guilty of a misdemeanor, punishable by fine of $1, 000. 00, imprisonment in the county jail for a period not to exceed six months, or both. Each such act is punishable as a separate offense.

11.39.130    Health officer--Enforcement.

~~The county health officer may enter and inspect any location suspected of conducting any activity regulated~~ by this chapter, and, for purposes of enforcing this chapter, the county health ~~officer may issue~~ notices and impose fines therein and take possession of any sample, photograph, record or other evidence, including any documents bearing upon adult film producer's compliance with the provision of the chapter. Such inspections may be ~~conducted~~ as often as necessary to ensure compliance with the provisions of ~~this chapter.~~

11.39.140    Noncompliance with county health officer--Injunctive relief

Any act or failure to act which is a violation of this chapter may be the subject of a civil action to enjoin the person or entity so acting or failing to act to conform his or her conduct to the provisions of this chapter. A civil action to enforce the provisions of this section may be brought by the county counsel, the district attorney or any person directly affected by said failure to comply with the provisions of this chapter. The filing



**TEXT OF THE PROPOSED MEASURE**
**COUNTY OF LOS ANGELES SAFER SEX IN THE**
**ADULT FILM INDUSTRY ACT**

## SECTION 4. (Cont.)

*and prosecution of such an action shall, in no way, limit the authority or ability to impose other requirements of this chapter or remedies or penalties as permitted by law.*

**Part 4 OPERATIONS**

11.39.150     *Exposure control plan and reporting.*

*Every producer of adult films shall provide a written exposure control plan, approved by the department, describing how the requirements of this chapter will be implemented The exposure control plan shall meet requirements established in departmental regulations.*

## SECTION 5.

Chapter 22.56.1925 of the Division 1 of Title 22 of the Los Angeles County Code is amended as follows:

22.56.1925     Movie on-location filming.

A.     Notwithstanding the other provisions of this Part 14, applications for movie on-location filming permits shall be filed with the filming permit coordination office which shall approve such application for a time period not to exceed the time period specified in this Title 22 where it finds that the findings set forth in Section 22.56.1860 and subsection A 1 of Section 22.56.1880 have been met by the applicant. In addition, in lieu of subsection A2 of Section 22.56.1880, the filming permit office shall also find that such approval will not result in a frequency of usage likely to create incompatibility between such temporary use and the surrounding area. Where an application is denied due to frequency of usage, the filming permit office shall specify the minimum time period between approvals which, in its opinion, is necessary to prevent such incompatibility.

B.     In interpreting the other provisions of this Part 14 in relation to movie onlocation filming, the filming permit office shall be substituted for the director, and the provisions of Sections 22.56.1840 and 22.56.1870 shall not apply.

C.     *Any person or entity issued a permit for the filming of an adult film, as defined in section 11.39.010 of this Code, under this chapter or any other law authorizing the issuance of permits for commercial filming are required to maintain engineering and work practice controls sufficient to protect employees from exposure to blood and/or any other potentially infectious materials controls, in a manner consistent with California Code of Regulations, Title 8, Section 519 3. Any such permit shall contain the following language: "Permittee must abide by all applicable workplace health and safety regulations, including California Code of Regulations Title 8, Section 5193, which mandates barrier protection, including condoms, to shield performers from contact with blood or other potentially infectious m:aterial during the production of films. " The county shall charge, or shall direct any other person or entity contracting with the county to administer the film permitting process, to charge, entertainment industry customers seeking permits for the production of adult films a fee sufficient to allow periodic inspections to ensure compliance with the conditions set forth in Section 11.39.010.*



**TEXT OF THE PROPOSED MEASURE**
**COUNTY OF LOS ANGELES SAFER SEX IN THE**
**ADULT FILM INDUSTRY ACT**

MEASURE B

### SECTION 6. COMPETING MEASURES

In the event that this measure and another measure or measures relating to the permit process for adult films shall appear on the same ballot, the provisions of the other measures shall be deemed to be in conflict with this measure. In the event that this measure shall receive a greater number of affirmative votes, the provisions of this measure shall prevail in their entirety, and the provisions of the other relating to the permit process for adult films shall be null and void.

### SECTION 7. AMENDMENT AND REPEAL

This chapter may be amended to further its purposes by an ordinance passed by a majority vote of the Board of Supervisors. This chapter may not be repealed, except by an ordinance proposed either by petition or by the Board of Supervisors at its own instance and adopted by a vote of the electors, or by an amendment of the charter superseding the ordinance.

### SECTION 8. SEVERABILITY

If any provision of this Act, or part thereof, is for any reason held to be invalid or unconstitutional, the remaining provisions shall not be affected, but shall remain in full force and effect, and to this end the provisions of the Act are severable.