1
2
3
4
5
6
7
8

Tom Myers (SBN 176008)
E-Mail: Tom.myers@aidshealth.org
Samantha R. Azulay (SBN 283424)
E-Mail: Samantha.azulay@aidshealth.org
Liza M. Brereton (SBN 261380)
E-Mail:  Liza.brereton@aidshealth.org
AIDS Healthcare Foundation
6255 W. Sunset Blvd., 21st FL
Los Angeles, CA 90028
Phone: 323-860-5200
Fax: 323-467-8450

9
10

*Attorneys for Intervenor*
*Michael Weinstein*

11

12
13

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

14
15
16

VIVID ENTERTAINMENT, LLC;
CALIFA PRODUCTIONS, INC.;
JANE DOE a/k/a Kayden Kross; and
JOHN DOE a/k/a Logan Pierce,

17

                    Plaintiffs,

                    vs.

18
19
20

JONATHAN FIELDING, Director of
Los Angeles County Department of
Public Health, JACKIE LACEY, Los
Angeles County District Attorney, and
COUNTY OF LOS ANGELES,

21

                    Defendants.

22
23
24
25

MICHAEL WEINSTEIN, MARIJANE
JACKSON, ARLETTE DE LA CRUZ,
MARK MCGRATH, WHITNEY
ENGERAN, and the CAMPAIGN
COMMITTEE YES ON B, MAJOR
FUNDING BY THE AIDS
HEALTHCARE FOUNDATION

26

Defendants-Intervenors.

27
28

) Case No.: 13-CV-00190-DDP-AGR
)
) **NOTICE OF MOTION AND JOINT**
) **STIPULATION FOR**
) **INTERVENOR'S MOTION TO**
) **COMPEL DEPOSITIONS AND**
) **FURTHER RESPONSES AND**
) **DOCUMENTS FROM FREE**
) **SPEECH COALITION, INC. TO**
) **INTERVENOR'S SUBPOENA**
)
)
) Date:       January 26, 2016
) Time:       10:00 a.m.
) Judge:      Hon. Alicia G. Rosenberg
) Location: 312 N. Spring Street,
)           Courtroom B. 8th Floor
)           Los Angeles, California
)           90012
)
)
) Discovery Cut-Off Date: May 31, 2016
) Trial Date: December 13, 2016
)
)
)
)
)
)

**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on **January 26, 2016, at 10 a.m.**, or as soon thereafter as the matter may be heard, before the Honorable Alicia G. Rosenberg in Courtroom B, 8th Floor of the United States District Court for the Central District of California, 312 N. Spring Street, Los Angeles, California 90012, Michael Weinstein  ("Intervenor"), will move for an order requiring Non-Party Free Speech Coalition, Inc. to provide further responses and documents to Intervenor Michael Weinstein's Subpoena, and to compel the depositions of Diana Duke,  Mark Kernes, and Jeffrey Douglas and for the imposition of sanctions against FSC, Diana Duke, Mark Kernes and Jeffrey Douglas and their counsel.

This motion is based on this Notice of Motion, the attached Joint Stipulation For Intervenor's Notice of Motion and Joint Stipulation For Intervenor's Motion To Compel Depositions And Further Responses And Documents From Free Speech Coalition, Inc. To Intervenor's Subpoena and attached exhibits, declaration of Samantha Azulay, all of the pleadings, files, and records in this proceeding, all matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

This motion is made following the conference of counsel pursuant to L.R. 37-1 which took place on at least October 15 and 20, 2015 regarding issues relating to the motion, and further communications between counsel.

Respectfully Submitted,

DATED:  January 5, 2016            AIDS HEALTHCARE FOUNDATION


By: /s/ Samantha R. Azulay
    TOM MYERS
    SAMANTHA R. AZULAY
    LIZA M. BRERETON
    *Attorneys for  Intervenor*
    *Michael Weinstein*

1
2

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

I. INTRODUCTORY STATEMENTS ............................................................. 1

  A.  Intervenor's Introductory Statement ..................................................... 1

    1.  Factual Background............................................................................ 1

    2.  Discovery Topics Sought By Intervenors' Subpoenas....................... 2

  B.  FSC's and the Deponents' Introductory Statement ............................... 5

    1.  Mr. Weinstein Issues Subpoenas to FSC's CEO, Chairman and Board Secretary and Refuses to Enter into a Protective Order................................................................. 5

    2.  Mr. Weinstein Issues RFPs to FSC and Refuses to Enter into a Protective Order. ......... 7

II. DEPOSITION SUBPOENAS OF DIANE DUKE, JEFFREY DOUGLAS AND MARK KERNES .................................................................................................... 9

  A.  Deposition Subpoenas......................................................................... 9

  B.  Intervenor's Contentions Regarding the Deposition Subpoenas At Issue ......................... 9

    1.  Discovery Into the Pass System Is Relevant ..................................... 9

    2.  FSC's Objections And Insistence On A Protective Order Before Producing Witnesses For Deposition Are Improper......................................................................... 10

  C.  The Deponents' Contentions Regarding The Deposition Subpoenas At Issue.................. 12

    1.  The Depositions Will  Address Confidential Information Regarding Internal Matters of FSC.. ........................................................................................... 14

    2.  The Depositions Will Address Sensitive Medical Information of Third Parties. .......... 15

    3.  Because Mr. Weinstein Has Engaged in a Long-Standing Campaign against FSC and its Members, a Protective Order Is Necessary to Ensure that Discovery Is Only Used For This Litigation............................................................................................. 16

4.    A Watermark in the Video of the Deposition Is Necessary to Ensure that the Video Is Not Leaked. .................................................................................... 21

III. THE DOCUMENT SUBPOENA ON FSC ............................................... 23

A.   Requests for Production At Issue ........................................................ 23

B.   Intervenor's Contentions Regarding the Requests At Issue ............... 29

1.    Requiring Intervenor To Obtain Or Agree To A Protective Order Prior to Producing Documents Is Improper ................................................................................ 29

2.    FSC's Objections Lack  Merit ................................................................ 29

C.   FSC'S Contentions Regarding the Requests At Issue. ....................... 35

1.    Requiring Intervenor Weinstein To Obtain Or Agree To A Protective Order Prior to FSC's Production of Documents Is Proper ............................................. 35

2.    Intervenor Weinstein's Efforts to Obtain a List of FSC's Producer/Agent Members Violate the Right of Association of FSC's Members. ......................................... 36

3.    The Court Should Not Require FSC to Produce Additional Documents in Response to Mr. Weinstein's Document Requests. ........................................................ 47

IV. THE COURT SHOULD IMPOSE MONETARY SANCTIONS ON FSC ......................... 56

A.   Intervenor's Contentions Regarding Sanctions .................................. 56

B.   FSC's and Deponents' Contentions Regarding Sanctions .................. 56

**NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL**

# TABLE OF AUTHORITIES

**Cases**

*Acorn Investments, Inc. v. City of Seattle,*

887 F.2d 219 ...................................................................................... 41

*Ashcroft v. Free Speech Coalition,*

535 U.S. 234 ...................................................................................... 36

*Bates v. Little Rock,*

361 U.S. 516 ...................................................................................... 40

*Britt v. Superior Court,*

20 Cal.3d 844 ........................................................................... 23, 38, 40

*Bursey v. United States,*

466 F.2d 1059 ............................................................................... 23, 40

*Butler v. State of Mich.,*

352 U.S. 380 ...................................................................................... 46

*Carushka, Inc. v. Premiere Products, Inc.,*

No. CV 87 02356 DT (JRX), 1989 WL 253565, at *2 .......................... 21

*Dart Indus. Co., Inc. v. Westwood Chem. Co., Inc.,*

649 F.2d 646 ...................................................................................... 54

*Eilers v. Palmer,*

575 F. Supp. 1259 .............................................................................. 38

*Evans v. Newton,*

382 U.S. 296 ...................................................................................... 39

*Evans v. Rite Aid Corp.,*

324 S.C. 269, 273, 478 S.E.2d 846 ...................................................... 16

*Fahmy v. Jay-Z,*

2:07-cv-05715 (Dkt. No. 644) ............................................................ 22

*In re Grand Jury 90-1,*

758 F. Supp. 1411, 1413 (D. Colo. 1991) ............................................ 21

*In re Grand Jury Subpoena Served Upon Crown Video Unlimited, Inc.,*

   630 F. Supp. 614 ..................................................................................... 33

*Gray v. First Winthrop Corp.,*

   133 F.R.D. 39 ................................................................................. 11, 21

*Great Plains Mut. Ins. Co. v. Mut. Reinsurance Bureau,*

   150 F.R.D. 193 ......................................................................................... 21

*Haworth, Inc. v. Herman Miller, Inc.,*

   998 F.2d 975 ............................................................................................. 53

*Herbert v. Lando,*

   441 U.S. 153, .......................................................................................... 10

*Hunt v. Washington State Apple Advert. Comm'n,*

   432 U.S. 333 ............................................................................................ 42

*IDK, Inc. v. County of Clark,*

   836 F.2d 1185 .......................................................................................... 32

*Int'l Action Ctr. v. United States,*

   207 F.R.D. 1 ...................................................................................... 41, 43

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,*

   No. 75 CIV. 5388 (MJL), 1985 WL 315, at *18 n.16........................... 38, 43, 45, 47

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., & its Locals 1093, 558 & 25 v. Nat'l Right to Work Legal Def. & Ed. Found., Inc.,*

   590 F.2d 1139 .......................................................................................... 42

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,*

   89 F.R.D. 489........................................................................................... 21

*Minter v. Wells Fargo Bank, N.A.,*

   No. CIV WMN-07-3442, 2010 WL 5418910, at *3............................... 15

*Moon v. SCP Pool Corp.,*

   232 F.R.D. 633..................................................................................... 10, 53

*Murphy v. Cont'l Tire N. Am., Inc.,*

No. CV 09-3004 GHK FMO, 2010 WL 3260183 ................................................ 11, 21

*NAACP v. Alabama,*

357 U.S. 449 ................................................ 8, 23, 39, 40, 42, 45, 46

*Nestle Foods Corp. v. Aetna Casualty & Surety Co.,*

135 F.R.D. 101 ................................................ 11

*Nidec Corp. v. Victor Co. of Japan,*

249 F.R.D. 575 ................................................ 53

*Oakes v. Halvorsen Marine Ltd.,*

179 F.R.D 281 ................................................ 11, 30

*Perry v. Brown,*

52 Cal. 4th 1116 ................................................ 38

*PHE, Inc.,*

790 F. Supp. 1310 ................................................ 32

*Reno v. Am. Civil Liberties Union,*

521 U.S. 844 ................................................ 46

*San Jose Mercury News, Inc. v. United States District Court*—Northern District,

187 F.3d 1096 ................................................ 12

*Shoen v. Shoen,*

5 F.3d 1289 ................................................ 21

*Skellerup Indus. Ltd. v. City of Los Angeles,*

163 F.R.D. 598 ................................................ 11, 21

*Sullivan v. Prudential Ins. Co. of Am.,*

233 F.R.D. 573 ................................................ 11, 21

*United States of America v. AHF*

(0:14-cv-61301-KMW) (S.D. Fl.) (Dkt. No. 50 at p. 2) ................................................ 15, 16

*United States v. Playboy Entm't Grp., Inc.,*

529 U.S. 803 ................................................ 46

*Verizon California Inc. v. Ronald A. Katz Tech. Licensing, L.P.,*

**NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL**

214 F.R.D. 583 .................................................................................................. 12

**Statutes**

45 CFR § 164.514 ............................................................................................. 30

**Rules**

Fed.R.Civ.P. 26 ........................................................................................... 9, 11

Fed. R. Civ. P. 37 ............................................................................................ 56

Fed. R. Civ. P. 45 .............................................................................................. 3

**Regulations**

17 Cal. Code of Regulations § 2500 ................................................................ 53

**NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL**

## JOINT STIPULATION

**I.   INTRODUCTORY STATEMENTS**

    **A.   Intervenor's Introductory Statement**

        **1.   Factual Background**

Plaintiffs Vivid Entertainment, LLC and Califa Productions, Inc. ("Plaintiffs") are adult film production and distribution companies who allege six claims under 42 U.S.C. § 1983 and one state preemption claim in their Complaint seeking to invalidate the Safer Sex in the Adult Film Industry Act, Title 11, Division 1, Chapter 11.39 of the Los Angeles County Code ("Measure B"). On August 13, 2013, the Court dismissed Plaintiffs' due process claim, state preemption claim, and their first amendment claim related to subjecting freedom of expression to a referendum. (Dkt. No. 79). On October 30, 2015, the individual plaintiffs dismissed their claims against Defendants with prejudice. (Dkt. No. 95). The remaining Plaintiffs bring claims for violations of their first and fourth amendment rights.

Measure B sets forth workplace safety measures for the adult film industry that must be followed prior to and during the actual production of adult films. Measure B defines an "adult film" as any film, video, multimedia or other representation of sexual intercourse in which performers actually engage in oral, vaginal, or anal penetration, including, but not limited to, penetration by a penis, finger, or inanimate object; oral contact with the anus or genitals of another performer; and/ or any other sexual activity that may result in the transmission of blood and/or any other potentially infectious materials. Judge Pregerson, in his August 16, 2013 Order, struck some of the language and redefined "adult film" as "as any film, video, multimedia or other representation of sexual intercourse in which performers actually engage in vaginal or anal penetration by a penis."

Intervenor's discovery requests have defined "adult film" in accordance with Judge Pregerson's Order.  (Dkt. No. 79)

Measure B requires producers of adult films to take safety measures such as: (1) get a public health permit; (2) obtain health training; (3) post the public health permit on sets; and (4) use condoms for vaginal and anal sex.

Plaintiffs' theories on how Measure B infringes on their First Amendment rights are that: (1) Measure B inhibits their desire to freely express unprotected sex in the actual making of the film in order to realize their artistic vision; (2) performers are consenting adults and may choose to have sex in the workplace in the manner in which they please; and, more relevant to the present motion, (3) the adult film industry takes adequate steps to protect its performers so no one else should protect them.

### 2.     Discovery Topics Sought By Intervenors' Subpoenas

Defendant's claim that the adult industry already takes adequate steps to protect its performers from sexually transmitted infections ("STIs") making Measure B unnecessary. (Complaint, Dkt. No 1 at ¶¶ 80, 85).   Specifically, Plaintiffs claim that they have created an STI testing and screening regime to protect performers from contracting and/or spreading STIs on set.  To support this claim, Plaintiffs have cited to the screening services called Adult Industry Medical Health Care Foundation ("AIM"), Performer Availability Scheduling Service and formerly Adult Performer Health and Safety Services ("APHSS") and more recently Performer Availability Screening Services ("PASS").[1]  (Dkt. No. 1 at ¶¶ 22-29); APHSS and PASS were/are developed and administered by the Free Speech Coalition, Inc. ("FSC").  (Dkt. 1 at ¶¶ 24-25); (Declaration of Samantha L.

---

[1]     PASS is the current screening service used by FSC and the adult film industry.  APHSS officially changed its name to PASS on August 23, 2015.  Azulay Decl., ¶ 2, Exh. A.  AIM is no longer in operation.

Azulay ("Azulay Decl."), ¶ 2, Exh. A (blog announcement). Exh. C (webpages of FSC and PASS websites).  Intervenor is entitled to discovery on the tests, test results, screening methods, and treatment for STIs to evaluate the legitimacy of Plaintiffs' claims.

To obtain discovery on this claim, Intervenor served a document subpoena pursuant to FRCP Rule 45 on FSC.  Azulay Decl., ¶ 3, Exh. B (Subpoena to FSC). FSC is the Trade Association for the adult entertainment industry.  (Dkt. No. 1 at ¶ 24).

As stated on FSC's website, PASS provides guidelines and services for the adult production industry designed to ensure a safe and healthy work environment of performers and adult film professionals.  *Id*.  The program allegedly includes:

- A series of nationwide testing sites providing low cost, high-quality testing in a timely manner
- Performers have electronic access to testing results directly from labs
- Variety of medical providers for treatment of performers in need of medical follow-up
- Consistent standards and guidelines for testing and treatment of adult performers
- A secure database that ensures performer privacy and protects producer liability
- Protocol for performer support in the event of a positive HIV test result, including funding for testing of 1st and 2nd generation partners.

Azulay Decl., ¶ 4, Exhibit C (webpages of FSC and PASS websites).

The APHSS/PASS program was developed in part by FSC.  An adult film producer, adult film agent, or testing facility must have a subscription to access the PASS system.  The PASS website states that PASS is free of charge to performers,

but remains silent about any subscription fee for producers, agents, or testing facilities.  *Id.*

On October 22, 2015, Intervenor also issued subpoenas for the depositions of Diane Duke, the CEO and executive director of "FSC"[2], Jeffrey Douglas, Chairman of the board of directors of FSC, and Mark Kernes, member of the board of directors of FSC.  See Azulay Declaration, ¶ 5, Exhs. D-F.

On September 16, 2015, FSC served its objections and responses to Intervenor's subpoenas.  Azulay Decl., ¶ 6, Exhibit G.  Although Intervenor did not seek personal health information or any patient-identifiable information, FSC generally asserted a litany of objections based on the right to privacy under the California and federal constitutions, the right to freedom of association under the California and federal Constitutions, that the requests seek confidential information, are overly broad, unduly burdensome and expensive, and seek irrelevant information.  FSC refused to produce any documents in response to Request Nos. 3, 5-7.  FSC also indicated it would produce documents in response to Request Nos. 1-2 and 4 but only subject to the entry of a protective order.  *Id.*

On October 7, 2015, Intervenor sent a letter to FSC requesting a conference of counsel under Local Rule 37-1.  Azulay Decl., ¶ 7, Exhibit H (Oct. 7, 2015 letter from Azulay to Gottfried).  Intervenor also outlined the deficiencies in FSC's responses and objections to the subpoena.  Id.  In response to the deposition subpoenas, the FSC individuals indicated that they would not sit for their depositions without the entry of a protective order, rules on handling the deposition transcript and other demands to limit the scope of the deposition.  Azulay Decl. ¶ 8, Exhs. I-K (October 30, 2015, November 12, 2015 and December 3, 2015

---

[2]     Diane Duke announced on November 30, 2015 that she will step down from her position at FSC at the end of December.  Jeffrey Douglas will step in as Interim head of FSC.

Gottfried letters to Azulay).

From October through December 2015, Intervenor and FSC continued to meet and confer with little success regarding the issues in FSC's response and objections and the issues with the deposition subpoena.  See Azulay Decl., ¶ 9, Exhs. I-K.

Intervenor respectfully requests that the Court compel the depositions of Ms. Duke, Mr. Douglas and Mr. Kernes and for further responses and production of documents in response to the subpoena without a protective order.

**B.    FSC's and the Deponents' Introductory Statement**

Founded in 1991, non-party FSC is the trade association of the adult entertainment industry based in the United States.  It protects the interests of its adult-industry members, including monitoring legislation affecting the industry and pursuing litigation.  As part of its mission, FSC formed the "Performer Availability Screening Services" or "PASS" in 2010 in order to focus on issues surrounding safe work environments for adult film professionals.  As part of its work on PASS, FSC has collected the names of thousands of members associated with the adult-entertainment industry who are aligned with FSC's health-oriented goals.  FSC regularly communicates (via email, social media and a blog (FSCPASS.org)) with members of the PASS system regarding health issues affecting the adult industry. The membership list of FSC's PASS system is not public—to the contrary, privacy is paramount since members do not want their real names publicly divulged for numerous reasons, including personal safety.

**1.    Mr. Weinstein Issues Subpoenas to FSC's CEO, Chairman and Board Secretary and Refuses to Enter into a Protective Order.**

This is a rare instance in which a moving party demands that non-parties be compelled to produce large volumes of sensitive information without the benefit of

any protective order.  In response to Mr. Weinstein's subpoenas on FSC's CEO (Diane Duke), board chairman (Jeffrey Douglas), and secretary (Mark Kernes) (collectively, the "Deponents"), the Deponents' counsel asked for a commonplace precaution:  the entry of the Court's Form Protective Order ("Form Protective Order")[3] (or an order analogous to it) so that confidential information would remain non-public and that deposition testimony was not used for purposes unrelated to this litigation.  This was necessary because the deposition would likely address the internal affairs of FSC, confidential board meetings, and sensitive information regarding sexually transmitted infections.  To the extent that Mr. Weinstein believed that any testimony were improperly designated as confidential, the protective order would enable Mr. Weinstein to challenge the designations. But Mr. Weinstein rejected the idea of entering into any protective order and took the position that nothing that the Deponents could say could be confidential. Furthermore, Mr. Weinstein refused to agree that he would limit to this litigation the use of protected material disclosed during the depositions.

To be clear, the Deponents are not refusing to appear for depositions.  To the contrary, they offered dates when they were available to be deposed, which Mr. Weinstein (not Deponents) postponed.  The non-party Deponents are simply asking that there exist a mechanism to protect the confidentiality of any non-public information and to ensure that confidential testimony is not used for purposes unrelated to this litigation.  The Court's Form Protective Order would be more than adequate.

---

[3] *See* http://court.cacd.uscourts.gov/CACD/JudgeReq.nsf/0/7b940ca760a87cd5882579f5006b0827/$FILE/FINAL%20FORM%20STIPULATED%20PROTECTIVE%20ORDER%20%5BREVISED%20SEPT%2016%202014%5D.pdf

**NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL**

## 2.      Mr. Weinstein Issues RFPs to FSC and Refuses to Enter into a Protective Order.

Mr. Weinstein issued a subpoena to non-party FSC for broad categories of documents.  As a result of meet-and-confers, FSC agreed to produce the vast majority of what Mr. Weinstein sought (subject, where appropriate, to a protective order), including:

- Data from the PASS system available since its inception on performers (stripped of all personally identifiable information pursuant to an agreement by the parties);

- Screenshots from the computer portion of the PASS system and descriptions of how it works;

- Any documents regarding the efficacy or inefficacy of the PASS system;

- Any documents (if they exist) regarding a performer's STI status being incorrect in the PASS system (stripped of all personally identifiable information);

- STI-related film production holds communicated to FSC's PASS members within the last five years.

Furthermore—as discussed above—FSC agreed to produce its CEO, board chairman and board secretary to be deposed regarding how the PASS system worked.

Mr. Weinstein nonetheless filed this motion on two primary grounds.  *First*, he wants a list of the names of every member of FSC's PASS system in the nation who is a producer or agent.  *Second*, he wants these names to be produced without the benefit of a protective order that would ensure the members' confidentiality and would limit the use of the confidential list to this litigation.  The Court should reject both requests.

*First*, Intervenor Weinstein's request for FSC's membership list infringes

NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL

upon those members' freedom of association under the First Amendment.  Mr. Weinstein's efforts to compel disclosure and then publicize FSC's confidential membership list (which contains the real names of members who use pseudonyms in their professional lives in order to protect their privacy and safety) undermines the ability of FSC's members to advocate beliefs which they admittedly have the right to advocate and will induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure and of harassment by Mr. Weinstein and his organization.  *See NAACP v. Alabama*, 357 U.S. 449, 465 (1958) (holding that "whatever interest the State may have in obtaining names of ordinary members has not been shown to be sufficient to overcome petitioner's constitutional objections to the production order").  Mr. Weinstein's vague justification for seeking a list of the names of every producer/agent member in the nation—that Mr. Weinstein wants to know how the PASS system works—cannot override the associational rights at stake.

*Second*, Mr. Weinstein asks that he be allowed to make this membership list public and be used for any purpose unrelated to this litigation.  That is unacceptable.  Publicly available evidence indicates that, as early as 2010, Mr. Weinstein believed that he was engaged in "war of attrition" against FSC and its members and sought to deliver a "blow to their solar plexus."  (Gottfried Decl. Ex. 1 at p. 28/119)  He and his organization, AIDS Healthcare Foundation ("AHF"), have solicited third parties to sue FSC's members; Mr. Weinstein organizes press conferences and otherwise aggressively uses the media to publicize negative information about FSC and its members; and Mr. Weinstein and AHF have sought to create the illusion of broad-based attacks on FSC and its members by paying third parties to be Mr. Weinstein's mouthpiece.  Any discovery provided to Mr. Weinstein should therefore be subject to strict, reasonable controls to prevent its misuse in Mr. Weinstein's broader campaign against FSC and its members.

NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL

***

Consequently, the Court should deny Mr. Weinstein's motion.  The Court should also award costs and attorney's fees to non-party FSC and the Deponents because Mr. Weinstein's arguments are substantially unjustified.

## II.     DEPOSITION SUBPOENAS OF DIANE DUKE, JEFFREY DOUGLAS AND MARK KERNES

### A.     Deposition Subpoenas

Intervenor served a deposition subpoena on Jeffrey Douglas, Chairman of the board of directors of FSC, requiring him to testify on December 2, 2015. Intervenor served a deposition subpoena on Mark Kernes, member of the board of directors of FSC, requiring him to testify on December 3, 2015.  Intervenor served a deposition subpoena on FSC's then Executive Director Diane Duke requiring her to testify on December 15, 2015.  *See* Azulay Declaration, ¶ 5, Exhs. D-F.

FSC has indicated that the individuals would not sit for their deposition unless a protective order is in place that ensures that: (i) their testimony is not used for purposes unrelated to this litigation, and (ii) any confidential information that they discuss is not publicly disclosed and (iii) if the deposition is videotaped, then a watermark stating 'Weinstein' should appear across the image of the witness in order to avoid improper disclosure of the video." Azulay Decl. ¶ 8, Exhs. I-K (October 30, 2015, November 12, 2015 and December 3, 2015 Gottfried letters to Azulay).

### B.     Intervenor's Contentions Regarding the Deposition Subpoenas At Issue

#### 1.     Discovery Into the Pass System Is Relevant

Fed.R.Civ.P. 26(b) establishes the scope of discovery and states in pertinent part:

Parties may obtain discovery regarding any matter, non-privileged,

1    that is relevant to any party's claim or defense, including the

2    existence, description, nature, custody, condition, and location of any

3    books, documents, or other tangible things and the identity and

4    location of persons having knowledge of any discoverable matter. For

5    good cause, the court may order discovery of  any matter relevant to

6    the subject matter involved in the action. Relevant information need

7    not be admissible at trial if the discovery appears reasonably

8    calculated to lead to the discovery of admissible evidence.

9    *Id.*

10    The Supreme Court has reiterated this broad standard, stating that it "has

11    more than once declared that the deposition-discovery rules are to be accorded a

12    broad and liberal treatment to effect their purpose of adequately informing the

13    litigants in civil trials." *Herbert v. Lando*, 441 U.S. 153, 177 (1979).  Thus, Rule

14    26(b) is liberally interpreted to permit wide-ranging discovery of information even

15    though the information may not be admissible at the trial.  *Moon v. SCP Pool*

16    *Corp.*, 232 F.R.D. 633, 635-36 (C.D. Cal. 2005).

17    Here, the individuals sought to be deposed possess highly relevant

18    information to the Plaintiff's claim in this case that the adult film industry takes

19    adequate steps to protect its performers such that Measure B is unnecessary. They

20    have information on, without limitation, how the PASS system works, how

21    effective the PASS system is in preventing STIs, what adult film producers and

22    agents utilize PASS, what testing facilities utilize PASS and the percentage rates of

23    infections in the adult film industry for those that use PASS.  Thus, the deponents

24    possess relevant information under FRCP Rule 26.

25    **2.    FSC's Objections And Insistence On A Protective Order**

26    **Before Producing Witnesses For Deposition Are Improper**

27    The party who resists discovery has the burden to show that discovery

**10**

**NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL**

should not be allowed, and has the burden of clarifying, explaining, and supporting its objections. *Oakes v. Halvorsen Marine Ltd*., 179 F.R.D 281, 283 (C.D. Cal. 1998); *Nestle Foods Corp. v. Aetna Casualty & Surety Co*., 135 F.R.D. 101, 104 (D. N.J. 1990).

Here, there is simply no authority that allows a party to insist on a protective order before producing witnesses for deposition.   Also, non-party, FSC and its individuals officers and directors could have moved the court for a protective order pursuant to FRCP Rule 26(c)(1) but failed to do so.  Instead, they have used the protective order concept as a means to obstruct and delay Intervenor's right to seek discovery of crucial information.  Their approach is to say "we will comply but only if certain conditions are met."  This approach is not supported by the federal rules of procedure.

Moreover, there is no good cause for a protective order.  A protective order may be granted pursuant to Federal Rule of Civil Procedure 26(c) when the moving party establishes "good cause" for the order and "justice requires [a protective order] to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." Fed. R. Civ. Proc. 26(c).  The moving party must show a particular and specific need for the protective order, as opposed to making stereotyped or conclusory statements.  See *Sullivan v. Prudential Ins. Co. of Am*., 233 F.R.D. 573, 575 (C.D. Cal. 2005) (denying protective order finding no good cause shown) (citing *Skellerup Indus. Ltd. v. City of Los Angeles*, 163 F.R.D. 598, 600 (C.D. Cal. 1995) and *Gray v. First Winthrop Corp*., 133 F.R.D. 39, 40 (N.D. Cal. 1990)); *See also Murphy v. Cont. Tire N. Am., Inc*., No. CV 09-3004 GHK FMO, 2010 WL 3260183, at *1-2 (C.D. Cal. Aug. 9, 2010) (Court refused to enter protective order as stipulated by the parties).

Even where good cause is shown, the court must balance the interests in freely allowing discovery against the burdens to the party or non-party of

disclosing such information.  *Id*.  Finally, "it is well-established that [under the Federal Rules of Civil Procedure,] the fruits of pretrial discovery are, in the absence of a court order to the contrary, presumptively public."  *Verizon California Inc. v. Ronald A. Katz Tech. Licensing, L.P*., 214 F.R.D. 583, 585-86 (C.D. Cal. 2003) (citing *San Jose Mercury News, Inc. v. United States District Court— Northern District*, 187 F.3d 1096, 1103 (9th Cir. 1999)).

Here, there is no evidence to support FSC's claim that the documents and information it seeks to protect are proprietary, or are for any other reason in need of protection.  Further, even assuming such documents and information may be construed as sensitive, FSC cannot demonstrate good cause for issuing a protective order.  FSC's demand that Intervenor obtain or agree to a protective order is based on speculative arguments that confidential information may be obtained and misused at and following the deposition.

Intervenor respectfully requests that the Court compel the depositions of Ms. Duke, Mr. Douglas and Mr. Kernes without further delay or conditions.

## C.    The Deponents' Contentions Regarding The Deposition Subpoenas At Issue.

Prior to being deposed, the Deponents asked Mr. Weinstein to agree to two precautions:  (1) a protective order, such as the Court's Form Protective Order, that would protect confidential information and ensure that discovery was not used for purposes unrelated to this litigation, and (2) a watermarking procedure that would ensure that deposition testimony was not leaked in violation of the protective order. Mr. Weinstein rejected both precautions.

Mr. Weinstein's position is that nothing that can be said at a deposition involving sexually transmitted infections and the internal affairs of a trade association could possibly be non-public.  He is wrong.  Numerous topics of the depositions—FSC board meetings, financial details, and information regarding

proprietary databases—are non-public and sensitive.  Furthermore, Mr. Weinstein's argument ignores another rationale for the protective order:  to ensure that depositions are not used for purposes outside of this litigation.  Mr. Weinstein believes that he is engaged in a "war of attrition" against FSC and its members; and Mr. Weinstein refuses to provide any assurance that he will not use the information to attack the Deponents or FSC outside of this lawsuit.  To the extent that Mr. Weinstein believes that any information is improperly designated as confidential, the protective order would provide a mechanism for challenging designations.

In light of Mr. Weinstein's refusal to enter into a protective order, the Deponents' counsel asked Mr. Weinstein to agree to a separate precaution: that a watermark be imposed over the deponent's image in a deposition video.  This watermark would identify the party receiving the video from the court reporting service.  For example, plaintiff's copy of the video would have a "VIVID" watermark; and Mr. Weinstein's copy of the video would have a "WEINSTEIN" watermark.  The watermark would ensure that, if a deposition video were leaked online (an increasingly common practice used by litigants to embarrass deponents), then the source of the leak could be identified.  This watermark would be removed for any videos shown at trial.  Mr. Weinstein refused, and he declined to offer any reason.  He could identify no prejudice to him.  This raised further questions about what Mr. Weinstein intended to do with the broad discovery that he was seeking.

As described in more detail below, the Court should not require the Deponents to appear for depositions until there is an appropriate protective order that ensures that:  (1) confidential information will remain confidential, and (2)  discovery will be used only for purposes of this litigation.  Moreover, in light of Mr. Weinstein's intent to use discovery for purposes unrelated to this litigation, the Court should not require the Deponents to appear for depositions until Mr.

NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL

Weinstein's agrees to a watermarking procedure to prevent leaks of deposition videos.

### 1. The Depositions Will  Address Confidential Information Regarding Internal Matters of FSC.

Mr. Weinstein seeks to depose the Chief Executive Officer of FSC, Chairman of the Board of FSC, and the Board Secretary.  The topics of these depositions can be understood from the Requests for Production upon FSC, which address:

- FSC's finances in connection with the PASS system (Azulay Decl. Ex. B at RFP. No. 3)
- Legal agreements between FSC and participants in the PASS system. *Id*. at RFP No. 2 & 4.
- Every FSC communications since 2010 with producers, agents and testing facilities who participate in the PASS system.  *Id*. at RFP No. 6

FSC does not publicize all of its financial information; it does not make publicly available every legal agreement in connection with PASS; and each communication since 2010 with producers, agents and testing facilities regarding PASS is not public.  (Declaration of Diane Duke ("Duke Decl.") ¶ 9)  FSC considers much of this information to be confidential—particularly from organizations, such as that of Mr. Weinstein, that have sought, for years, to damage FSC.  Moreover, FSC's board meetings are not open to the public:  to the contrary, they are private in order to enable board members to discuss the internal matters of FSC freely and in confidence.  *Id*.

In the second page of its Form Protective Order, the Court acknowledges that confidential information can include "confidential business or financial information, information regarding confidential business practices" and "information otherwise generally unavailable to the public."  Much of the

information that may be sought during depositions of the Deponents falls into these categories.[4]  Indeed, Mr. Weinstein's organization, AHF, has sought a protective order to ensure the confidentiality of materials distributed within its organization.  *See United States of America v. AHF* (0:14-cv-61301-KMW) (S.D. Fl.) (Dkt. No. 50 at p. 2) (seeking protective order with respect to "materials obtained through or in connection with Plaintiffs' employment with AHF, which also contains confidential information").

In the absence of a protective order that ensured the proper handling of this information, FSC's counsel would instruct the witnesses not to answer when a question seeking confidential information arose—until the Court could make line-by-line determinations regarding any protections afforded to the information.  This kind of piecemeal adjudication, which would likely require multiple depositions of the same non-parties, would impose a burden upon the Court and non-parties.[5]  In fact, in the Joint Rule 26(f) Report, Mr. Weinstein acknowledged discovery issues that can "be worked out via a stipulated protective order."  (Dkt. No. 86 at 5:8-9) But Mr. Weinstein seems to be taking the position that only his documents potentially merit a protective order, whereas a non-party's documents do not.

### 2.     The Depositions Will Address Sensitive Medical Information of Third Parties.

Mr. Weinstein argues that he is "entitled to discovery on the tests, test

---

[4] This is not to suggest that every piece of information disclosed during a deposition would be confidential or highly confidential.  But without a protective order, the Deponents would be faced with the choice of:  (1) refusing to answer questions that required disclosure of non-public information, or (2) making confidential information public.

[5] *See Minter v. Wells Fargo Bank, N.A.*, No. CIV WMN-07-3442, 2010 WL 5418910, at *3 (D. Md. Dec. 23, 2010) ("'Umbrella' or 'blanket' protective orders have become a common feature of complex litigation in the federal courts.  Such orders are intended to 'expedite production, reduce costs, and avoid the burden on the court of document-by-document adjudication.' Manual for Complex Litigation § 11.432 (4th ed. 2010).").

1  results, screening methods, and treatment for STIs to evaluate the legitimacy of
2  Plaintiffs' claims."  *See supra* at Section I(A)(2).  These topics of the depositions
3  touch upon sensitive medical information.

4      Mr. Weinstein's organization has recognized "the stigma still attached to
5  HIV."  *United States of America v. AHF* (0:14-cv-61301-KMW) (S.D. Fl.) (Dkt.
6  No. 50 ¶ 3)  Likewise, there may still be a stigma attached to other sexually
7  transmitted infections that are the subject of Mr. Weinstein's discovery, including
8  gonorrhea, herpes and syphilis.  *See, e.g., Evans v. Rite Aid Corp.,* 324 S.C. 269,
9  273, 478 S.E.2d 846, 848 (1996) ("A statement that another is suffering from
10  a…venereal disease constitutes slander per se.").

11      Mr. Weinstein argues that none of this information is sensitive because he is
12  not seeking personally identifying patient information.  But in the give-and-take of
13  a deposition, there is a risk that personal information may be disclosed.  Given the
14  sensitivity of the information at issue, the potential to designate specific testimony
15  as confidential is a necessary precaution.

16      Again, Mr. Weinstein is insisting that FSC adopt a position that he refuses to
17  adopt vis-à-vis his own organization.   In August 2015, AHF moved to seal
18  documents containing "patient information relating to services rendered by AHF."
19  *United States of America v. AHF* (0:14-cv-61301-KMW) (S.D. Fl.) (Dkt. No. 50
20  ¶ 3).  AHF emphasized that it is best to err on the side of caution when dealing
21  with sensitive medical information. *Id*.  ("Although there is reason to believe that
22  the AHF patient whose medical information is at issue has already publicly
23  disclosed his health condition, AHF still believes that sealing is appropriate….").
24  No less protection should be afforded to any personal information in the possession
25  of the deponents.

26      **3.    Because Mr. Weinstein Has Engaged in a Long-Standing**
27            **Campaign against FSC and its Members, a Protective**

**NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL**

**Order Is Necessary to Ensure that Discovery Is Only Used For This Litigation.**

> **(a)** **Mr. Weinstein Has Engaged in a Long-Standing Campaign Against FSC and the Adult-Entertainment Industry on Whose Behalf FSC Works.**

Mr. Weinstein has been engaged in a long campaign against FSC, its CEO and its members in the adult-entertainment industry.[6] For example:

- A series of emails from 2010 and 2011 relating to Mr. Weinstein and his organization indicate that:

  - In February 2010, Mr. Weinstein sent an email stating, "We are interested in finding performers who would be willing to participate in filing a suit against a [adult performer testing clinic] for violating their privacy. Do you know anyone?  We would cover any legal costs." (Declaration of Jonathan Gottfried ("Gottfried Decl.") Ex. 1 at p. 1/119)

  - In October 2010, a senior director at AHF described to Mr. Weinstein the attacks against FSC as "a war of attrition."  Mr. Weinstein responded that a recent editorial in the *LA Times* was a "blow to their solar plexus." (*Id.* at p. 28/119)

  - In August 31, 2011, Mr. Weinstein organized a press conference to announce the filing of nuisance complaints against an adult production company by plaintiffs whom AHF solicited.  (*Id.* at p. 112/119)

  - In 2011, Mr. Weinstein's organization made financial contributions to a faith-based organization, whose members claimed to be the "main voices

---

[6] Mr. Weinstein's attorneys in this action are in-house counsel with AHF.  *See, e.g.,* http://members.calbar.ca.gov/fal/Member/Detail/283424

**NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL**

for the adult film industry" but regularly appeared publicly to criticize the industry.  *Id*. at p. 52/119 (email of May 8, 2011 stating that if Mr. Weinstein/AHF "want[s] us to show up and testify as the main voices for the adult film industry…[m]aybe AHF could even financially assist us more?") *See also id*. at p. 54/119 (email from AHF employee that "we have been more than generous with assisting her organization"); *id*. at p. 52/119 (email from Mr. Weinstein that "AHF has always been happy to pay any of Pink Cross's expenses.").

- In April 2011, Mr. Weinstein learned that FSC was organizing a meeting for industry members to discuss workplace safety protocols.  He emailed his colleagues at AHF, "Who could we dress up to sneak in?"  (*Id*. at p. 50-51/119)

- Employees of Mr. Weinstein's organization regularly interacted with media outlets, including the *Los Angeles Times* and ABC, to publicize attacks on the adult-entertainment industry.  In one email, an employee at AHF wrote to Mr. Weinstein: "ABC managed to do two quotes about porn, where you referred to animals and pedophilia!  Nice." (*Id*. at p. 114/119)   In another email to Mr. Weinstein, an AHF employee writes: "If we go after [an adult production company] at the same time we attack AIM, we link AIM to [the adult studio].  Suddenly they aren't just an innocent clinic serving sex workers—they are scum who are enabling the horrible abuse of women—we can frame the issue and ramp up the ick factor exponentially." (*Id*. at p. 14/19)

- In August 2011, Mr. Weinstein provided money to an individual who later appeared at an AHF press conference and criticized the adult-entertainment industry for safety precautions (*id*. at p. 88/19 (Mr. Weinstein stating on August 5, 2011 that he "would be willing to front the money

NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL

personally on a temporary basis" to Derrick Burts) & Gottfried Decl. Ex. 2 (press release by AHF describing their press conference with Mr. Burts))

- In an article on AHF's website dated September 30, 2011, Mr. Weinstein accused the adult industry and FSC of being engaged in "a full-scale cover-up" in its reaction to HIV.  (Gottfried Decl. Ex. 3*)*

- In March 2012, Mr. Weinstein's organization sent a letter to Los Angeles County's Director of Public Health, accusing a production company of violating the Los Angeles County Health and Safety Code. (Gottfried Decl. Ex. 4)

- According to an AHF press release dated September 13, 2015 and distributed online, individuals associated with AHF filed seven complaints with the Los Angeles County Department of Public Health against seven producers for "not taking out required film permits." (Gottfried Decl. Ex. 5)

- On October 8, 2015, Mr. Weinstein issued a press release stating that "the industry, its trade group the Free Speech Coalition and FSC head Diane Duke, are basically cheaters—cheating on performer safety for years…." AHF also accused FSC and its CEO of violating campaign-finance laws. (Gottfried Decl. Ex. 6)

> **(b)   A Protective Order Is Necessary to Ensure that Discovery Provided by the Deponents and FSC Is Only Used For This Litigation.**

The Court's Form Protective Order ensures that protected material produced by a non-party is used "in connection with this Action only for prosecuting, defending, or attempting to settle this Action."  (Form Protective Order ¶ 7.1)  This provision is critical to ensuring that Mr. Weinstein does not use confidential information obtained via depositions for purposes unrelated to this litigation.  As explained in the preceding section, Mr. Weinstein envisions that he is engaged in a

19

"war of attrition" against FSC; Mr. Weinstein and his organization solicit plaintiffs to sue businesses in the adult-entertainment industry; Mr. Weinstein aggressively uses the media (including the Internet) and press conferences to publicize negative information about FSC and the industry; and Mr. Weinstein and his organization pay people and entities who attack FSC and the industry.  This conduct dates back at least five years (well before the filing of this lawsuit).  A protective order is necessary in order to ensure that information produced pursuant to a subpoena from this Court is not used by Mr. Weinstein in his broader campaign against FSC, its officers and the adult-entertainment industry.

One example of how Mr. Weinstein may abuse the discovery process is the following:  Mr. Weinstein seeks to depose Mark Kernes, a journalist who reports on the adult-entertainment industry and is the secretary on the board of FSC.  Mr. Kernes' relevance to this lawsuit is weak, at best; and Mr. Weinstein is already deposing the CEO and board chair of FSC.  Mr. Weinstein never explains what additional information he hopes to obtain from Mr. Kernes that cannot be obtained through the other members of FSC.

But in September 2015, Mr. Weinstein's organization issued a press release that Mr. Kernes stated on the radio that adult-film producers are "breaking the law…by not taking out required film and public health permits."  (Gottfried Decl. Ex. 8)  This issue is not relevant to the constitutionality of Measure B; and, in the past, Mr. Weinstein's organization has been involved in lawsuits against adult-film producers for allegedly not having the requisite permits.  (*Id*. Exs. 4 & 5 at p. 4/6)  This suggests that Mr. Weinstein's goal in deposing Mr. Kernes is to obtain information that can be used outside of this action—namely, to pursue lawsuits or instigate criminal complaints against non-parties in unrelated litigation.  Despite his dubious relevance to this case, Mr. Kernes is not refusing to testify.  Mr. Kernes' position is simply that a protective order should ensure that confidential

testimony is not misused for purposes unrelated to this litigation.[7]

The fact that Mr. Weinstein has opposed any protective order vis-à-vis the deponents is telling and disturbing as it suggests that Mr. Weinstein, in fact, intends to use the information disclosed in this lawsuit as part of his larger campaign against FSC and its industry.[8]

### 4. A Watermark in the Video of the Deposition Is Necessary to Ensure that the Video Is Not Leaked.

With the advent of the Internet, numerous videotaped depositions have been leaked online to tabloids and made available to the public on video-sharing websites, like YouTube. *See, e.g.,* https://www.youtube.com/watch?v=ZIxmrvbMeKc;

---

[7] The depositions also raise other issues regarding sensitive information. As a journalist, Mr. Kernes will not divulge sources and unpublished information, which benefit from a qualified privilege under the First Amendment from compelled disclosure. *See Shoen v. Shoen,* 5 F.3d 1289, 1294 (9th Cir. 1993); *Carushka, Inc. v. Premiere Products, Inc.*, No. CV 87 02356 DT (JRX), 1989 WL 253565, at *2 (C.D. Cal. Sept. 1, 1989); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 489, 494 (C.D. Cal. 1981). And, as a lawyer who has provided legal advice to FSC, Mr. Douglas will not answer questions that seek to reveal the substance of legal advice provided to FSC. *See Great Plains Mut. Ins. Co. v. Mut. Reinsurance Bureau,* 150 F.R.D. 193, 198 (D. Kan. 1993) (citing cases from various jurisdictions); *In re Grand Jury 90-1,* 758 F. Supp. 1411, 1413 (D. Colo. 1991).

[8] The cases relied upon by Mr. Weinstein in his arguments against a protective order are inapposite. Most of the cases involve a different kind of protective order than the one at issue here: an order that seeks to avoid producing discovery. *See Sullivan v. Prudential Ins. Co. of Am.*, 233 F.R.D. 573 (C.D. Cal. 2005) (seeking a protective order to prevent disclosure of several categories of discovery); *Skellerup Indus. Ltd. v. City of Los Angeles*, 163 F.R.D. 598 (C.D. Cal. 1995) (involving protective order to stay all discovery); *Gray v. First Winthrop Corp*., 133 F.R.D. 39 (N.D. Cal. 1990) (involving protective order to stay discovery). In contrast, neither FSC nor the other subjects of Mr. Weinstein's subpoena seek to avoid discovery. They simply want limits on how the discovery will be used outside of this litigation. The sole case cited by Mr. Weinstein that involves the kind of protective order at issue here—*Murphy v. Cont'l Tire N. Am., Inc.,* No. CV 09-3004 GHK FMO, 2010 WL 3260183 (C.D. Cal. Aug. 9, 2010)—concerned a protective order with provisions (*e.g*., requiring the court to return or destroy confidential documents) that are not at issue. The Deponents and FSC seek an order similar to the Court's Form Protective Order.

**NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL**

https://www.youtube.com/watch?v=n_kbtKL3Z94. By revealing the source of any video, the use of watermarks in videos can be used to prevent the improper distribution of video depositions outside of this action (*e.g.,* for public viewing on the Internet). *See, e.g., Fahmy v. Jay-Z*, 2:07-cv-05715 (Dkt. No. 644) (describing the use of a watermarking procedure).[9]  In light of Mr. Weinstein's campaign against FSC and his aggressive use of media (including the Internet), the deponents requested that videos of the depositions be watermarked with the receiving party's name imposed over the deponent's image.  For example, any copy of the video deposition received by Mr. Weinstein would have a watermark of "Weinstein" imposed over the deponent's image.  Any copy of the video deposition received by Vivid would have a watermark of "Vivid" imposed over the deponent's image. The originals of the video would be maintained by the court reporter, and additional copies would not be made without the written permission of the deponents.  This process would ensure that any videos leaked online could be traced backed to the source.  This watermark would be removed for any video played at trial.  Although Mr. Weinstein opposes this precaution, he offers no rationale and details no prejudice.  In fact, the only prejudice to Mr. Weinstein would be if he intended to leak these videos and sought to hide that he was the source.

***

Consequently, the deponents respectfully request that:  (1) they not be required to appear for a deposition without a protective order that ensures the protection of any confidential information and that any protected information disclosed is used only for this case, and (2) Mr. Weinstein be required to abide by a

---

[9] The cited motion involved the removal of the watermark for purposes of trial—something which the Deponents here agree to.

NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL

1   watermarking procedure that ensures that videos are not leaked.

2   **III.   THE DOCUMENT SUBPOENA ON FSC**

3       **A.   Requests for Production At Issue**

4   **REQUEST FOR PRODUCTION NO. 1:**

5       All DOCUMENTS which show the identities of all producers, agents, and/or

6   testing facilities that currently participate in, use, and/or access the PASS

7   DATABASE and/or the APHSS DATABASE.

8   **RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

9       FSC will produce documents sufficient to identify the testing services that

10  currently participate in, use and/or access the DATABASES.  FSC objects to the

11  remainder of this request because it:

12  •  Violates the right to privacy under the California and federal

13      constitutions.

14  •  Violates the right to freedom of association under the California and

15      federal constitutions.  *See Nat'l Ass'n for Advancement of Colored*

16      *People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 466 (1958)

17      ("We hold that the immunity from state scrutiny of membership lists

18      which the Association claims on behalf of its members is here so

19      related to the right of the members to pursue their lawful private

20      interests privately and to associate freely with others in so doing as to

21      come within the protection of the Fourteenth Amendment."); *Britt v.*

22      *Superior Court*, 20 Cal.3d 844, 852 (1978) ("[P]eaceful and lawful

23      associational activity is, without question, constitutionally protected

24      activity which, under both our state and federal Constitutions, enjoys

25      special safeguard from governmental interference."); *Bursey v. United*

26      *States*, 466 F.2d 1059, 1084 (9th Cir. 1972) ("Freedom of association

27      was secured not only to protect the privacy of those who assert their

23

**NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL**

rights in litigation, but also to shelter all persons from unjustifiable governmental prying into their associations  with lawful groups.").
See also Dkt. No. 44 at 7:20-23 ("[U]nder California law, proponents of a ballot measure are considered to have a protectable interest that they have assumed on behalf of the state....").

- Violates federal and state statutes limiting the disclosure of identifying medical information (e.g., because producers and agents may "participate in" the DATABASES because of the provision of healthcare to those producers or agents).

- Seeks confidential information, is overly broad and requests irrelevant information.

## REQUEST FOR PRODUCTION NO. 2:

All DOCUMENTS which RELATE TO any and all contracts and/or agreements with all producers, agents, and/or testing facilities that currently participate in, use, and/or access the PASS DATABASE and/or the APHSS DATABASE for the participation in, use of, and/or access to each database.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

Upon the entry of a protective order that adequately protects the confidentiality of this information, FSC will produce the Letter of Understanding Concerning the PASS Availability Index. FSC is not aware of any other documents responsive to this request.

FSC objects to this request because it:

- Violates the right to privacy under the California and federal constitutions.

- Violates the right to freedom of association under the California and federal constitutions.

24

NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL

1  •  Seeks confidential information, is overly broad and requests irrelevant
2  information.

3  **REQUEST FOR PRODUCTION NO. 3:**

4  All DOCUMENTS which RELATE TO any and all costs to and/or money
5  paid by all producers, agents, and/or testing facilities that currently participate in,
6  use, and/or access the PASS DATABASE and/or the APHSS DATABASE to
7  participate in, use, and/or access the database.

8  **RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

9  FSC is not aware of any documents in its possession, custody or control
10  relating to money that producers, agents and/or testing facilities pay in order to
11  participate in, use and/or access the DATABASES.

12  FSC objects to this request because it:

13  •  Violates the right to privacy under the California and federal
14  constitutions.

15  •  Violates the right to freedom of association under the California and
16  federal constitutions.

17  •  Seeks confidential information, is overly broad, is unduly burdensome
18  and expensive, and requests irrelevant information.

19  **REQUEST FOR PRODUCTION NO. 4:**

20  All DOCUMENTS which RELATE TO all terms and/or conditions and/or
21  requirements by which all producers, agents, and/or testing facilities that currently
22  participate in, use, and/or access the PASS DATABASE and/or the APHSS
23  DATABASE, must abide by in order to be allowed to participate in, use, and/or
24  access the database.

25  **RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

26  Upon the entry of a protective order that adequately protects the
27  confidentiality of this information, FSC will produce the Letter of Understanding

25

NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL

Concerning the PASS Availability Index.  FSC is not aware of other documents responsive to this request.

FSC objects to this request because it:

- Violates the right to privacy under the California and federal constitutions.

- Violates the right to freedom of association under the California and federal constitutions.

- Seeks confidential information, is overly broad, is unduly burdensome and expensive, and requests irrelevant information.

**REQUEST FOR PRODUCTION NO. 5:**

All DOCUMENTS which RELATE TO any and/or all information provided to any and/or all producers, agents, and/or testing facilities that currently participate in, use, and/or access the PASS DATABASE and/or the APHSS DATABASE, when they participate in, use, and/or access the database.

Information that would disclose the identity of individual Performers (as that term is used at http://fscpass.com/about_us)  may be redacted from the DOCUMENTS, including, but not limited to the following: name, date of birth, social security number, address, and/or phone number.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

FSC objects to this request because it:

- Is unduly burdensome and expensive, seeking to impose upon FSC the burden of collecting and extensively redacting sensitive documents containing information on thousands of participants in the DATABASES with tens of thousands of entries over the course of more than four years.

- Violates the right to privacy under state and federal constitutions, including the California constitution.

**NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL**

- • Violates the right to freedom of association under the California and federal constitutions.

- • Violates federal and state statutes limiting the disclosure of identifying medical information.

- • Seeks confidential information, is overly broad and requests irrelevant information.

**REQUEST FOR PRODUCTION NO. 6:**

All COMMUNICATION, created and/or received during the period January 1, 2010 to the present, between and/or among any employee, agent, and/or member of the Free Speech Coalition and any and all producers, agents, and/or testing facilities that currently participate in, use, and/or access the PASS DATABASE and/or the APHSS DATABASE that RELATE TO the PASS database and/or the APHSS DATABASE.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

FSC objects to this request because it:

- • Is unduly burdensome and expensive, seeking to impose upon FSC the burden of collecting and extensively redacting numerous sensitive communications over more than five years.

- • Violates the right to privacy under the federal and state constitutions (including the California constitution).

- • Violates the right to freedom of association under the California and federal constitutions.

- • Violates federal and state statutes limiting the disclosure of identifying medical information.

- • Seeks confidential information, is overly broad and requests irrelevant information.

**REQUEST FOR PRODUCTION NO. 7:**

All COMMUNICATION, created and/or received during the period January 1, 2010 to the present, between and/or among any employee, agent, and/or member of the Free Speech Coalition and any and all producers, agents, and/or testing facilities that currently participate in, use, and/or access the PASS DATABASE and/or the APHSS DATABASE that RELATE TO a sexually transmitted infection (a sexually transmitted infection includes, but is not limited to, Bacterial Vaginosis (BV),Chlamydia, Gonorrhea, Viral Hepatitis, Genital Herpes, HIV/AIDS, Human Papillomavirus (HPV), Pelvic Inflammatory Disease (PID), Syphilis, and Trichomoniasis). Information that would disclose the identity of individual Performers (as that term is used at http://fscpass.com/about_us) may be redacted from the documents and/or records, including, but not limited to the following: name, date of birth, social security number, address, and/or phone number.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

FSC objects to this request because it:

- Is unduly burdensome and expensive, seeking to impose upon FSC the burden of collecting and extensively redacting numerous sensitive communications over more than five years.

- Violates the right to privacy under the federal and state constitutions (including the California constitution).

- Violates the right to freedom of association under the California and federal constitutions.

- Violates federal and state statutes limiting the disclosure of identifying medical information.

- Seeks confidential information, is overly broad and requests irrelevant information.

NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL

**B.     Intervenor's Contentions Regarding the Requests At Issue**

      **1.     Requiring Intervenor To Obtain Or Agree To A Protective Order Prior to Producing Documents Is Improper**

Although far from complying with the requests, FSC has agreed to produce a limited amount of documents in response to Requests 2 and 4 but only upon the entry of a protective order.  FSC's demand that Intervenor obtain or agree to a protective order before producing any documents fails for the same reasons stated above in Section II.B.2 with respect to FSC's refusal to produce the individuals for depositions. There is no legal authority for such a request.  FSC failed to file a motion for a protective order to address its alleged concerns over privacy, confidentiality and misuse of confidential information.

Again, FSC is attempting to appear that it is inclined to comply with some of the discovery requests but at the same time obstructing and delaying Intervenor's ability to obtain the discovery by insisting on a protective order without moving for one.  This approach is not permissible under the federal rules.

FSC should be ordered to produce all responsive documents immediately.

      **2.     FSC's Objections Lack  Merit**

FSC generally objects to Intervenor's requests for documents related to sexually transmitted infections that were transmitted in the making of adult films based on its assertion that the request (a) violates right to privacy; (b) violates the freedom of association; (c) violates state and federal statutes on Protected Health Information ("PHI") because agents and producers may participate in those websites because of the provision of healthcare; (d) seeks confidential information, is overly broad and requests irrelevant information.  Azulay Decl., ¶ 6, Exhibit G.

As an initial matter, conclusory statements about the objectionable nature of discovery requests are not sufficient.  Rather, the burden is on the objecting party to show grounds for failing to provide the requested discovery.  So merely stating

that the request seeks confidential information, is overly broad and requests irrelevant information is insufficient.  *Oakes*, 179 F.R.D at 283.  As discussed above, all of the requests are relevant to the Plaintiffs' claims that the adult film industry takes adequate steps to protect its performers such that Measure B is unnecessary.

### a.    The Requests Do Not Seek Information That Would Violate HIPPA

FSC presumably relies on legal arguments related to privacy to refuse production of any documents.  FSC's objections are misplaced as Intervenor's Subpoena for documents does not actually require personal health information or any patient-identifiable information that would violate the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  Specifically, Intervenor is not seeking the names, addresses, birthdates, or social security numbers of any patients.

The information sought by Intervenor is similarly not barred from disclosure by Federal HIPAA regulations.  In fact, the HIPAA regulations explicitly allow the disclosures contemplated here.  As noted above, Intervenor is not seeking any personally identifying patient information.

HIPAA allows disclosure of data where it has been scrubbed of any of the specific identifiers listed at 45 CFR § 164.514(b)(2).  Moreover, § 164.514(a) expressly states that "[h]ealth information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify an individual is not **individually identifiable health information**." (Emphasis added).  Intervenor submits that it is merely seeking data regarding the prevalence of STDs, and is *not* seeking individually identifiable health information.

For example, Request 5 seeks any and/or all information provided to any

and/or all producers, agents, and/or testing facilities that currently participate in, use, and/or access the PASS DATABASE and/or the APHSS DATABASE—this essentially is the data uploaded that states a performers' availability to work, which is indicative of a positive or negative test result.  Request No. 1 merely seeks to know which producers, agents and testing facilities participate in the PASS system.  This is not PHI - just the identity of users of a website.  Further, even if individual producers or agents were accessing PASS for their own personal work status results, these work status results on the PASS website do not contain any actual test results, and therefore do not contain PHI.  The PASS website was set up the way it is—posting work status as opposed to actual test results—for the very reason of itself avoiding a violation of the laws under HIPAA.  Indeed, the PASS website states in its answers to the FAQ of whether the database contains medical records:  "No. The database contains only information needed to verify performers' availability, which is updated when you are tested at an FSCPASS.com participating testing facility."  *See* Azulay Decl., ¶ 4, Exhibit C (Webpages of FSC website).  It also states that PASS is a secure database that ensures performer privacy and protects producer liability.  *Id*.  Because Intervenor seeks information that is not personally identifiable health information, none of the laws and regulations that FSC cited in its objections are applicable.

As individuals involved in serving the needs of people living with HIV/AIDS, Intervenor is extremely sensitive to the privacy concerns surrounding medical records. Intervenor merely seeks the information uploaded to PASS, the information regarding availability that is assessed on PASS, and the identities of producers, agents and testing facilities that use PASS.  Intervenor does not seek to identify individual patients, and is more than willing to ensure that even de-identified data is maintained in a format that will guarantee privacy and

1  confidentiality.[10]

2  **b.    The Requests Do Not Violate the Right of Association**

3  **of FSC Or Its Members**

4      FSC also objects on the grounds that the requests violate the right to freedom

5  of association under the California and federal constitutions. However, this

6  objection lacks merit as well. Here, Plaintiffs in the above-titled case contend that

7  their PASS system is effective at reducing the risk of the spread of STIs. Parties to

8  the case have the right to investigate how the PASS system works and whether it is

9  as effective as Plaintiffs contend.  To do so, Intervenor needs to know who

10  participates in PASS and how the system works.  The cases FSC cites are

11  inapposite.  Seeking this information is certainly not a government action targeting

12  an associated crowd for the purpose of prying or punishing.  Further this is a matter

13  of discovery directly related to the issues in the case, not a challenged statute

14  requiring FSC to disclose its participants on a regular basis.

15      Courts have repeatedly held that the freedom of association does not apply

16  to customer or member lists.  The "members" who are producers, agents and

17  testing facilities are in reality customers—they pay fees in exchange for products

18  and services designed to assist them in the adult film industry.  Indeed, producing

19  customer lists does not offend the First Amendment because commercial

20  transactions do not give rise to associational rights. *IDK, Inc. v. County of Clark*,

21  836 F.2d 1185, 1193 (9th Cir.1988) (escort/client relationship not protected by

22  freedom of association); *In re PHE, Inc.*, 790 F. Supp. 1310, 1317 (W.D. Ky.

23  1992) (holding that commercial relationship between publisher and its customers

24  was not protected "associational right" under First Amendment); *In re Grand Jury*

25

26  [10]      Although Intervenor does not believe it is required, it would also agree to enter into a confidentiality agreement regarding PHI. It would also stipulate to return or destroy any disclosed information at the end of litigation.

27

*Subpoena Served Upon Crown Video Unlimited, Inc.*, 630 F. Supp. 614, 619 (E.D.N.C. 1986) ("commercial relationship arising from the sale of videotapes by the subpoenaed corporations to their customers is not protected by the first amendment's freedom of association," even though videotapes themselves were protected form of speech).

Thus, FSC's privacy objections, including its objections based on HIPAA and the right of association lacks merit.

### c.   Summary of the Requests That FSC Should Be Compelled To Provide Further Responses And Produce Documents

As shown, FSC's objections to the subpoenaed documents lack merit.  For the convenience those documents requests are summarized as follows:

Request No. 1 seeks documents related to identities of producers agents and/or testing facilities that use PASS or APHSS.  FSC has only agreed to produce documents sufficient to identify the testing services that currently participate in, use and/or access the PASS databases.  FSC should be compelled to produce all responsive documents and also verify that no documents are being withheld based on its objections and/or privilege.

Request No. 2 seeks documents related to agreements with producers, agents and/or testing facilities that use PASS.  FSC indicates that it will produce the Letter of Understanding Concerning the PASS Availability Index and that it is unaware of any additional documents responsive to this request.  FSC should be compelled to produce the document immediately without the entry of a protective order and also verify that no additional documents are being withheld based on its objections and/or privilege.

Request No. 3 seeks documents related to costs or money paid by producers, agents or testing facilities to participate in the PASS System.  FSC's response that

it is unaware of any responsive documents is highly dubious given that the PASS website itself makes clear that PASS is only free of charge to performers, not producers, agents, or testing facilities.  FSC should be compelled to produce any responsive document immediately without the entry of a protective order and also verify that no additional documents are being withheld based on its objections and/or privilege.

Request for Production No. 4 seeks documents related to terms and conditions of using PASS.  FSC has indicated that it will produce a document responsive to this request so long as a protective order is entered into, and states that it is unaware of any other responsive documents.  FSC should be compelled to produce all responsive documents immediately without the entry of a protective order and also verify that no additional documents are being withheld based on its objections and/or privilege.

Request No. 5 seeks documents related to information provided to producers, agents or testing facilities that use PASS.  Request for Production No. 6 seek communications related to PASS, between FSC and producers, agents or testing facilities that use PASS.  Request No. 7 seeks communications between FSC employees and producers, agents or testing facilities that use PASS that are related to sexually transmitted infections.  FSC refuses to produce any documents responsive to these requests based on its objections. FSC should be compelled to produce all responsive documents immediately without the entry of a protective order.

In an effort to resolve the dispute on Request Nos. 6-7, Intervenor narrowed the requests to seek:

- All communications regarding moratoria or production holds within the last 5 years.

NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL

- All communications regarding FSC's or the adult film industry's decision to go from testing every 30 days to every 14 days.

- All communications regarding what STIs are required to be tested for in order to get an "available" status.

- All communications regarding what tests must be used to test for the certain STIs identified that are required to be tested for in order to get an "available" status.

- All communications regarding the effectiveness, ineffectiveness, vulnerabilities, flaws or errors in the PASS and/or APHSS systems.

- All communications regarding a particular performer's STI status (all names and personal health information redacted unless the information is in the public domain).

- All communications regarding a performer's STI status being incorrect in the PASS or APHSS system.

- All group alerts from FSC to the producers, directors or agents of ADULT FILM, including but not limited to "FSCx-press" communications.

- All communications regarding any changes or modifications to the PASS and/or APHSS system.

Azulay Decl., ¶¶ 9, 10, Exh. L (November 16, 2015 letter from Azulay to Gottfried).

To date, Intervenor and FSC have yet to resolve their discovery disputes. As such, Intervenor respectfully requests that the Court enter an order compelling FSC to provide further responses and to produce all responsive documents to Intervenor's subpoena.

C. **FSC'S Contentions Regarding the Requests At Issue.**

1. **Requiring Intervenor Weinstein To Obtain Or Agree To A**

35

**Protective Order Prior to FSC's Production of Documents Is Proper**

In Section II(C), the Deponents explained that a protective order is necessary in order: (1) to protect confidential, sensitive information, and (2) to ensure that Mr. Weinstein uses confidential discovery in this action only for purposes of this action and not in his broader campaign against FSC and the members whom it represents.  Those same reasons support the conclusion that documents produced by FSC should benefit from a protective order.

**2.     Intervenor Weinstein's Efforts to Obtain a List of FSC's Producer/Agent Members Violate the Right of Association of FSC's Members.**

**a.     Background on FSC and the PASS System.**

Founded in 1991, FSC is the trade association of the adult entertainment industry based in the United States.  (Duke Decl. ¶ 2)  It monitors legislation affecting the industry and pursues litigation to defend the rights of its members. *Id*. It has been involved in:  (1) fighting an excise tax on adult products and services, (2) challenging a federal statute that regulated the creation and distribution of recorded images of sexual conduct, prevailing in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), and (3) opposing Measure B in Los Angeles County.  *Id.*

FSC's health-oriented work focuses on the PASS system, which was created in 2010 and, consistent with FSC's mission, addresses issues surrounding a safe work environment for adult film professionals.  As part of its safe-work platform, FSC has collected the names of thousands of members associated with the adult-entertainment industry who are aligned with FSC's goals.  (Duke Decl. ¶ 4) Certain of these members are identified as "producers" or "agents," while others are identified as "performers" (though there is overlap among these groups—such

1  that revealing the names of producers/agents will reveal the names of performers).

2  (*Id.*)  FSC sends emails to members of the PASS system regarding health and

3  regulatory issues affecting the adult industry.  FSC also uses social media—such as

4  Twitter and a blog—to communicate with PASS members.  The FSCPASS.org

5  blog provides up-to-date news on topics affecting the adult-entertainment industry.

6  (*Id.* ¶ 5)

7       The privacy of the identities of members associated with PASS is critical.

8  FSC describes PASS to its members as secure, with an emphasis on privacy.

9  (Duke Decl. ¶ 3)  FSC's list includes the actual names of producers/agents.  In

10  public, however, certain producers/agents use pseudonyms in order to protect their

11  privacy and ensure their safety.  *Id.* ¶ 8  In addition, certain performers work as

12  producers/agents.  *Id.* ¶¶ 8, 10.  Consequently, revealing the names of all

13  producers/agents on the PASS membership list will reveal the real names of

14  numerous performers.  *Id.* ¶ 8.  Furthermore, this list includes the names of

15  assistants of producers/agents/studios who are members of PASS.  These

16  individuals may not have publicly disclosed that they work in the adult industry.

17  Public disclosure of their names could be difficult for them.  *Id.*  For all of these

18  reasons, there is an overwhelming probability that FSC's health-focused work

19  would lose members if FSC could not protect the confidentiality of the identities of

20  its member.[11]  *Id.*

21       **b.  Compelling Disclosure of FSC's PASS Membership**

22       **List Would Violate the Member's Freedom of**

23       **Association under the First Amendment.**

24       **(i)    The First Amendment Is Applicable to**

25

26

27  ___

[11] These reasons further justify the entry of a protective order if FSC is required to divulge these names.

**NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL**

## Intervenor Weinstein's Efforts to Compel Disclosure.

Mr. Weinstein argues that the First Amendment does not apply to his efforts to compel disclosure of FSC's membership list because he is a private party.  That argument fails for two reasons.  *First*, even if Mr. Weinstein were acting in a private capacity (as discussed below, he is not), "judicial discovery orders inevitably involve state-compelled disclosure of presumptively protected information, [and] the [First Amendment] principles have equal application to purely private litigation."  *Britt v. Superior Court*, 20 Cal. 3d 844, 856 n.3 (1978).  *See also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, No.* 75 CIV. 5388 (MJL), 1985 WL 315, at *18 n.16 (S.D.N.Y. Feb. 28, 1985) (rejecting argument that First Amendment did not apply to compelled disclosure between private litigants); *Eilers v. Palmer*, 575 F. Supp. 1259, 1261 (D. Minn. 1984) (recognizing First Amendment associational rights in litigation between private parties).

*Second,* Mr. Weinstein is not acting in a private capacity.  Mr. Weinstein intervened in this action as an official proponent and part of the campaign committee for Measure B.  (Dkt. No. 24 at 1:4)  *See also id*. at 6:17-19 (explaining that intervenors' "unique status as a 'primarily formed ballot measure committee' under state law, distinguish their interest in Measure B from that of other supporters in the general public"); *id*. at 4:8-6:2 (explaining intervenors' unique powers under California law distinct from the general public).  In allowing Mr. Weinstein to intervene, this Court explained, "under California law, proponents of a ballot measure are considered to have a protectable interest that they have assumed on behalf of the state...." (Dkt. No. 44 at 7:20-24)  *See also Perry v. Brown*, 52 Cal. 4th 1116, 1127 (Cal. 2011) ("[T]he official proponents of [an] initiative are authorized...to appear and assert the state's interest in the initiative's validity.").  In defending Measure B, intervenors are assuming a task traditionally

38

performed by public officials.  *See id.* at 1149 ("[P]ublic officials ordinarily have the responsibility of defending a challenged law…").  Having assumed powers on behalf of the State, the intervenors are subject in this case to constitutional limitations placed upon state action.  *See Evans v. Newton,* 382 U.S. 296, 299 (1966) ("[W]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations….Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action.").

Consequently, Mr. Weinstein's motion to compel is not immune from the First Amendment.

> **(ii)   Intervenor Weinstein's Efforts to Compel Disclosure of the Identities of the PASS System's Members Infringe Upon Their Freedom of Association.**

Mr. Weinstein seeks to compel FSC to divulge the names of all agents/producers of FSC's PASS system throughout the nation.[12]  "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute a[n] effective … restraint on freedom of association…." *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).  The Supreme Court has therefore "recognized the vital relationship between freedom to associate and privacy in one's associations."  *Id.  See also id.* at 460-61 ("[I]t is immaterial whether the beliefs sought to be advanced by association pertain to political, economic,

---

[12] As discussed above, because producers may also act as performers, FSC would also be required to compel the real names of several performers.

religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."). In *NAACP*, the Supreme Court recognized that the First Amendment creates a qualified associational privilege from disclosure of certain information in discovery. In that case, the State moved to compel discovery of the organization's members and agents in the context of discovery in a pending case (in particular, in order to prove that the NAACP conducted intrastate activities). The U.S. Supreme Court ruled that "whatever interest the State may have in obtaining names of ordinary members has not been shown to be sufficient to overcome petitioner's constitutional objections to the production order." *Id.* at 465. Likewise, in *Britt v. Superior Court*, the California Supreme Court held that a litigation discovery order was not exempt from protection for freedom of association/speech under the federal and state constitutions. 20 Cal. 3d at 852. *See also Bates v. Little Rock*, 361 U.S. 516, 525 (1960) (upholding qualified First Amendment privilege against disclosure of membership list); *Bursey v. United States*, 466 F.2d 1059, 1084 (9th Cir. 1972) ("Freedom of association was secured not only to protect the privacy of those who assert their rights in litigation, but also to shelter all persons from unjustifiable governmental prying into their associations with lawful groups.").

In evaluating whether Mr. Weinstein's request infringed upon the First Amendment, the Court should consider: (1) whether Mr. Weinstein is seeking to compel disclosure of affiliation with a group, (2) whether Mr. Weinstein's requested discovery has a substantial bearing on, or goes to the heart of, the underlying case, and (3) whether there is a likelihood of a substantial restraint upon the exercise by the group's members of their right to freedom of association. *See NAACP*, 357 U.S. at 462, 464. If the Court answers these questions in the affirmative, then it should deny Intervenor Weinstein's motion to compel.

**Mr. Weinstein is seeking to compel disclosure of members' affiliation with a group.**

Mr. Weinstein is asking the Court to compel the disclosure of the affiliation between producers/agents and FSC. The associational privilege under the First Amendment protects an organization's internal activities, including membership, volunteers and contributors. *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 3 (D.D.C. 2002) ("The courts have long recognized the sensitivity of information related to such activities and consequently have ruled that the following information is protected by the First Amendment: membership and volunteer lists, contributor lists, and past political activities of plaintiffs and of those persons with whom they have been affiliated." (footnotes citing cases excluded)). And FSC's list of producer/agent members who are involved in its health-focused work warrants protection under the First Amendment. The PASS system falls under FSC's mission as the trade association for the adult-entertainment industry.[13] (Duke Decl. ¶ 3) Consistent with FSC's mission, the PASS system (including its members) focus on ensuring a safe and healthy work environment for adult film professionals. *Id*. ¶ 3. FSC uses the membership list to send emails to members of the PASS system regarding issues affecting the adult industry (*e.g.,* regulations and business issues); and the FSCPASS blog provides up-to-date news on legal and

---

[13] Mr. Weinstein mischaracterizes FSC's membership list as a customer list, and he claims that producers/agents "pay fees in exchange for products and service designed to assist them in the adult film industry." But members do not pay a fee in order to participate in the PASS system. (Duke Decl. ¶ 3) Even if they did, Mr. Weinstein cites no authority for the proposition that individuals who pay to become members of a group—or that groups associated with commerce or trade—are stripped of their associational rights. For example, in *Acorn Investments, Inc. v. City of Seattle*, 887 F.2d 219 (9th Cir. 1989), the Ninth Circuit struck down under the First Amendment a law that compelled disclosure of the names of shareholders of peep-show businesses. Furthermore and contrary to Mr. Weinstein's argument, the relationship between FSC and its members is not analogous to the relationships between an escort/client or between a video-store/distributor and its customers.

business topics affecting members of the industry.[14]  (*Id.* ¶ 5)  FSC also uses social media—such as Twitter—to communicate with PASS members about matters affecting the industry.  *Id.*   Consequently, FSC's list of PASS members is part of its efforts to advocate on behalf of the needs of the adult industry.

**Mr. Weinstein's requested discovery does not have a substantial bearing on, or goes to the heart of, the case.**

When compelled disclosure implicates associational rights, the next question is whether the requested discovery has a "substantial bearing" on the case. *NAACP,* 357 U.S. at 464.   When associational rights are implicated, a court must carefully analyze the relevance of the information sought:

> The interest in disclosure will be relatively weak unless the information goes to 'the heart of the matter,' that is, unless it is crucial to the party's case [citations omitted].  Mere speculation that information might be useful will not suffice....Second, courts must determine whether the litigants seeking disclosure have pursued alternative sources. Even when the information sought is crucial to a

---

[14] There is no dispute that FSC may assert associational rights under the First Amendment on behalf of its members.  The members would have standing to object in their own right; protecting the confidentiality of adult-industry members who are part of FSC's system is germane to FSC's role as the trade association of the adult-entertainment industry; and neither the First-Amendment claim asserted nor the relief requested (allowing FSC not to turn over lists of its members) requires the participation of individual members.  *See Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333, 342 (1977).  *See also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., & its Locals 1093, 558 & 25 v. Nat'l Right to Work Legal Def. & Ed. Found., Inc.,* 590 F.2d 1139, 1152 (D.C. Cir. 1978) ("Without doubt, the association itself may assert the right of its members and contributors to withhold their connection with the association.").  Furthermore, requiring the members to assert objections would undermine the confidentiality that FSC seeks to protect.  *See NAACP v. Alabama*, 357 U.S. 449, 459 (1958) ("If petitioner's rank-and-file members are constitutionally entitled to withhold their connection with the Association despite the production order, it is manifest that this right is properly assertable by the Association.  To require that it be claimed by the members themselves would result in nullification of the right at the very moment of its assertion.").

litigant's case, disclosure should be compelled only after the litigant

has shown that he has exhausted every reasonable alternative source

of information.

*International Action Center*, 207 F.R.D. at 4 (some internal quotation marks

omitted).  *See also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* No. 75 CIV.

5388 (MJL), 1985 WL 315, at *8 (S.D.N.Y. Feb. 28, 1985) ("[I]t is clear that First

Amendment privacy interests will be overridden only when the party seeking the

information asserts a compelling interest.").

    Mr. Weinstein has failed to prove that a list of the real names of all

producers/agents of the PASS system has a substantial bearing on—or goes to the

heart of the matter of—this case.  According to Mr. Weinstein's arguments above,

he must know the actual names of every producer/agent member of FSC's PASS

system because he has a "right to investigate how the PASS system works and

whether it is as effective as Plaintiffs contend."  This would purportedly enable

him to undermine plaintiff's argument that the "PASS system is effective at

reducing the risk of the spread of STIs."  But for the following reasons, Mr.

Weinstein's argument is unconvincing:

- FSC is already providing ample information regarding how the PASS
    system works, including:  (1) data from the PASS system available since its
    inception regarding all performers' availability or unavailability to work
    (stripped of all personally identifiable information pursuant to an agreement
    by the parties); (2) any documents regarding the efficacy or inefficacy of the
    PASS system (stripped of all personally identifiable information); (3)
    documents (to the extent that they exist) regarding a performer's STI status
    being incorrect in the PASS system, (4) screenshots from the computer
    portion of the PASS system and descriptions of how it works; (5) the
    identities of the clinics that test performers for sexually transmitted

infections and any contracts between FSC and those clinics, (5) any contracts/agreements with producers/agents required for their participation in the PASS system (stripped of the real names of those producers/agents); (6) STI-related production holds communicated to FSC's PASS members within the last five years; (7) documents sufficient to indicate what STI's are required to be tested (and what tests are used) under the PASS system; and (10) group alerts to PASS members related to the PASS system.  In addition, the CEO, board chairman and board secretary of FSC will be deposed on how the PASS system works.  Mr. Weinstein fails to explain why—in addition to all of the preceding information—he must also know the real names of all agent/producer members of FSC's PASS system in order to evaluate its efficacy.

- The PASS membership list contains the names of producers/agents throughout the country. (Duke Decl. ¶ 3)  Although Mr. Weinstein is defending a law limited to Los Angeles County, he is nonetheless seeking information on every agent/producer, regardless of where he or she lives or works.

- In practical terms, Mr. Weinstein is seeking the real names of anyone with a producer or agent credential in the PASS system.  But it is improbable that knowledge of the identifies of those with agent/producer credentials in the PASS system would enable someone to determine relevant information about the efficacy of the system.  An assistant or casting person of a producer/agent may have his/her own producer/agent credentials.  (Duke Decl. ¶ 7 And a single person may use the PASS system on behalf of various producers/agents.  *Id*.  Or a designated person at a studio may review the availability of performers on behalf of multiple directors working with the studio.  *Id*.  Consequently, the absence of a producer's/agent's name in the

PASS system does not mean that he or she does not use it. *Id*. Likewise, the presence of a producer's/agent's name does not mean that the producer/agent accessed the system (as opposed to someone working on his/her behalf) for a particular film. *Id*. A list of the real names of individuals with producers/agent credential will therefore not enable Mr. Weinstein to determine how the system works (*e.g.,* which producers/agents use it and whether they used it on a particular occasion).

**There is a likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association.**

If associational rights are implicated, the Court analyzes whether there is a "likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association." *NAACP*, 357 U.S. at 462. This may be evidenced by "manifestations of public hostility." *Id. See, e.g., International Society for Krishna Consciousness,*1985 WL 315, at *9 (noting that beliefs of Krishnas were "to say the least, controversial and subject to occasionally overt hostility," as indicated by judicial decisions).

There is a significant probability that compelled disclosure of the information sought will adversely affect FSC's ability to advocate its beliefs, causing active members to withdraw from the organization or dissuading prospective members from joining the organization because of a fear that exposure will subject them to threats, harassment, or reprisal.   As explained above, Mr. Weinstein believes that he is engaged in a highly publicized "war" against FSC and its members.  He has used his organization, AHF, to file and to solicit others to file complaints and lawsuits and seek criminal sanctions against members of FSC; he regularly conducts media campaigns on television, in newspapers, and online against FSC and its members; and emails suggest that he and his organization pay others to verbally attack FSC and its members.   Furthermore, as discussed above,

NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL

Mr. Weinstein has opposed any protective order that would ensure that the real
names of FSC members would be confidential or limited to use in this lawsuit.  It
is striking that Mr. Weinstein seeks to make public the real names of FSC's
members who use pseudonyms in their professional lives in order to protect their
privacy and safety.  These facts suggest that one of the purposes of Mr.
Weinstein's efforts to compel disclosure is to chill the associational rights of FSC's
members by creating a public blacklist of producer/agents whom he is targeting.

Moreover, FSC has already received numerous communications from
members concerned about the disclosure of their names to Mr. Weinstein and what
harassment Mr. Weinstein might engage in with the requested information.  *See*
Duke Decl. ¶ 8 (describing negative consequences to FSC of disclosure of
membership list).  Given that the privacy of its members is crucial to FSC and its
PASS system (*id.*), the disclosure of these names will undermine FSC's ability "to
pursue their collective effort to foster beliefs which they admittedly have the right
to advocate, in that it may induce members to withdraw from the Association and
dissuade others from joining it because of fear of exposure of their beliefs shown
through their associations and of the consequences of this exposure."  *NAACP,* 357
U.S. at 463.  The adult-entertainment industry is controversial in the United States,
provoking strong moral and religious responses.  *See, e.g.,*
https://www.religiousalliance.org/ (Religious Alliance Against Pornography). Case
law is replete with legislatures improperly trying to suppress adult content.  *See,
e.g., United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803 (2000) (striking
down as unconstitutional Telecommunications Act's "signal bleed" provision,
requiring cable operators either to scramble sexually explicit channels in full or
limit programming on such channels to certain hours); *Reno v. Am. Civil Liberties
Union,* 521 U.S. 844 (1997) (striking down portions of Communications Decency
Act); *Butler v. State of Mich.,* 352 U.S. 380 (1957) (reversing conviction of

46

1  defendant charged with violating Michigan obscene literature statute).

2  Consequently, whatever interest Intervenor Weinstein may have in obtaining the

3  real names of FSC's producer/agent members is not sufficient to overcome the

4  constitutional objections of FSC's members. *See International Society for Krishna*

5  *Consciousness*, 1985 WL 315, at *17 (under First Amendment associational

6  privilege, refusing to compel Krishna society to disclose membership list and

7  funding sources in response to interrogatories).

8                                          ***

9        Consequently, the Court should hold that FSC's producer/agent members

10 benefit from a qualified First Amendment privilege that protects their names from

11 being disclosed to Mr. Weinstein.

12       **3.      The Court Should Not Require FSC to Produce Additional**

13               **Documents in Response to Mr. Weinstein's Document**

14               **Requests.**

15            **a.      RFP No. 1 ("All DOCUMENTS which show the**

16                    **identities of all producers, agents, and/or testing**

17                    **facilities that currently participate in, use, and/or**

18                    **access the PASS DATABASE and/or the APHSS**

19                    **DATABASE")**

20       In response to this request, FSC produced documents sufficient to identify

21 the testing facilities that are associated with FSC's PASS system.  But Mr.

22 Weinstein seeks to compel FSC to disclose the real names of all producers and

23 agents who are members FSC's PASS system.  For the reasons discussed in the

24 preceding section, the Court should deny Mr. Weinstein's request because it

25 infringes upon the associational rights of FSC's members.  FSC is willing to

26 produce documents on how the PASS system works; but FSC should not be

27 required to disclose members' names.

**NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL**

b.   **RFP No. 2 ("All DOCUMENTS which RELATE TO any and all contracts and/or agreements with all producers, agents, and/or testing facilities that currently participate in, use, and/or access the PASS DATABASE and/or the APHSS DATABASE for the participation in, use of, and/or access to each database.")**

FSC has agreed to produce any contracts/agreements subject to a protective order.  Mr. Weinstein argues that:  (1) these contracts/agreements should be produced without a protective order, and (2) FSC must verify that it is not withholding any other documents.  Neither argument has merit.  *First*, these contracts/agreements are not public (Duke Decl. ¶ 9) and should not be used for purposes unrelated to this litigation.  Consequently, FSC should have the option of designating confidential material under a protective order.  *Second*, Mr. Weinstein cites no authority for the proposition that responses to Requests for Production must be verified.  There is no requirement in the Federal Rules of Civil Procedure; and Mr. Weinstein fails to cite to any case law or statute that supports his position.  Nor is FSC aware that Mr. Weinstein has submitted verified responses to RFPs in this litigation.  Consequently, there is no reason for the Court to impose this unique requirement on a non-party.

c.   **RFP No. 3 ("All DOCUMENTS which RELATE TO any and all costs to and/or money paid by all producers, agents, and/or testing facilities that currently participate in, use, and/or access the PASS DATABASE and/or the APHSS DATABASE to participate in, use, and/or access the database.")**

FSC has already informed Mr. Weinstein that it is "not aware of any

documents in its possession, custody or control relating to money that producers, agents and/or testing facilities pay in order to participate in, use and/or access the DATABASES." (Azulay Decl. Ex. G at p. 6)  FSC has also offered its CEO, board chairman and secretary to be deposed on this topic.  Nonetheless, Mr. Weinstein asks that the Court order FSC to produce these documents and verify that none others exist.  Mr. Weinstein will already have the opportunity to depose FSC under oath, and—as explained above—Mr. Weinstein fails to identify any requirement to provide verified RFP responses.

> **d.** **RFP No. 4 ("All DOCUMENTS which RELATE TO any and all costs to and/or money paid by all producers, agents, and/or testing facilities that currently participate in, use, and/or access the PASS DATABASE and/or the APHSS DATABASE to participate in, use, and/or access the database.")**

FSC agreed to produce any agreements/contracts with testing facilities responsive to this request, subject to a protective order.  FSC further explained that, because producers/agents are not required to pay fees in order to access the database, there were no agreements relating to that portion of the request.  (Azulay Decl. Ex. G at p. 6)  Nonetheless, Mr. Weinstein argues that:  (1) these contracts/agreements should be produced without a protective order, and (2) FSC must verify that it is not withholding any other documents.   For the reasons explained with respect to RFP Nos. 2 and 3, neither argument has merit and the Court should deny Mr. Weinstein's request.

> **e.** **RFP Nos. 6 & 7**

As Mr. Weinstein explains in his portion of this stipulation (Section III(B)(2)(c)), after serving these requests, he narrowed them to the following categories:

- All communications regarding moratoria or production holds within the last 5 years.
- All communications regarding FSC's or the adult film industry's decision to go from testing every 30 days to every 14 days.
- All communications regarding what STIs are required to be tested for in order to get an "available" status.
- All communications regarding what tests must be used to test for the certain STIs identified that are required to be tested for in order to get an "available" status.
- All communications regarding the effectiveness, ineffectiveness, vulnerabilities, flaws or errors in the PASS and/or APHSS systems.
- All communications regarding a particular performer's STI status (all names and personal health information redacted unless the information is in the public domain).
- All communications regarding a performer's STI status being incorrect in the PASS or APHSS system.
- All group alerts from FSC to the producers, directors or agents of ADULT FILM, including but not limited to "FSCx-press" communications.
- All communications regarding any changes or modifications to the PASS and/or APHSS system.

FSC agreed to produce:

- The moratoria/production holds communicated to FSC's members as well as updates, corrections and withdrawals within the last five years.
- Documents explaining FSC's decision to go from testing every 30 days to every 14 days

- Documents indicating what STIs are required to be tested in order to get an "available" status.

- Documents indicating what tests must be used to test for the STIs that are required to be tested in order to get an "available" status.

- Communications (to the extent they exist) regarding the effectiveness, ineffectiveness, vulnerabilities, flaws or errors in the PASS and/or APHSS systems.

- Communications (to the extent they exist) regarding a performer's STI status being incorrect in the PASS/APHSS system.

- Group alerts from FSC related to the PASS/APHSS system.

(Gottfried Decl. Ex. 7)  FSC only objected to producing:  (1) all communications from the past five years regarding any changes or modifications to the PASS/APHSS system; and (2) all communications from the past five years regarding any performer's STI status.  *Id*.  The Court should sustain both objections.

     *First*, FSC should not be required to produce all communications from the past five years regarding any changes or modifications to the PASS system.  As FSC's counsel explained to Mr. Weinstein's counsel, "[t]his request is overly broad and would require FSC to sift through all communications over several years for any change (*e.g*., website design).  I am willing to meet and confer in order to focus this request."  If there are particular changes or categories of modifications that Mr. Weinstein believes are relevant, then FSC remains willing to discuss this request in order to make it more focused.  As written, however, it is overly broad because it requires disclosure of information regarding any changes to the PASS system that are not relevant to this lawsuit.  Furthermore, it is burdensome.  FSC has a full-time staff of only three people, and each person's inbox would have to be searched for responsive documents over the past five years.  (Duke Decl. ¶¶ 10-11)

1    Mr. Weinstein has failed to provide any keywords that would narrow this request;

2    and FSC lacks the resources to recover, review and potentially redact numerous

3    emails acquired over five years for a vague request relating to any changes to the

4    PASS system.  *Id.*

5         *Second*, FSC should not be required to produce all communications with

6    producers/agents from the past five years regarding any performer's STI status

7    (with all personally identifiable information redacted).  Again, this is an example

8    of Mr. Weinstein invoking vague claims of relevance in order to impose significant

9    burdens on a non-party.  Does Mr. Weinstein need to compel a non-party with

10   three employees to produce every STI-related email over the past five years with

11   any producer/agent in order to determine how the PASS system works?  FSC

12   already agreed to produce data on performers from the PASS/APHSS system (with

13   all personally identifiable information redacted).  Mr. Weinstein fails to explain

14   why he needs the same information in email format.  Furthermore, sorting through

15   all emails over five years to produce more anonymous information is unduly

16   burdensome.  *First*, FSC's email system would have to be searched for the names

17   of the hundreds of people with agent/producer credentials in order to isolate

18   communications with producers/agents.  Given FSC's limited capacity, this would

19   require entering each person's last name one-by-one into the system.  (Duke Decl.

20   ¶ 10)  *Second,* the emails would have to be individually reviewed.  Part of this

21   review would be to eliminate false positives—non-producers/agents with the same

22   last names as producers/agents.  Part of this review would be to ensure that the

23   emails contained subject matter responsive to the request.  FSC estimates

24   thousands of emails that would have to be removed.  *Id.*

25        *Third*, FSC would have to extensively redact these emails in order to protect

26   the privacy of performers and their health information.  In order to protect

27   performers' privacy, FSC would need to carefully review the emails in order to

ensure that no identifying information (*e.g.,* names, social security numbers, birthdates, professional credentials, affiliated studios) were revealed. *Id.* This process would disrupt the schedule of FSC's small staff for weeks. *Id.* ¶¶ 10-11.

Moreover, Mr. Weinstein's request states that FSC need not redact information regarding a performer's STI status if "the information is in the public domain." But to the extent that the information is in the public domain, there is no reason for Mr. Weinstein to burden a third party with this discovery. Furthermore, if Mr. Weinstein's purpose in seeking non-personally identifiable information regarding STIs from FSC is to determine STI infection rates in Los Angeles County, then this information can be more readily obtained from a party to this lawsuit:  namely, the Los Angeles County Department of Public Health and the County of Los Angeles.[15]  These defendants collect reports on sexually transmitted infections in Los Angeles County. *See* 17 Cal. Code of Regulations § 2500 (requiring health care providers to report STIs to health officials).   Mr. Weinstein should not impose considerable burdens on FSC in retrieving, searching and redacting emails when the information can be obtained from a party. *See Nidec Corp. v. Victor Co. of Japan,* 249 F.R.D. 575, 577 (N.D. Cal. 2007) ("There is simply no reason to burden nonparties when the documents sought as in the possession of the party defendant."); *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005) ("[T]hese requests all pertain to defendant, who is a party, and, thus, plaintiffs can more easily and inexpensively obtain the documents from defendant, rather than from nonparty KSA."); *Haworth, Inc. v. Herman Miller, Inc.,* 998 F.2d 975, 978 (Fed. Cir. 1993) (affirming order requiring party to first

---

[15] *See, e.g.,* http://www.publichealth.lacounty.gov/std/docs/STD_CMR.pdf (Los Angeles County Sexually Transmitted Disease Morbidity Report that must be submitted to the Department of Public Health for each STI); http://publichealth.lacounty.gov/std/docs/2011STDReport.pdf (*2011 Sexually Transmitted Disease Report for Los Angeles County*).

attempt to obtain documents from opposing party rather than nonparty).  *See also Dart Indus. Co., Inc. v. Westwood Chem. Co., Inc*., 649 F.2d 646, 649 (9th Cir. 1980) (explaining that limits on discovery may be broader where target is nonparty).

Consequently, the Court should not require FSC to produce additional documents in response to RFP Nos. 6 & 7.

> **f.     RFP No. 5 ("All DOCUMENTS which RELATE TO any and/or all information provided to any and/or all producers, agents, and/or testing facilities that currently participate in, use, and/or access the PASS DATABASE and/or the APHSS DATABASE, when they participate in, use, and/or access the database. Information that would disclose the identity of individual Performers (as that term is used at http://fscpass.com/about_us) may be redacted from the DOCUMENTS, including, but not limited to the following: name, date of birth, social security number, address, and/or phone number.")**

One of the functions of the PASS system is to indicate to a producer/agent whether a performer (who is identified by his/her legal name) is available or unavailable for work.  (Duke Decl. ¶ 6)  There are over 6,000 performers who are members of the PASS system.  In response to Mr. Weinstein's RFP No. 5, FSC offered to provide raw data communicated to producers/agents that indicates whether a performer was "available" or "unavailable."  (Gottfried Decl. Ex. 7)  Personal information would be stripped from this data in order to protect the performers' privacy.  *Id*.  This information would be automatically extracted from the system into a spreadsheet.  (Duke Decl. ¶ 6)

1    This is exactly what Mr. Weinstein's counsel indicated that Mr. Weinstein

2   was seeking via this request.  *See* Azulay Decl. Ex. L at p. 2 ("Intervenor seeks

3   documents related to information provided on the PASS and/or APHSS databases

4   to producers, agents or testing facilities that use PASS and/or APHSS.

5   Specifically, one of the types of documents Intervenor seeks to obtain are all of the

6   reports that are electronically uploaded to PASS and/or APHSS that indicate a

7   performers [sic] "availability to work" status in the past 5 years….Such electronic

8   reports of work status may be easily downloaded into a spreadsheet without

9   revealing any personal health information (the spreadsheet fields containing such

10  personal information may simply be deleted prior to production).").

11   It is unclear what additional information Mr. Weinstein seeks to compel.

12  Once personally identifiable information is redacted, what remains is the

13  "available"/"unavailable" work status that FSC has agreed to produce in precisely

14  the manner that Mr. Weinstein's counsel asked for.  In fact, prior to Mr.

15  Weinstein's filing of this motion: FSC's counsel wrote to Mr. Weinstein's counsel:

16  "During our last conversation, I offered to provide a document containing all data

17  indicating 'availables' and 'unavailables' in the PASS/APHSS database (with no

18  personally identifying information). This would not be a bottom-line summary. I

19  believe that this is what you are seeking; but please let me know if I am mistaken."

20  (Gottfried Decl. Ex. 7)  Mr. Weinstein's counsel never responded.

21   Given that FSC has offered to provide Mr. Weinstein with the information

22  that his counsel indicated that he was seeking via RFP No. 5, it is unclear what

23  additional information the Court could compel FSC to produce.  FSC is ready to

24  produce this information once a protective order has been entered that ensures that

25  this proprietary information is not misused.

26

27

## IV.  THE COURT SHOULD IMPOSE MONETARY SANCTIONS ON FSC

### A.  Intervenor's Contentions Regarding Sanctions

The court must impose sanctions and require the party whose conduct necessitated the motion, and/or the party's attorney, to pay the reasonable costs of the moving party, including attorneys' fees.  See Fed. R. Civ. P. 37(a)(5).  As shown above, FSC, the FSC individuals and their counsel lack any substantial justification for their responses and objections.   Their refusal to provide the necessary discovery necessitated this motion.  The Court should order FSC, the FSC individuals and their counsel to pay Intervenor's costs and attorneys' fees associated with this motion.

### B.  FSC's and Deponents' Contentions Regarding Sanctions

The Court must require the party whose conduct necessitated the motion, and/or the party's attorney, to pay the reasonable costs of the moving party, including attorneys' fees if the opposing party's objections were substantially unjustified.  Fed. R. Civ. P. 37(a)(5).  The Court should deny Mr. Weinstein's request for attorney's fees because—as explained above—FSC's and the Deponents' positions were substantially justified.

In contrast, the position of Mr. Weinstein and his counsel were not substantially justified.  Mr. Weinstein's refusal to enter into the Court's Form Protective Order—despite the sensitivity of the topics addressed and despite his own organization's insistence upon protective orders when dealing with comparable information—was improper.  There is every indication that Mr. Weinstein is harassing a non-party (*e.g.,* by seeking to publicly disclose membership lists) in order to support his "war of attrition" against FSC and its members.  Because of Mr. Weinstein's misuse of discovery, the Court should order Mr. Weinstein and his counsel to pay FSC's costs and attorneys' fees associated with Mr. Weinstein's motion.

NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL

Respectfully submitted,

Dated:  January 5, 2016                AIDS HEALTHCARE FOUNDATION


By    /s/ Samantha R. Azulay
          TOM MYERS
          SAMANTHA R. AZULAY
          LIZA M. BRERETON
          *Attorneys for  Intervenor*
          *Michael Weinstein*



DATED:  January 5, 2016               BROWNE GEORGE ROSS LLP
          Jonathan L. Gottfried



By    /s/ Jonathan L. Gottfried
          Jonathan L. Gottfried
Attorneys for Free Speech Coalition, Inc.,
Diane Duke, Jeffrey Douglas, and Mark
Kernes.

NOTICE OF MOTION AND JOINT STIPULATION FOR INTERVENOR'S MOTION TO COMPEL